UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
:  S1 10-CR-654 (H.B.)

UNITED STATES OF AMERICA

: Filed: May 31, 2011

v.                                                          :
DOMINICK P. CAROLLO,                        Violations:   18 U.S.C. § 371
STEVEN E. GOLDBERG, and               :                      18 U.S.C. § 1343
PETER S. GRIMM,
          Defendants.                        :
------------------------------------------------------x

INDICTMENT

The Grand Jury charges:

COUNT ONE - CONSPIRACY
(18 U.S.C. § 371)

1.    DOMINICK P. CAROLLO, STEVEN E. GOLDBERG and PETER S. GRIMM are hereby indicted and made defendants on the charges stated below:

THE RELEVANT PARTIES AND ENTITIES

2.    During all times relevant to the Indictment, Provider B was a group of separate financial services companies located in New York, New York, and was owned or controlled by a company headquartered in Fairfield, Connecticut. Provider B sold investment agreements and other municipal finance contracts through its business leaders and marketers, including DOMINICK P. CAROLLO, STEVEN E. GOLDBERG and PETER S. GRIMM.

1

3.     DOMINICK P. CAROLLO, a resident of Holmdel, New Jersey, worked at Provider B from approximately 1993 until at least November 2002. Defendant CAROLLO was a Business Leader at Provider B. CAROLLO worked in Provider B's offices in New York, New York, and managed and supervised the day-to-day activities and personnel of Provider B's businesses involved in the sales of investment agreements and other municipal finance contracts.

4.     STEVEN E. GOLDBERG, a resident of Glen Ridge, New Jersey, was employed by Provider B from approximately August 1999 until at least May 2001. Defendant GOLDBERG was a Liability Manager at Provider B, and worked in its offices in New York, New York, and reported to defendant CAROLLO. As a Liability Manager, defendant GOLDBERG had authority to, and did submit bids for, investment agreements and other municipal finance contracts on behalf of Provider B.

5.     PETER S. GRIMM, a resident of Bloomfield, New Jersey, was employed by Provider B from approximately February 2000 until at least November 2006. Defendant GRIMM was a Liability Manager and a Vice President at Provider B. Defendant GRIMM worked at Provider B's offices in New York, New York, and, for a period of time, reported to defendant CAROLLO. As a Liability Manager and as a Vice President, GRIMM had authority to and did submit bids for investment agreements and other municipal finance contracts on behalf of Provider B.

6.     During all times relevant to the Indictment, Rubin/Chambers, Dunhill Insurance Services, Inc. d\b\a Chambers, Dunhill, Rubin & Co. and CDR Financial Products, Inc., and

certain of their employees (collectively "CDR"), located in Beverly Hills, California, marketed financial products and services, including services as a broker and advisor, to various municipal issuers throughout the United States.

7.  Whenever in this Count reference is made to any act, deed, or transaction of any corporation, such allegation shall be deemed to mean that the corporation engaged in such act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business affairs.

8.  Various persons and entities, not made defendants herein, participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof.

## BACKGROUND

9.  Municipal bonds are issued by government entities, such as states, counties, and cities, or quasi-governmental entities, such as public authorities and school, utility or water districts, to raise money for operating funds or for specific projects, such as the construction of public facilities, and to refinance outstanding municipal debt. In some instances, the entity issuing the bond turns the money over to a not-for-profit entity, such as a school or hospital, or to an entity that will spend the money for a specific public purpose, such as the construction of low-cost housing or waste treatment facilities. Both the entities that issue municipal bonds and the entities that receive and spend the money are, unless otherwise stated, collectively referred to

herein as "issuers," "municipal issuers," or "municipalities." In 2007 and 2008, combined, approximately $800 billion in municipal bonds were issued in the United States.

10. The money an issuer raises from a municipal bond offering ("bond proceeds") is typically spent over a period of time rather than immediately, in one lump sum. The issuer frequently invests some or all of the bond proceeds in an investment product (sometimes referred to as an "investment agreement") that is designed for its specific needs. Investment agreements vary in size from a few hundred thousand to several hundred million dollars, and in duration from as short as one month to as long as thirty years.

11. Major financial institutions, including banks, investment banks, insurance companies, and financial services companies (collectively "providers") sell investment agreements and other municipal finance contracts through their employees or agents.

