UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| | : |
| -v.- | :  S1 10-CR-654 (HB) |
| | : |
| DOMINICK P. CAROLLO, | : |
| STEVEN E. GOLDBERG, and | : |
| PETER S. GRIMM, | : |
| | : |
| Defendants. | : |
| | : |
| | : |

---

**REPLY MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
<u>THE SUPERSEDING INDICTMENT AS TIME-BARRED</u>**

Howard E. Heiss
Mark A. Racanelli
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
*Attorneys for Defendant Peter S. Grimm*

John S. Siffert
Daniel M. Gitner
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, New York 10110
Telephone:  (212) 921-8339
*Attorneys for Defendant Steven E. Goldberg*

Walter F. Timpone
MCELROY, DEUTCH, MULVANEY &
CARPENTER LLP
1300 Mt. Kemble Ave.
Morristown, NJ 07962
Telephone:  (973) 993-8100
*Attorneys for Defendant Dominick P. Carollo*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES…………………………………………………………..........ii

I.     Counts Four, Five and Seven of the Indictment Should Be Dismissed Because the
       Ten-Year Statute of Limitations Does Not Apply…………………………………..1

II.    Counts One Through Six Are Time-Barred Because the Interest Payments the
       Government Relies On Are the Result Of, Not Acts Furthering, the Conspiracies……...5

III.   Count Three Does Not Allege an Overt Act in Furtherance of the Conspiracy…………9

CONCLUSION…………………………………………………………………… ……10

# TABLE OF AUTHORITIES

**Cases**                                                          **Page**

*Grunewald v. United States*
    353 U.S. 391 (1957)................................................................. 7, 10

*Toussie v. United States,*
    397 U.S. 112 (1970)................................................................. 5, 9

*United States v. A-A-A Elec. Co.,*
    788 F.2d 242 (4th Cir. 1986) ..................................................... 9

*United States v. Agne,*
    214 F.3d 47 (1st Cir. 2000)........................................................ 3, 4

*United States v. Anderson,*
    326 F.3d 1319 (11th Cir. 2003) ................................................. 9

*United States v. Bouyea,*
    152 F.3d 192 (2d Cir. 1998) ...................................................... 3, 4

*United States v. Daugerdas,*
    No. S3 09 Cr. 581 (WHP) (S.D.N.Y.  Apr. 5, 2011) ................. 4

*United States v. Debrow,*
    346 U.S. 374 (1953)................................................................. 9

*United States v. Doherty,*
    867 F.2d 47 (1st Cir. 1989)................................................... passim

*United States v. Evans & Assocs. Constr. Co.,*
    839 F.2d 656 (10th Cir. 1988) ................................................... 9

*United States v. Girard,*
    744 F.2d 1170 (5th Cir. 1984) ................................................... 8

*United States v. Mennuti,*
    679 F.2d 1032 (2d Cir. 1982) .................................................... 8

*United States v. N. Improvement Co.,*
    814 F.2d 540 (8th Cir. 1987).................................................... 9

*United States v. Ohle,*
    678 F. Supp. 2d 215 (S.D.N.Y. 2010) .................................... 3, 4, 5

*United States v. Pelullo,*
    964 F.2d 193 (3d Cir. 1992) ..................................................... 3, 4

## TABLE OF AUTHORITIES
### (continued)

*United States v. Roshko,*
   969 F.2d 9 (2d Cir. 1992) .................................................................... 10

*United States v. Salmonese,*
   352 F.3d 608 (2d Cir. 2003) ......................................................... 7, 8, 10

*United States v. Serpico,*
   320 F.3d 691 (7th Cir. 2003) ............................................................ 4, 5

*United States v. Ubakanma,*
   215 F.3d 421 (4th Cir. 2000) ............................................................... 4

*United States v. Van Brocklin,*
   115 F.3d 587 (8th Cir. 1997) ............................................................... 2

*United States v. Walker,*
   653 F.2d 1343 (9th Cir. 1981) .......................................................... 8, 9

## Statutes

18 U.S.C. § 215 ...................................................................................... 2

18 U.S.C. § 371 .................................................................................... 10

18 U.S.C. § 1343 .................................................................................... 4

18 U.S.C. § 1344 .................................................................................... 2

18 U.S.C. § 1963 .................................................................................... 2

18 U.S.C. § 3293 ........................................................................... passim

## Other Authorities

H.R. Rep. No. 101-54(I) (1989) ............................................................. 3

Defendants respectfully submit this reply in support of their motion to dismiss the Indictment as time-barred.

