```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/27/11
```

# LANKLER SIFFERT & WOHL LLP
### ATTORNEYS AT LAW

33RD FLOOR
500 FIFTH AVENUE
NEW YORK, N.Y. 10110-3398
WWW.LSWLAW.COM

TELEPHONE (212) 921-8399
TELEFAX   (212) 764-3701

December 23, 2011

**VIA FACSIMILE**
Honorable Harold Baer
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

Re: *United States v. Carollo, et al*, 10 Cr. 654 (HB)

Dear Judge Baer:

Pursuant to the Court's instructions, we respectfully submit the enclosed 5-page letter on behalf of all defendants in the above-matter in connection with the hearing held on December 20, 2011. We also enclose as exhibits the documents referred to in the letter, all of which were produced to us by the government in advance of the hearing. For ease of reference, we have sometimes denominated multiple emails or 302s as a single exhibit. See SDXs 16, 18 and 19.

Respectfully submitted,

John S. Siffert

Encls.

cc: Honorable Kimba M. Wood (by facsimile, enclosures by hand)
    Honorable Victor Marrero (by facsimile, enclosures by hand)
    Charles Reilly, Esq. (by email)
    Lucy McClain, Esq. (by email)
    Laura Heiser, Esq. (by email)
    Deirdre McEvoy, Esq. (by email)
    Defense counsel in *United States v. Caroll, et al.* (by email)
    Defense counsel in *United States v. Rubin/CDR, et al.* (by email)
    Defense counsel in *United States v. Ghavami, et al.* (by email)
    Nina Beattie, Esq. (by email)
    Richard Scheff, Esq. (by email)
    Chris Hall, Esq. (by email)

# LANKLER SIFFERT & WOHL LLP
ATTORNEYS AT LAW

33RD FLOOR
500 FIFTH AVENUE
NEW YORK, N.Y. 10110-3398
WWW.LSWLAW.COM

TELEPHONE (212) 921-8399
TELEFAX    (212) 764-3701

December 23, 2011

Honorable Harold Baer, Jr.
United States Courthouse
500 Pearl Street
New York, New York 10007

Re: *United States v. Carollo, et al*, 10 Cr. 654 (HB)

Dear Judge Baer:

We respectfully submit this letter pursuant to the Court's instructions. The government has depicted cooperating witnesses who repeatedly were admonished to avoid intruding into privilege, and a trial team that was shielded from taint. A starkly different picture emerges from the documents produced to the defense. Those documents – which we sought to hand up to the Court in an offer of proof – demonstrate repeated, intentional intrusions into attorney communications by inadequately supervised cooperators, and reckless disregard of those intrusions by the prosecution team. The tainted information contaminated the case agents and trial team. The government now endeavors to conceal the complete picture from this Court.

**1. Standard.** This Court may exercise its supervisory power to ensure fair proceedings and to enforce ethical rules where improper governmental conduct occurs pre-indictment. *See, e.g., United States v. Ming He*, 94 F.3d 782, 792 (2d Cir. 1996); *United States v. Hammad*, 858 F.2d 834, 841 (2d Cir. 1988). Even after finding no privilege intrusion, courts may grant a remedy when the government fails to acknowledge its own misconduct and lacks candor in its submissions to the court. In such circumstances, the court itself is prejudiced, and may dismiss an indictment and bar the prosecutors and investigators from participating in further proceedings. *See United States v. Omni Int'l Corp.*, 634 F. Supp. 1414 (D. Md. 1986). We respectfully submit that we are entitled to similar relief here.

The defendants have standing because the intrusions in this case prejudiced the defendants and this Court. The intrusions resulted not only in invasions of individual attorney-client communications, but also of joint defense communications. *See United States v. Horn*, 811 F. Supp. 739, 745 (D.N.H. 1992) (defendants' common interest gives one defendant standing when prejudice is suffered by another), *rev. in part on other grounds*. The government took advantage of these intrusions in investigating and preparing for trial, and cannot shoulder its burden of showing there was no taint. A remedy is warranted. *Shilinger v. Haworth*, 70 F.3d 1132, 1143 (10th Cir. 1995) (remanded for further proceedings where court was unable to conclude with "absolute certainty" that retrial would "purge the taint").

LANKLER SIFFERT & WOHL LLP

**2. The Cooperators' Intentional Intrusions.** The intrusions into lawyer-client communications and work product were demonstrably intentional. On November 15, 2006,[1] cooperator Dean Pinard purposely asked a represented subject, "What's your lawyer say about this?" CR-19.[2] This occurred during a monitored telephone call in the presence of two senior FBI agents who were familiar with proper warnings. Tr. 68. This intentional intrusion was reported the same day to the lead prosecutor for the three cases, Rebecca Meiklejohn. SDX 11. Pinard's intentional intrusions into attorney communications did not stop. The next day, he contacted a different subject and asked, "So, you guys are meeting with your lawyers again today? . . . And have your lawyers heard anything from, from any of these guys or about . . . ." CR- 23.