12. Issuers usually select providers of investment agreements through bona fide competitive bidding procedures that are designed to comply with federal tax law and United States Department of the Treasury regulations relating to the tax-exempt status of municipal bonds. Compliance with these regulations is monitored by the Internal Revenue Service ("IRS"), which is entitled to receive a portion of the earnings from a municipality's investment agreement under certain circumstances. Among other things, each provider submitting a bid typically certifies that specific Treasury regulations have been followed, including that the provider did not consult with any other potential provider about its bid and that all providers had an equal opportunity to bid, commonly referred to as the no "last looks" provision.

13. Issuers often hire third parties ("brokers") to act as their agents in conducting a bona fide competitive bidding process and complying with the relevant Treasury regulations. The broker's fee for conducting a bona fide competitive bidding process is generally paid by the winning provider, which takes account of the cost of such broker's fee when calculating its bid and generally discloses the fee to the issuer.

14. A provider usually becomes aware of an upcoming bid from a broker. In some cases, the broker decides which providers will be solicited to bid without consulting with the issuer or any of the other professional representatives advising the issuer. A provider typically receives a bid package from the broker, usually via e-mail. A typical bid package contains, among other things, the bid specifications, which detail the type of investment agreement or other municipal finance contract for which bids are being solicited, the date and time of the bid, and under what circumstances the bid will take place. A typical package also requires each provider that submits a bid to make certain representations, including that a bona fide bid was conducted and that the bidding process conformed to the relevant Treasury regulations. A provider usually submits its bid to the broker orally over the telephone at a time identified in the bid specifications, and then sends a conforming copy of the bid via facsimile to the broker.

15. After reviewing the bids to ensure conformity with the specifications, the broker informs the issuer of the outcome of the bid, including the identity of the winning, qualified bidder and, if appropriate, any conditions that deviate from the specifications. Brokers

are often required by issuers to provide written certification that the bidding procedures complied with the relevant Treasury regulations.

16. Depending on the structure of the bid, providers may be asked to quote only the interest rate to be paid on funds on deposit for the duration of the agreement or they may be asked to submit a bid in the form of a dollar amount or date (sometimes referred to as the "price" or "price level" of a bid). In a typical investment agreement, providers are asked to quote only an interest rate and, generally, the agreement is awarded to the provider quoting the highest rate.

17. Many brokers that conduct bona fide competitive bidding for investment agreements subject to the Treasury regulations also are hired by municipal issuers and other quasi-governmental entities to conduct bona fide competitive bidding in connection with the award of other contracts involving public funds, even though those contracts are not subject to the Treasury regulations. These contracts (collectively, "other municipal finance contracts"), include, but are not limited to, investment agreements for taxable municipal bonds; investment agreements for funds borrowed by entities in which the federal government or any municipal entity is a participant; and derivative contracts, which are contracts between a municipal issuer and a financial institution that are designed to manage or transfer some or all of the interest rate risk associated with a municipal bond issue. They do not include underwriting contracts.

## DESCRIPTION OF THE OFFENSE

18. From as early as August 1999 until at least November 2006, the exact dates being unknown to the Grand Jury, in the Southern District of New York and elsewhere, DOMINICK P.

CAROLLO, STEVEN E. GOLDBERG and PETER S. GRIMM, the defendants, and their co-conspirators, including Provider B and CDR, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Title 18, United States Code, Section 1343, and to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of the Treasury, all in violation of Title 18, United States Code, Section 371.

19.   It was a part and an object of the conspiracy that DOMINICK P. CAROLLO, STEVEN E. GOLDBERG, and PETER S. GRIMM, the defendants, and their co-conspirators, including Provider B and CDR, and others known and unknown, unlawfully, willfully, and knowingly would and did devise and intend to devise a scheme and artifice to defraud municipal issuers and to obtain money and property from municipal issuers by means of false and fraudulent pretenses, representations, and promises, namely a scheme to deprive municipal issuers of money by causing them to award investment agreements and other municipal finance contracts at artificially determined or suppressed rates, and to deprive the municipal issuers of the property right to control their assets by causing them to make economic decisions based on false and misleading information, and for purposes of executing such scheme and artifice, and attempting to do so, would and did transmit and cause to be transmitted by means of wire, radio or television communication in interstate or foreign commerce any writings, signs, signals, pictures or sounds, in violation of Title 18, United States Code, Section 1343.