I.  **Counts Four, Five and Seven of the Indictment Should Be Dismissed Because the Ten-Year Statute of Limitations Does Not Apply.**

The government's principal argument against dismissal of Counts Four, Five and Seven—which involve GIC transactions that occurred in 2002 and 2003—is that the ten-year statute of limitations in 18 U.S.C. § 3293(2) applies because the "offense affects a financial institution." While the government's brief relies heavily on Section 3293, its Indictment notably does not even mention it. Nowhere does it allege that any banks were affected by the charged offenses, much less how they were supposedly affected. In any event, the argument is meritless.

There is no allegation that Defendants sought to defraud any financial institution. The government's theory as to how certain banks were "affected" by the charged fraud is much more attenuated—and unsustainably so. The government maintains that two financial institutions—Institutions A and B—had a role in the fraud because they entered into swap transactions with Defendants' employers that involved paying or receiving fees meant to compensate brokers for awarding GICs. (Opp'n Br. 6-7) The government does *not* suggest that the banks were "affected" because they lost money or were otherwise harmed as a direct result of the swaps. Instead, the government's position is that, because the banks were involved in swaps it says were part of a fraud, they were indirectly "exposed…to considerable risk of loss, including criminal fines and civil damages." (Opp'n Br. 7) It is solely a *litigation consequence* flowing from the government's allegation that the banks had some role in a fraud, then, that the government says constitutes the sufficient effect on the banks to justify a near-doubling of the limitations period.

The government's theory is not supported by the text of Section 3293(2), its legislative history or the vast mainstream of cases interpreting it. Section 3293(2) extends the limitations

period for certain offenses when *those offenses*, not their indirect consequences, harm banks. The government's theory—that contingent litigation exposure relating to a bank's use as an instrumentality of an alleged fraud is the kind of effect the statute covers—is wrong.

Section 3293 was enacted as part of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), the response to the 1980's–era savings and loan crisis.  It was meant to "strengthen the civil sanctions and criminal penalties for defrauding or otherwise damaging" banks.  *United States v. Van Brocklin*, 115 F.3d 587, 597 (8th Cir. 1997).  Most of the statutes mentioned in Section 3293, a violation of which would extend the limitations period, address specific types of fraud either by bank insiders or against banks.[1]  In addition, Section 3293(2) states that a violation of the mail and wire fraud statutes also triggers the extension, *but only "if the **offense** affects a financial institution.*"  18 U.S.C. § 3293(2) (emphasis added).  That limitation has meaning.  It reins the government's ability to use general fraud statutes to expand the limitations period unless, as with the specifically listed offenses against banks or by bank insiders, there is a direct connection between the fraud and any harm to the bank.  The *charged fraud*, not its collateral consequences, must affect the financial institution for the statute to apply. The government's interpretation would essentially rewrite the statute, exploding its restriction, permitting a longer limitations period for *any* alleged fraud if just a ripple of that fraud happens to touch a bank in some way.  That is not what the statute says.

The government's interpretation also finds no support in Section 3293's legislative history, which shows that Congress meant to address fraud that directly harmed banks.  The House Report from the Committee on Banking and Urban Affairs explains that Section 3293,

---

[1]  Section 3293(1) specifies violations of 18 U.S.C. §§ 215 (bribery of bank insiders); 656 (theft or embezzlement by bank insiders); 1005 (unauthorized or fraudulent transactions, or false entries, by bank insiders); 1007 (fraud aimed at the FDIC); 1014 (false statements to obtain loans from federal or federally-backed finance agencies); 1033 (crimes against or by insurance companies engaged in interstate commerce); and 1344 (bank fraud).  Section 3293(3) specifies a violation of RICO—18 U.S.C. § 1963—to the extent the racketeering activity involves a violation of the bank fraud statute (18 U.S.C. § 1344).

and FIRREA more generally, were enacted "to respond to a serious epidemic of financial institution insider abuse and criminal misconduct." H.R. Rep. No. 101-54(I) at 464 (1989). The purpose of provisions like Section 3293 was "to increase criminal and civil money penalties for crimes of fraud *against* financial institutions and depositors." *Id.* at 322 (emphasis added). The articulated focus on fraud "against" banks underscores that Congress was concerned with fraud directly affecting them.