In spite of these intrusions, the case agents (who at some point listened to the first call), caused Pinard to make additional consensual recordings over the next three weeks. *See* Tr. 68-70. Pinard persisted in his privilege intrusions no fewer than seven times,[3] asking such questions as, "This is what you're telling your lawyer?", "What's your lawyer telling you that, with respect to the SEC stuff?", and "What's the next step for you guys?" CR-30, 37, 26. *See United States v. Nouri*, 611 F. Supp. 2d 380, 387 (S.D.N.Y. 2009) (Chin, J.) (finding "troubling" "on its face" the informant's question, "[W]hat's your plan now?"). At Tuesday's hearing, the government admitted that Pinard's conduct gave rise to a question of "whether or not he engaged in improper conduct." Tr. 57. This Court should not hesitate to find that he did.

Other cooperators also purposefully elicited discussion of attorney-client communications and attempted to interfere with attorney-client relationships. On September 20, 2007, Doug Goldberg, a witness in the *CDR* and *Carollo* trials, asked a subject, "Why did you agree to let Bear [Stearns] hire you an attorney? That doesn't make sense to me." He also asked, "Is he showing you emails or asking about deals? What are they asking?" CR-205. In his affidavit, Goldberg – unlike Pinard – does not deny intentionally intruding on the attorney-client communications. *See* Goldberg Aff. ¶ 4.

The government's redactions to the tapes render it impossible for us to establish the full extent of additional intentional intrusions.

**3. The Government's Management of the Taping Program Constituted Deliberate Disregard of the Misconduct.** The government failed to supervise its cooperators, failed to protect the investigation from taint, and showed deliberate disregard for the rights of the subjects.

---

[1] Contrary to FBI written policy and the testimony of Agent Zachariades, Agent Mulvey provided Dean Pinard with his first written admonishment on January 3, 2007, SDX 10, after Pinard had made or attempted to make 49 recordings including 9 in which he elicited attorney-client communications. *See* SDX 12 (Privilege Log).

[2] The defense does not have complete transcripts of the tapes at its disposal because we have been shielded from portions reflecting privileged communications. We have heard redacted tapes, and during the course of these proceedings have learned some of the (non-privileged) questions that elicited the privileged material. The government has provided complete unredacted tapes to the Court. We refer to the unredacted versions of the tapes. The government indicates a tape has been redacted by appending the suffix "-R" to the end of the tape ID number.

[3] Dean Pinard's privilege intrusions occurred on the following tapes, catalogued in the government's privilege log, SDX 12: CR-19-c-R; CR-23-R; CR-26-R; CR-28-R; CR-30-R; CR-43-R; CR-36-R; CR-216-R; CR-37-R; CR-40-R.

2

## LANKLER SIFFERT & WOHL LLP

The government's conduct fits the definition of conscious avoidance. Pinard's first intentional intrusion on November 15, 2006 was reported immediately to Ms. Meiklejohn, who avers she asked Pinard's lawyer to caution his client against similar conduct. Meiklejohn Aff. ¶ 8. That cannot be enough. On November 16th, an FBI agent sent trial prosecutor Steven Tugander the tape of Pinard's second intentional intrusion, SDX 13, and Mr. Tugander apparently did nothing in response. Mr. Tugander's affidavit fails to acknowledge that he received the tape, let alone to indicate that he took measures to guard against further taint or future incursions. That cannot be sufficient. The FBI agents heard cooperators intentionally intruding on attorney-client communications, either because they were standing next to the cooperators when the calls were made, or because they listened to the tapes shortly afterward. Tr. 16. The agents also provided attorney-client information to trial team prosecutors. For instance, on June 5, 2008, Agent Mulvey emailed the trial team about a recorded conversation that apparently mentions the phrase "my lawyer" four times, and the word "lawyer" eight times, pointing out as a "highlight" attorney-client communications. He said he would provide the tape to the prosecutors "shortly." DX 5 (referring to CR-63). Not one of the four prosecutors to whom that email was addressed took any remedial action.