20.     It was further a part and an object of the conspiracy that DOMINICK P. CAROLLO, STEVEN E. GOLDBERG, and PETER S. GRIMM, the defendants, and their co-conspirators, including Provider B and CDR, and others known and unknown, would and did defraud the United States of America and the IRS by impeding, impairing, obstructing, and defeating the lawful government functions of the IRS in the ascertainment, computation, assessment, and collection of revenue due and owing from municipal issuers and in exercising its responsibilities to monitor compliance with Treasury regulations related to tax-exempt municipal bonds, in violation of Title 18, United States Code, Section 371.

## THE MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

21.     For the purpose of forming and carrying out the charged conspiracy, the defendants and their co-conspirators did those things that they conspired to do, including, among other things:

(a)     increasing or attempting to increase the number and profitability of investment agreements and other municipal finance contracts awarded to Provider B by municipal issuers that used CDR as their broker through the control and manipulation of bidding for investment agreements and other municipal finance contracts;

(b)     discussing and agreeing with CDR which of Provider B's competitors should and should not be solicited to submit bids for a particular investment agreement or other municipal finance contract;

(c)     obtaining from CDR information about the prices, price levels,

8

rates, conditions or other information related to competing providers' bids, including, in some instances, the exact price, price level or rate of competing providers' bids;

   (d) determining Provider B's bids after obtaining information from CDR about the prices, price levels, rates, conditions, or other information related to competing providers' bids;

   (e) submitting and arranging to be submitted, intentionally losing bids for certain investment agreements or other municipal finance contracts brokered by CDR to make it appear that Provider B had competed for those agreements or contracts, when, in fact, it had not;

   (f) agreeing to pay and arranging for kickback payments to be made to CDR, in the form of fees that were inflated, relative to the services performed, or unearned. These payments were made in exchange for CDR's assistance in controlling and manipulating the competitive bidding process and were not disclosed to the municipal issuers that hired CDR or to the IRS;

   (g) misrepresenting to municipal issuers or bond counsel that the bidding process was <u>bona fide</u> and in compliance with Treasury regulations or was otherwise competitive;

   (h) certifying, causing to be certified, and forwarding certifications to municipal issuers or bond counsel stating that the bidding process for certain investment agreements or other municipal finance contracts was <u>bona fide</u> and in compliance with Treasury regulations or was otherwise competitive, when, in fact, it was not;

9

   (i)  causing municipal issuers to award investment agreements and other municipal finance contracts to Provider B, which agreements and contracts the municipal issuers would not have awarded to Provider B if they had true and accurate information regarding the bidding process;

   (j)  enabling Provider B to perform investment agreements or other municipal finance contracts at artificially determined or suppressed rates that deprived and will continue to deprive municipal issuers of money and property; and

   (k)  causing municipal issuers not to file required reports with the IRS or to file inaccurate reports with the IRS, and, on occasion, to fail to give the IRS or the United States Treasury money to which it was entitled, thus jeopardizing the tax-exempt status of the underlying bonds.

## OVERT ACTS

  22.  In furtherance of the conspiracy and to effect the illegal objects thereof, DOMINICK P. CAROLLO, STEVEN E. GOLDBERG and PETER S. GRIMM, the defendants, and their co-conspirators, including Provider B and CDR, and others known and unknown, committed or caused to be committed the following overt acts, among others, in the Southern District of New York and elsewhere:

   (a)  On numerous occasions, at or about the time bids were due, the defendants and their co-conspirators participated in telephone calls with CDR during which CDR provided defendants with information about the prices, price levels, rates, conditions or other information related to competing providers' bids, which information the defendants used to determine

Provider B's bids and, on some occasions, to lower Provider B's bid and still win the contract.

    (b)    On numerous occasions, at or about the time bids were due, defendants and their co-conspirators participated in telephone calls and other wire transmissions during which the defendants agreed to, and did, submit intentionally losing bids for investment agreements and other municipal finance contracts.

    (c)    On occasion, the defendants and their co-conspirators participated in telephone calls during which they discussed, made or sought to make arrangements for CDR to receive kickbacks.