     With one exception—*United States v. Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010)—on which the government relies almost exclusively, cases applying Section 3293(2) have required a close connection between the fraud and the effect on a bank. In most cases, the fraud was aimed at the bank or its affiliate, which established that connection. In *United States v. Bouyea*, 152 F.3d 192 (2d Cir. 1998), the only Second Circuit case to address this provision of Section 3293, the court considered whether the defendant's submission of fraudulent documents to obtain a loan from a bank's subsidiary "affected" the parent bank. The court found that it did because the subsidiary borrowed money from the bank to make the loan; thus, "the effect of the wire fraud on [the parent bank] *was sufficiently direct*...." *Id.* at 195 (emphasis added). *See also United States v. Pelullo*, 964 F.2d 193, 197-98, 216 (3d Cir. 1992) (defendant obtained loan through fraud from mortgage company owned by bank; court applied Section 3293(2) because "it cannot be fairly argued that the effect on the parent [bank] by reason of [the defendant's] conduct was unreasonably remote as may have been the case if the fraud was directed against a customer," which was then prejudiced in dealings with bank).

     Other courts have refused to apply Section 3293(2) where there was no direct connection between the charged fraud and the effect on a bank. In *United States v. Agne*, 214 F.3d 47 (1st Cir. 2000), the defendant's fraud caused a bank to debit a customer's account but there was no realistic chance of any loss to the bank as a result of the fraud. *Id.* at 53. The court rejected the

3

argument that the risk of the bank losing its customer or tarnishing its reputation was a sufficient effect, noting that there is "a limit to the statute's reach," and holding that any such harm was "too remote." *Id.* at 51-53.  Similarly, the court in *United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000), refused to apply the enhanced penalty provision of 18 U.S.C. § 1343, which also requires an effect on a bank, when banks were utilized as part of the fraud but there was no indication that they "were harmed or victimized in any way, or that they were intended to be so harmed or victimized by the fraud scheme."

*Ohle* cannot be reconciled with this authority.  In that case, the court applied Section 3293(2) when a bank participated in the creation of fraudulent tax shelters. 678 F. Supp. 2d at 229.  The basis for the court's decision that the fraud "affected" the bank was *not* that the bank was directly harmed by the shelters, but that it made the decision to pay money to settle claims by clients who participated in the shelters and to attorneys to defend those lawsuits. *Id.*  While the court characterized these losses as a "direct and foreseeable result" of the fraud, that harm was clearly different from that found in other cases applying the statute.  *Id.*  No other case has found that a bank was "affected" by a fraud for purposes of Section 3293(2) because it later paid litigation costs relating to the fraud.  And for good reason:  a company may decide to settle a civil case or resolve a government investigation for reasons having nothing to do with whether a fraud has actually occurred or the case can be defended on the merits.  That kind of effect is not proximately caused by the offense, and thus is not "sufficiently direct," as the statute and the cases interpreting it require. *Bouyea*, 152 F.3d at 195.

Nor do the cases *Ohle* relies on support its holding.  It cites *Bouyea* and *Pelullo*, which involved banks that suffered direct harm as a result of the fraud, as noted above.[2] *Id.*  And while

---

[2]  The government also cites a slip opinion in *United States v. Daugerdas*, No. S3 09 Cr. 581 (WHP) (S.D.N.Y. Apr. 5, 2011).  But that opinion only considered whether Section 3293(2) applies when the bank is a perpetrator

it cites *United States v. Serpico*, 320 F.3d 691, 695 (7th Cir. 2003), for the proposition that a

bank can be affected if it participates in a fraud and is "put out of business as a direct result," the

harm to the banks in *Serpico* was not tangential but directly related to the alleged fraud: they

made loans they otherwise would not have made absent the fraud, exposing them to risk. *Id.*

The effect on banks the government relies on here—fines and civil penalties they were

exposed to relating to the alleged fraud—would result in an unsupportable extension of Section

3293(2), directly contrary to the "principle that criminal limitations statutes are to be liberally

interpreted in favor of repose." *Toussie v. United States*, 397 U.S. 112, 115 (1970).