Although the agents portrayed themselves to be diligent supervisors of the cooperators, the documents show otherwise. Contrary to Agent Zachariades' assertion that she provided written instructions "prior to any operational activity" for "every one of the cooperators," Tr. 11, 14, several cooperators received the written instructions only after the tapes were made. For example, Agent Zachariades provided Doug Goldberg with his first written admonishment on October 31, 2007, SDX 14, after he had made or attempted to make 34 recordings, including the September 20, 2007 intentional intrusion mentioned above. *See also* n.1, above.

The documents not offered by the government establish that the FBI agents should have known the cooperators were not following the instructions they were supposedly given. *See* Tr. 33. Melvin Lublinski, a member of the Filter Team, wrote in a January 30, 2008 email that the Filter Team had reviewed 55 to 60 recorded conversations. SDX 15. That was more than 25% of all recordings made as of that date.[4] As of February 2008, then, the agents and prosecutors knew that at least one quarter of the recordings were potentially tainted. Under the circumstances, the agents' testimony that they took no action because they had no basis to believe the cooperators were disregarding instructions, Tr. 33, should not be credited. It also is inconceivable that the trained ears of the lawyers would not have heard and understood that intrusions into attorney-client communications were occurring. Yet nothing was done.

Agent Zachariades' testimony also is at odds with the affidavit of Jacqueline Distleman, a member of the 2006 Filter Team. While the agent denied receiving feedback from the Filter Team during the entire investigation, Tr. 28, Ms. Distelman averred that her responsibilities included "informing the agent who presented the previously-screened recording to me whether the recording contained privileged or potentially privileged information." Distelman Aff. ¶ 5. On this record, the Court can have no confidence that the government discharged its responsibilities to assure privilege was not invaded and any taint was mitigated.

---

[4] The Filter Team says it only reviewed tapes referred to it by the FBI agents. Lublinski Aff. ¶ 5; Distleman Aff. ¶ 5. According to the FBI spreadsheet, as of January 30, 2008, the cooperators made approximately 207 calls. DX 2.

3

## LANKLER SIFFERT & WOHL LLP

**4. The Case Agents and Trial Teams Are Tainted.** As a consequence of the intrusions and failures of oversight, the taping program tainted the prosecution teams of all three cases. The prosecutors were tainted because they received and heard tainted tapes. The Filter Team functioned more like a sieve. How much passed through, and when, cannot be reconstructed, because no records were kept, Tr. 52, 75. We do not even know how many tapes were identified for the first time by either of the 2011 Filter Teams, after being readily accessible to the trial teams for years. The prosecutors also were tainted by the case agents, who had listened to tapes containing attorney-client communications, *see, e.g.*, DX 4, 9 & SDX 16 (302s demonstrating that agents listened to unredacted versions of tapes now on the privilege log), and participated daily in strategy discussions, witness interviews, proffers, documents reviews, grand jury preparation, and trial preparation. *See* Tr. 24-26, 71-73. Agent Mulvey testified there may have been thousands of emails exchanged among the team in this case, including emails that discuss tapes. Tr. 62. On at least three occasions, trial team prosecutors accessed attorney-client communications. Reilly Aff. ¶¶ 15, 16.

The trial team's exposure to attorney-client communications was even more extensive. The documents produced by the government prove that trial team members had access for more than a year to a comprehensive 118-page spreadsheet that summarized the contents of all the consensual recordings, *including* the privileged ones. This spreadsheet describes in detail at least 25 unredacted tapes containing privileged information—including explicit references to what the targets' lawyers were saying—and may contain more, as the copy provided to the defense is incomplete. *See* DX 6 at MUNI-MISC 000388-389. The documents show that Kevin Hart, a member of the trial team in this case, directed the creation of the spreadsheet in September 2010. SDX 17. Emails establish that other members of the trial team, including Antonia Hill and Laura Heiser, not only received but reviewed and "worked from" that spreadsheet. SDX 18. In March 2011, the Antitrust Division apparently recognized the problem and made efforts to collect and destroy copies of the document. SDX 19. The only reason the defense is aware of this spreadsheet is that Mr. Hart did not destroy his copy, and it was produced to the defense. DX 6. Other prosecutors did destroy or return their copies. *See* SDX 19.

**5. Prejudice and Standing.** The *Carollo* and *CDR* defendants have been prejudiced by the government's misconduct and have standing to raise these claims, because the trial team used improperly obtained privileged material to prepare for trial. The government selectively disclosed to this Court only that a member of the trial team had "inadvertently" listened to a tape that did not "involve" any defendant. Reilly Aff. ¶ 18. In fact, the prosecutor in question was Joseph Muoio, a member of the *Carollo* and *CDR* trial teams. He and paralegal Roman Babadzhanov not only listened to the tape, but also used it last month to prepare Mr. Muoio to play the role of defense counsel in a mock trial. At that mock trial, Mr. Muoio used a confidential portion of that tape to prepare for defense strategies and exhibits in the *CDR* case. The *CDR* case involves many of the same transactions and coconspirators as the *Carollo* case. This use of the tainted tape, as well as the prosecutors' work from the tainted spreadsheet, undeniably has helped the government improve its case.