    (d)    On numerous occasions, the defendants and their co-conspirators misrepresented to municipal issuers or their bond counsel the circumstances under which investment agreements and other municipal finance contracts were bid.

    (e)    On numerous occasions, the defendants and their co-conspirators certified, caused to be certified, or forwarded certifications to municipal issuers or their bond counsel stating that the bidding process for certain investment agreements or other municipal finance contracts was <u>bona fide</u> and in compliance with Treasury regulations or was otherwise competitive, when, in fact, it was not.

    (f)    On numerous occasions, Provider B performed investment agreements or other municipal finance contracts and made payments to municipal issuers via interstate wire transfer at artificially determined or suppressed rates.

(g) With respect to the award and performance of an investment agreement for a state housing agency, GRIMM and his co-conspirators, including Provider B and CDR, committed the following overt acts, among others:

(i) On or about May 19, 2004, during a telephone call on the day before bids were due, CDR suggested to GRIMM that GRIMM could lower the rate Provider B was preparing to bid because the state housing agency would have to give any money it earned at the higher rate to the IRS.

(ii) On or about May 20, 2004, during a telephone call on the day bids were due, GRIMM checked with CDR to confirm that a bid at the suppressed rate previously suggested by CDR would be the winning bid and then caused Provider B to submit a bid at the suppressed rate and Provider B was awarded the contract.

(iii) Beginning in approximately July 2004, Provider B made scheduled interest payments via interstate wire transfer to the state housing agency at a rate GRIMM caused to be artificially determined and suppressed, which payments continued until approximately November 1, 2005.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371

## COUNT TWO - CONSPIRACY
## (18 U.S.C. § 371)

The Grand Jury further charges:

### THE RELEVANT PARTIES AND ENTITIES

23. DOMINICK P. CAROLLO, STEVEN E. GOLDBERG and PETER S. GRIMM are hereby indicted and made defendants on the charges stated below:

24. Paragraphs 2 through 5 and 7 through 17 of Count One of the Indictment are repeated, re-alleged, and incorporated in Count Two as if fully set forth below.

25. During all times relevant to the Indictment, Broker A, located in Pottstown, Pennsylvania, and certain of its employees or representatives (collectively "Broker A"), marketed financial products and services, including services as a broker and advisor to various municipal issuers throughout the United States.

### DESCRIPTION OF THE OFFENSE

26. From as early as October 1999 until at least November 2006, the exact dates being unknown to the Grand Jury, in the Southern District of New York and elsewhere, DOMINICK P. CAROLLO, STEVEN E. GOLDBERG and PETER S. GRIMM, the defendants, and their co-conspirators, including Provider B and Broker A, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Title 18, United States Code, Section 1343, and to defraud the United States and an agency thereof, to wit, the Internal

Revenue Service ("IRS") of the United States Department of the Treasury, all in violation of Title 18, United States Code, Section 371.

27. It was a part and an object of the conspiracy that DOMINICK P. CAROLLO, STEVEN E. GOLDBERG and PETER S. GRIMM, the defendants, and their co-conspirators, including Provider B and Broker A, and others known and unknown, unlawfully, willfully, and knowingly would and did devise and intend to devise a scheme and artifice to defraud municipal issuers and to obtain money and property from municipal issuers by means of false and fraudulent pretenses, representations, and promises, namely a scheme to deprive municipal issuers of money by causing them to award investment agreements and other municipal finance contracts at artificially determined or suppressed rates, and to deprive the municipal issuers of the property right to control their assets by causing them to make economic decisions based on false and misleading information, and for purposes of executing such scheme and artifice, and attempting to do so, would and did transmit and cause to be transmitted by means of wire, radio or television communication in interstate or foreign commerce any writings, signs, signals, pictures or sounds, in violation of Title 18, United States Code, Section 1343.

28. It was further a part and an object of the conspiracy that DOMINICK P. CAROLLO, STEVEN E. GOLDBERG and PETER S. GRIMM, the defendants, and their co-conspirators, including Provider B and Broker A, and others known and unknown, would and did defraud the United States and the IRS by impeding, impairing, obstructing, and defeating the lawful government functions of the IRS in the ascertainment, computation, assessment, and collection of revenue due and owing from municipal issuers and in exercising its responsibilities