## II.   Counts One Through Six Are Time-Barred Because the Interest Payments the Government Relies On Are the Result Of, Not Acts Furthering, the Conspiracies.

In its effort to salvage the charged conspiracies in Counts One Through Six, the

government adheres to the position that the routine interest payments made to GIC issuers by

Defendants' employers on the investment contracts were overt acts in furtherance of the

conspiracies. The logic of that argument would mean the government could prosecute conduct

alleged in this case as late as 2038 for a contract that Peter Grimm bid on in 2002. That result

would extinguish the protections of the statute of limitations and is precisely the vice that cases

like *United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989), warn against.

The government cannot distinguish the ongoing salary payments in *Doherty* from the

interest payments in this case. In describing *Doherty* as a case that involved "an indefinite series

of salary checks, not a determinate series of rigged contract payments over a limited period of

time" (Opp'n Br. 14), the government misunderstands that decision and mischaracterizes the

facts here. The distinction in *Doherty* was between the unilateral, potentially lengthy and

prolonged salary payments at issue there and receiving a "conspiratorial objective" that "consists

---

rather than "the victim or intended victim of the offense," not whether it does when the only effect on the bank is a
contingent litigation cost relating to the charged fraud, which is the issue here.

of one action, or a handful of actions, taking place over a limited period of time, or where some evidence exists that the special dangers attendant to conspiracies, the dangers of 'concerted' activity and 'group association' for criminal purposes, remain present until the payoff is received." 867 F.2d at 61. But where the conduct marking the alleged "conspiratorial objective" is lengthy, ordinary, unilateral and does not involve continued concerted activity, *Doherty* holds that it is not conduct that can extend the limitations period. *Id.*

Here, the contractual obligations on the part of GIC providers to make interest payments indisputably *are extraordinarily lengthy* (the payments on the GICs alleged in Counts Two through Six extend for decades, until 2033, 2021, 2032, 2022 and 2029, respectively), *ordinary and unilateral* (they are administrative payments automatically made to meet contractual obligations) and *involved no continuing conduct by defendants* (the Indictment alleges no conduct by any defendant relating to these GICs after they were bid on and awarded). *Doherty* governs here, and the government's theory is the theory *Doherty* rejected.

According to the government, because the Indictment alleges that the conspiracies featured the receipt of benefits in the form of lower interest payments, the conspiracies themselves continued as long as those payments were to be made. (Opp'n Br. 8-12) But the government fails to acknowledge that *Doherty* dismissed that very argument, holding that these types of payments cannot be in furtherance of conspiracies as a matter of law, however the government chooses to characterize them. In *Doherty*, the indictment specifically alleged that an object of the conspiracy was to obtain continuing increased salary payments; the court nevertheless rejected the government's contention that the conspiracy extended with each payment. 867 F.2d at 56, 60-62. It held that the salary payments were the result of the conspiracy, rather than acts in furtherance of it, *because* they were lengthy, ordinary and involved no ongoing conspiratorial conduct. *Id.* at 61-62. A contrary result, the court held,

"would for all practical purposes wipe out the statute of limitations in [this kind of] conspiracy cases...." *Id.* at 62 (quoting *Grunewald v. United States*, 353 U.S. 391, 402 (1957)).

      The same rule applies here.  It is plain from the Indictment that the alleged central object of the charged conspiracies was to win GICs.  Virtually all the conduct asserted in the "manner and means" and "overt acts" sections is directed toward that goal.  *See* Indictment at ¶¶ 21, 22, 29, 30, 37, 38, 46, 47, 56, 57, 63, 64.  The alleged manipulation of the bidding, discussions about pricing, "last looks," and misrepresentations occurred without exception at or around the time the GICs were awarded.  While the government alleges as well that the conspiracy included interest payments made to the issuers—as the government in *Doherty* alleged that increased salary payments were one of the conspiracy's objects—that mere allegation is insufficient.  Like the salary payments in *Doherty*, the nature of the prolonged payments here means that, as a matter of law, they are the result of the conspiracy, not acts in furtherance of it.