Defendants further were prejudiced on account of the invasion of their Joint Defense Agreement ("JDA") with the third-party privilege holders. After the JDA was entered, the government intruded into the attorney-client communications of JDA member "John Doe," and thus learned information directly related to the JDA. The tape revealed defense strategy

4

**LANKLER SIFFERT & WOHL LLP**

concerning the statute of limitations defense, which remains an important component of the defense case. Agent Mulvey listened to that tape and in disregard of its obvious connection to lawyers' strategy, forwarded a summary to the *Carollo* trial team as a "highlight." DX 5.

**6. The Government Has Not Been Candid With the Court.** The government has neither acknowledged its lapses nor been candid with the Court. The government's affidavits were carefully worded to avoid revealing what the prosecutors knew about the nature of the intrusions and the scope of the taint. First, the affidavits of trial counsel aver that they did not listen to any tapes that were not first reviewed or redacted by the Filter Team. But the agents testified that not all tapes were sent to the Filter Team; many were released immediately to the trial team. Tr. 29, 75. Also, the Filter Team did not exist until November 2006, five months after the first tapes were created. Tr. 29, 76. Second, the affidavits did not disclose that all trial team members had the tainted spreadsheet summarizing the tapes. SDX 20 (email to trial team making clear that "the information in the attached report ... is currently available to all muni team members to view"). That summary – distributed in November 2010 and never completely recalled – contains references to attorney-client materials in multiple calls.

The witness affidavits submitted by the government should not be accepted by this Court without scrutiny. For example, Pinard averred that his questions to the subjects he was recording were "not designed to elicit privileged material," Pinard Aff. ¶ 7, yet he asked on tape, "What's your lawyer say about this?" CR-19. Although none of the cooperators admits in his affidavit that he sought to elicit privileged information,[5] the government concedes they did. *See* Dec. 14, 2011 letter from L. Heiser, at 3 ("[O]f the 325 consensually recorded conversations, there are only 3 where a cooperating witness attempted to elicit attorney-client information.").[6] This Court should not accept Pinard's obviously false statement, relied upon by the government to show it did nothing wrong. *See Omni*, 634 F. Supp. at 1436; *see also United States v. Freeman*, 650 F.3d 673, 680 (7th Cir. 2011); *United States v. Mele*, 462 F.2d 918 (2d Cir. 1972).

**7. Remedy.** The defendants seek dismissal of the Indictment without prejudice and an Order barring the tainted lawyers, agents, and paralegals from continuing to participate in the case. Alternatively, the Court should: (1) dismiss the CDR conspiracy counts (which relate to the witnesses involved in the misconduct); (2) preclude the witnesses who engaged in this misconduct from testifying; and (3) bar the tainted lawyers, agents, and paralegals from continuing to participate in the case. The Court also should order that the witnesses who violated the instructions to not engage in "lawyer talk" testify at a further hearing, and that summaries of their anticipated trial testimony be made available to the defense two months prior to trial.

> The Clerk of Court is directed to enter into the public record of this action the letter above submitted to the Court by defendants.
>
> SO ORDERED.
>
> 12-27-11
> DATE    VICTOR MARRERO, U.S.D.J.

Respectfully submitted,

John S. Siffert /DMC
John S. Siffert

---

[5] Douglas Goldberg, at least, does not deny that he did. *See* Goldberg Aff.

[6] We are not in a position to know if there were significantly more intentional intrusions, as IMAGE states, 12/2/11 Tr. 21-22, because we do not have access to the unredacted tapes. *See* n. 2, above.

5

**LANKLER SIFFERT & WOHL LLP**

Encls.

cc: Honorable Kimba M. Wood (by facsimile, enclosures by hand)
    Honorable Victor Marrero (by facsimile, enclosures by hand)
    Charles Reilly, Esq. (by email)
    Lucy McClain, Esq. (by email)
    Laura Heiser, Esq. (by email)
    Deirdre McEvoy, Esq. (by email)
    Defense counsel in *United States v. Caroll, et al.* (by email)
    Defense counsel in *United States v. Rubin/CDR, et al.* (by email)
    Defense counsel in *United States v. Ghavami, et al.* (by email)
    Nina Beattie, Esq. (by email)
    Richard Scheff, Esq. (by email)
    Chris Hall, Esq. (by email)