      The cases the government relies on actually support Defendants' position and are consistent with *Doherty*:  unlike the facts here, each involved conduct consisting of either a single action, or handful of actions, close in time to the core goal of the conspiracy, or continuing concerted conduct.  *United States v. Salmonese*, 352 F.3d 608, 613 (2d Cir. 2003), for example, involved a "pump and dump" scheme to obtain and sell warrants at artificially high prices.  The defendant argued that the indictment was time-barred because the conspiracy ended when each of the conspirators received his share of the warrants or, at the latest, when the market manipulation stopped.  *Id.* at 615.  The court disagreed, finding that the conspiracy continued through the conspirator's receipt of proceeds from the sale of the warrants.  *Id.* at 616.  The Second Circuit distinguished those facts from *Doherty,* reasoning that, although the sales of warrants "numbered more than a handful, they were hardly 'indefinite' in number or 'lengthy' in duration." *Id.* at 616.  Unlike the lengthy salary payments in *Doherty*, the warrant sales occurred

7

within months of when the warrants were obtained.  *Id.*

The government fails to mention that, for reasons that apply here, *Doherty* itself distinguished many of the other cases the government relies on:  *United States v. Mennuti*, 679 F.2d 1032 (2d Cir. 1982), *United States v. Girard*, 744 F.2d 1170 (5th Cir. 1984) and *United States v. Walker*, 653 F.2d 1343 (9th Cir. 1981).  *See Doherty*, 867 F.2d at 61-62.

In *Mennuti*, the defendant conspired to burn down a house to collect the insurance proceeds.  679 F.2d at 1033-34.  As part of his "payoff," the defendant received the right to sell the damaged property at a profit.  The defendant argued that the conspiracy ended when his co-conspirator received the insurance check when the house was destroyed.  *Id.* at 1035.  The court disagreed, finding the limitations period did not begin to run until the defendant received his profit when the property was sold, just seven months later.  *Id.*  *Mennuti* falls into the category of cases addressed by *Doherty*:  the payoff was a single event, close in time to the initial conduct, accompanied by continuing conspiratorial activity.

The same is true with *Girard*, which involved bid-rigging and payoffs among the conspirators within 14 months of the contract award.  744 F.2d at 1172-73.  The court ruled that the conspiracy continued until the conspirators received the payoffs.  *Id.*  The conduct there was precisely the type *Doherty* distinguished since it involved a limited number of payments within 14 months of the contract award, accompanied by continuing concerted activity.

*Walker*, another bid-rigging case, also involved ongoing, concerted activity within the limitations period.  653 F.2d at 1347.  The defendant argued that the conspiracy ended when he made misrepresentations to the Forest Service in connection with the bidding for allegedly rigged contracts.  The court ruled that the conspiracy continued because, as part of the conspiratorial agreement, the defendant continued to cut timber under the contracts and actively split the profits with his conspirators.  *Id.* at 1346-47.  Indeed, *Doherty* distinguished *Walker* on

8

that very basis: "the realization and division of profits required 'continuing cooperation'" among the conspirators. *Doherty*, 867 F.2d at 62. Here, the Indictment contains no allegation of concerted activity after the GICs were awarded; the only conduct alleged after that is the unilateral, routine payment of interest on the GICs.[3]

Finally, while the government complains that limiting the reach of these purported "overt acts" would allow "Defendants to act with impunity so long as they only manipulated bidding on long term investment agreements" (Opp'n Br. 15-16), that has nothing to do with the merits. The government could have brought a timely case; it has been investigating the bond industry since at least 2003. One of the salutary effects of the statute of limitations is "encouraging law enforcement officials promptly to investigate suspected criminal activity." *Toussie*, 397 U.S. at 115. The government did not do that here. Instead, it waited to indict until July 2010 and charged conduct up to ten years old, relying on a notion that assumes routine interest payments to be acts furthering an alleged conspiracy. That was the government's choice, but it cannot ask this Court to excuse its inaction by making the statute of limitations so elastic.

## III.   Count Three Does Not Allege an Overt Act in Furtherance of the Conspiracy.

The government attempts to save Count Three, which alleges a GIC transaction more than a decade old, on the grounds that it identified in its bill of particulars a deal relevant to that count that occurred in 2004. (Opp'n Br. 7-8) But "[a]n *indictment*"—not a bill of particulars— must "set forth the elements of the offense sought to be charged." *United States v. Debrow*, 346 U.S. 374, 376 (1953) (emphasis added). Because Count Three charges a violation of 18 U.S.C.

---

[3] The government's reliance on cases prosecuted under the Sherman Act is misplaced because those cases also fall into the *Doherty* categories, involving either "payoffs" consisting of a single or series of actions in close proximity to the award of the contract, or continuing concerted activity. *See, e.g., United States v. N. Improvement Co.*, 814 F.2d 540, 542 (8th Cir. 1987) (last payment under contract was single event fourteen months after contract awarded); *United States v. Evans & Assocs. Constr. Co.*, 839 F.2d 656, 661 (10th Cir. 1988) (payment was single event within two years of contract); *United States v. Anderson*, 326 F.3d 1319, 1328 (11th Cir. 2003) (payment was single event and part of continuing concerted activity); *United States v. A-A-A Elec. Co.*, 788 F.2d 242, 245 (4th Cir. 1986) (concerted activity to divide profits following last payment under contract).

§ 371, it must specify "both that the conspiracy still subsisted" within the limitations period, "and that at least one overt act in furtherance of the conspiratorial agreement was performed within that period." *Grunewald*, 353 U.S. at 396-97. *See also United States v. Roshko*, 969 F.2d 9, 11 (2d Cir. 1992) (conspiracy time-barred where indictment did not allege overt acts within limitations period). The only authority the government relies on—*Salmonese*—is inapplicable. There, the court held that an overt act *proven at trial* could satisfy the statute of limitations. 352 F.3d at 620. The court did not consider whether an indictment that does not properly allege an overt act within the statutory period is facially deficient, as it is here, because the indictment in that case *did* allege overt acts within the limitations period. *Id.* at 613.

## CONCLUSION

For the foregoing reasons, the defendants respectfully request that the Court dismiss the Indictment as time-barred.

Dated: August 8, 2011
      New York, New York

Respectfully submitted:

Howard E. Heiss
Mark A. Racanelli
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
*Attorneys for Defendant Peter S. Grimm*

John S. Siffert
Daniel M. Gitner
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 921-8339
*Attorneys for Defendant Steven E. Goldberg*

Walter F. Timpone
MCELROY, DEUTCH, MULVANEY &
CARPENTER LLP
1300 Mt. Kemble Ave.
Morristown, NJ 07962
Telephone: (973) 993-8100
*Attorneys for Defendant Dominick P. Carollo*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v.-

DOMINICK P. CAROLLO, STEVEN E.
GOLDBERG, and PETER S. GRIMM,

Defendants.

S1 10-CR-654 (H.B.)

---

## CERTIFICATE OF SERVICE

I, Melissa Wangenheim, hereby certify that a true and correct copy of the Reply Memorandum of Law in Support of Defendants' Joint Motion to Dismiss the Superseding Indictment as Time-Barred was served on all parties of record by the Court's ECF system, and by first class mail, postage prepaid on the following counsel, this 8th day of August, 2011:

| | |
|---|---|
| Antonia Hill, Esq.<br>**U.S. DEPARTMENT OF JUSTICE,**<br>**ANTITRUST DIVISION**<br>26 Federal Plaza, Room 3630<br>New York, New York 10278 | Steven Tugander, Esq.<br>**U.S. DEPARTMENT OF JUSTICE,**<br>**ANTITRUST DIVISION**<br>26 Federal Plaza, Room 3630<br>New York, New York 10278 |
| Kevin B. Hart, Esq.<br>**U.S. DEPARTMENT OF JUSTICE,**<br>**ANTITRUST DIVISION**<br>26 Federal Plaza, Room 3630<br>New York, New York 10278 | Joseph Muoio, Esq.<br>**U.S. DEPARTMENT OF JUSTICE,**<br>**ANTITRUST DIVISION**<br>26 Federal Plaza, Room 3630<br>New York, New York 10278 |

    /s/ Melissa Wangenheim
    Melissa Wangenheim