## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    - v. -

DOMINICK P. CAROLLO,
STEVEN E. GOLDBERG, and
PETER S. GRIMM,

        *Defendants*.

S1 10-CR-654 (H.B.)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## JOINT MOTION FOR JUDGMENT OF ACQUITTAL

Howard E. Heiss
Mark A. Racanelli
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
*Attorneys for Defendant Peter S. Grimm*

John S. Siffert
Daniel M. Gitner
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 921-8339
*Attorneys for Defendant Steven E. Goldberg*

Walter F. Timpone
MCELROY, DEUTSCH, MULVANEY &
CARPENTER LLP
1300 Mt. Kemble Ave.
Morristown, NJ 07962
Telephone: (973) 993-8100
*Attorneys for Defendant Dominick P. Carollo*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................... 1

ARGUMENT ........................................................................................ 1

I.    The Government Failed To Present Sufficient Evidence Of An Overt Act In Furtherance Of The Charged Conspiracy Within The Limitations Period ...................... 2

    A.    The Interest Payments Were Not Overt Acts In Furtherance Of The Charged Conspiracy Because They Were Not Made By A Member Of The Conspiracy ................................................ 4

    B.    The Interest Payments Were Not In Furtherance Of The Conspiracy Because The Conspiracy Had Terminated By The Time The Payments Were Made ........................................ 8

II.    The Evidence Demonstrates That The Government Proved One Overarching Conspiracy, Not Five Separate Ones, And The Counts Of Conviction Are Thus Multiplicitous In Violation Of The Fifth Amendment ................... 16

III.    The Government Failed To Introduce Sufficient Evidence Of Defendants' Fraudulent Intent ................................................................ 21

    A.    The Provider Certificates Fail To Prove Defendants' Fraudulent Intent ............. 22

    B.    The Evidence Was Insufficient To Demonstrate Fraudulent Intent ................... 24

CONCLUSION ................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Braverman v. United States*,
   317 U.S. 49 (1942)........................................................................................4

*Brownlee v. Lear Siegler Mgmt. Servs. Corp.*,
   15 F.3d 976 (10th Cir. 1994) .......................................................................7

*Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*,
   2 F.3d 24 (2d Cir. 1993).............................................................................7

*Coleman v. Hous. Indep. Sch. Dist.*,
   113 F.3d 528 (5th Cir. 1997) .......................................................................7

*Fiswick v. United States*,
   329 U.S. 211 (1946)..................................................................8, 11, 14, 15

*Girard v. 94th St. & Fifth Ave. Corp.*,
   530 F.2d 66 (2d Cir. 1976) .........................................................................6

*Grunewald v. United States*,
   353 U.S. 391 (1957)................................................................................3, 15

*Hartline v. Gallo*,
   546 F.3d 95 (2d Cir. 2008).........................................................................6

*Herrmann v. Moore*,
   576 F.2d 453 (2d Cir.1978)........................................................................6

*In re Lernout & Hauspie Sec. Litig.*,
   236 F. Supp. 2d 161 (D. Mass. 2003) .........................................................7

*Kaplan v. United States*,
   7 F.2d 594 (2d Cir. 1925) .........................................................................17

*Monterey Plaza Hotel Ltd. P'ship v. Local 408*,
   215 F.3d 923 (9th Cir. 2000) .....................................................................32

*N.Y. Cent. & H.R.R. Co. v. United States*,
   212 U.S. 481 (1909).................................................................................6

*Nelson Radio & Supply Co. v. Motorola, Inc.*,
   200 F.2d 911 (5th Cir. 1952) .....................................................................6

*Porcelli v. United States*,
   404 F.3d 157 (2d Cir. 2005).......................................................................32

*Scheidler v. NOW, Inc.*,
   537 U.S. 393 (2003).................................................................................32

*United States v. Ansaldi*,
   372 F.3d 118 (2d Cir. 2004)..................................................................16, 21

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Brown*,
  335 F.2d 170 (2d Cir. 1964)......................................................................4

*United States v. Carlo*,
  507 F.3d 799 (2d Cir. 2007)....................................................................31

*United States v. Chacko*,
  169 F.3d 140 (2d Cir. 1999)....................................................................16

*United States v. D'Amato*,
  39 F.3d 1249 (2d Cir. 1994)...............................................................2, 28

*United States v. Doherty*,
  867 F.2d 47 (1st Cir. 1989)............................................................. passim

*United States v. Gabriel*,
  125 F.3d 89 (2d Cir. 1997)......................................................................28

*United States v. Gallerani*,
  68 F.3d 611 (2d Cir. 1995).......................................................................2

*United States v. Glenn*,
  312 F.3d 58 (2d Cir. 2002)..................................................................2, 28

*United States v. Gjurashaj*,
  706 F.2d 395 (2d Cir. 1983)......................................................................1

*United States v. Guadagna*,
  183 F.3d 122 (2d Cir. 1999)...............................................................21, 28

*United States v. Habig*,
  390 U.S. 222 (1968)...............................................................................15

*United States v. Hernandez*,
  2009 WL 3169226 (S.D.N.Y. Oct. 1, 1999)...........................................21

*United States v. Jones*,
  482 F.3d 60 (2d Cir. 2006)......................................................................16

*United States v. Josephberg*,
  459 F.3d 350 (2d Cir. 2006)....................................................................16

*United States v. Klein*,
  124 F. Supp. 476 (S.D.N.Y. 1954)...........................................................3

*United States v. Lewis*,
  161 F.2d 683 (2d Cir. 1947)......................................................................8

*United States v. Lewis*,
  67 F.3d 225 (9th Cir. 1995) ....................................................................32

*United States v. Manzella*,
  791 F.2d 1263 (7th Cir. 1986) ..................................................................6

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*United States v. Martinez,*
    54 F.3d 1040 (2d Cir. 1995)...................................................................................2

*United States v. Mittelstaedt,*
    31 F.3d 1208 (2d Cir. 1994)................................................................................29

*United States v. Montour,*
    944 F.2d 1019 (2d Cir. 1991)........................................................................21, 24

*United States v. Muyet,*
    994 F. Supp. 501 (S.D.N.Y. 1998).....................................................................17

*United States v. Ness,*
    2003 WL 21804973 (S.D.N.Y. Aug. 6, 2003).....................................................20

*United States v. Novak,*
    443 F.3d 150 (2d Cir. 2006)...........................................................................28, 29

*United States v. Pinckney,*
    85 F.3d 4 (2d Cir. 1996).....................................................................................26

*United States v. Regent Office Supply Co.,*
    421 F.2d 1174 (2d Cir. 1970)..............................................................29, 30, 31

*United States v. Rosenblatt,*
    554 F.2d 36 (2d Cir. 1977)..............................................................................2, 15

*United States v. Roshko,*
    969 F.2d 1 (2d Cir. 1992) ....................................................................................8

*United States v. Salmonese,*
    352 F.3d 608 (2d Cir. 2003)...............................................................................13

*United States v. Shellef,*
    507 F.3d 82 (2d Cir. 2007).................................................................................29

*United States v. Starr,*
    816 F.2d 94 (2d Cir. 1987).................................................................................28

*United States v. Sureff,*
    15 F.3d 225 (2d Cir. 1994).................................................................................20

*United States v. United States Gypsum Co.,*
    438 U.S. 422 (1978)...........................................................................................11

*United States v. Walters,*
    997 F.2d 1219 (7th Cir. 1993) ...........................................................................32

*United States v. Zauber,*
    857 F.2d 137 (3d Cir. 1988)...............................................................................32

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,*
    933 F.2d 131 (2d Cir. 1991)................................................................................7

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

**STATUTES**

18 U.S.C. § 371 ................................................................................................................2

18 U.S.C. § 1343 ..........................................................................................................2, 32

18 U.S.C. § 3282(a) .........................................................................................................3

26 U.S.C. § 6531(1) ..........................................................................................................3

**OTHER AUTHORITIES**

Fed. R. Crim. P. 29 ..........................................................................................................1

Fed. R. Evid. 701 ............................................................................................................24

Defendants Dominick Carollo, Steven Goldberg, and Peter Grimm respectfully move this Court for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.

## PRELIMINARY STATEMENT

The Court should grant defendants' motion for three specific reasons.[1]

*First*, there is no evidence that any overt acts in furtherance of the conspiracy were committed within the limitations period. The only relevant acts that were proved to have occurred within the limitations period were routine, periodic interest payments made by defendants' employers to the issuers. Those routine interest payments were not in furtherance of the conspiracy, for two reasons. First, the interest payments were made by innocent third parties, not by members of the conspiracy. And second, the conspiracy had in any event already terminated when the GICs were won, long before the limitations period expired.

*Second*, the indictment purported to charge six separate conspiracies, but the government proved and argued the existence of one overarching agreement. The conviction on the five separate conspiracies was inconsistent with the court's charge, and violated defendants' Fifth Amendment right against multiple punishments for the same crime.

*Third*, the evidence was insufficient to establish that defendants specifically intended to defraud the IRS or the issuers.

## ARGUMENT

This Court may grant a judgment of acquittal, notwithstanding the jury's verdict, if the "evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a); *see also* Fed. R. Crim. P. 29(c). In a sufficiency-of-the-evidence challenge, "the evidence [should] be viewed in the

---

[1] Defendants are presumed to have generally challenged the sufficiency of the evidence pursuant to Rule 29(a). Tr. 2834. All sufficiency challenges are thus preserved. *See United States v. Gjurashaj*, 706 F.2d 395, 399-400 (2d Cir. 1983). This motion focuses on the three grounds for acquittal described in detail below.

light most favorable to the government and all permissible inferences drawn in its favor." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994). "Nonetheless, a conviction based on speculation and surmise alone cannot stand." *Id.* "In particular, the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (quotation omitted). And "where a fact to be proved is also an element of the offense ... it is not enough that the inferences in the government's favor are permissible. [The court] must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

In this case, this standard must be applied in light of the Second Circuit's warning that "[c]onspiracy-to-defraud prosecutions are 'scrutinized carefully,'" *United States v. Rosenblatt*, 554 F.2d 36, 40 (2d Cir. 1977) (quoting *Dennis v. United States*, 384 U.S. 855, 860 (1966)), as "courts must be alert to subtle 'attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions,'" *id.* (quoting *Grunewald v. United States*, 353 U.S. 391, 404 (1957)); *see also United States v. Gallerani*, 68 F.3d 611, 618 (2d Cir. 1995). With that caution in mind, and under the legal standards described above, a judgment of acquittal is required.

## I.    The Government Failed To Present Sufficient Evidence Of An Overt Act In Furtherance Of The Charged Conspiracy Within The Limitations Period.

Each count of conviction alleged a conspiracy under 18 U.S.C. § 371, with two independent objects: (i) to defraud municipalities in violation 18 U.S.C. § 1343, and (ii) to

defraud the IRS, *see United States v. Klein*, 124 F. Supp. 476 (S.D.N.Y. 1954), *aff'd*, 247 F.2d 908 (1957).  Wire fraud carries a five-year statute of limitations, while the statute of limitations for *Klein* conspiracies is six years.  18 U.S.C. § 3282(a); 26 U.S.C. § 6531(1).  A conspiracy prosecution is timely only if a conspirator commits at least one overt act in furtherance of the conspiracy within the limitations period.  *Grunewald*, 353 U.S. at 396.  The initial indictment was brought on July 27, 2010.  Accordingly, to survive a statute-of-limitations challenge, the government must have introduced sufficient evidence of at least one overt act in furtherance of the wire fraud conspiracy that occurred on or after July 27, 2005, or at least one overt act in furtherance of the *Klein* conspiracy that occurred on or after July 27, 2004.  There is no dispute that all of the allegedly fraudulent conduct concerning bidding on GICs—the focus of the indictment and the government's case at trial—occurred outside the limitations period.  The only acts that even arguably qualify as overt acts in furtherance of the conspiracy are routine, periodic interest payments made by General Electric and FSA, defendants' former employers.  It is also undisputed that defendants had no involvement whatever with making those interest payments. Tr. 2785.  Those payments are factually and legally insufficient to sustain the jury's verdict, for two independent reasons.

First, the interest payments could not have been in furtherance of the conspiracy because they were not performed by any member of that conspiracy.  They were made by other GE and FSA employees who are not even alleged to have participated in (or even known about) the conspiracy.  The government seeks to avoid this failure of proof by labeling the companies themselves as co-conspirators, distinct from the defendants, and theorizing that the interest payments were made by the companies in furtherance of the conspiracy.  But while a corporation may be held *vicariously* liable for the criminal acts of its conspiratorial agents, that does not

mean that the corporation can be deemed a separate member of the conspiracy, distinct from its agents, such that *any* act done on behalf of the corporation can be deemed a conspiratorial one, even when done by individuals having nothing to do with the conspiracy.  No precedent supports that result, which would turn the law of vicarious liability on its head.

Second, the interest payments could not have been in furtherance of the charged conspiracy because the conspiratorial enterprise had, as a matter of law, concluded long before the interest payments were made.  The scope of the conspiratorial agreement, both as charged by the grand jury and as proven at trial, was to obtain the award of GICs at favorable rates.  And even if securing lower interest payments was one of the objects of that conspiracy, that object was attained once the GIC was won, and the schedule of interest payments fixed.  The routine, lawful, unilateral interest payments on those GICs were merely the result of the charged conspiracy, not in furtherance of it.  Indeed, accepting the government's theory would all but eradicate the fundamental distinction between the object of a conspiracy and its result, not to mention the statute of limitations in this and similar conspiracy prosecutions—both results the Supreme Court has expressly rejected.

A.  **The Interest Payments Were Not Overt Acts In Furtherance Of The Charged Conspiracy Because They Were Not Made By A Member Of The Conspiracy.**

The evidence is insufficient to demonstrate that the interest payments were acts in furtherance of the conspiracy, most obviously, because they were made by innocent third parties, not by a member of the conspiracy.

1.  As the Court correctly charged the jury in this case, only acts done by members of a conspiracy can be deemed in furtherance of that conspiracy.  *E.g.*, *Braverman v. United States*, 317 U.S. 49, 53 (1942); *United States v. Brown*, 335 F.2d 170, 172 (2d Cir. 1964); *see also* Tr. 3234 (jury charge) (government must prove beyond a reasonable doubt "that one of the members

-4-

of the conspiracy knowingly committed at least one overt act" in furtherance of the charged conspiracy).  Here, however, the only purported overt acts done within the limitations period—the interest payments—are not even alleged, let alone proven, to have been done by an individual member of the conspiracy.  On the contrary, the government's own witness admitted that none of the co-conspirators had any involvement with the interest payments.[2]  Rather, the amount of the interest payments is calculated and the payments are made automatically by a computer system, based on terms set at the time the GICs are awarded, overseen by operations employees who have no involvement in the bidding process (and no alleged involvement in the conspiracy).  Tr. 2744-47, 2779-84.[3]  In short, it is undisputed that the only acts that occurred within the limitations period were not done by individuals who had joined the conspiracy, and the evidence is thus insufficient to sustain the jury's verdict.

2.  The government apparently seeks an end-run around this fatal flaw by contending that General Electric and FSA were themselves members of the conspiracy, separate and apart from the defendants, and that the interest payments should be treated as acts done by those corporate entities in furtherance of the conspiracy.  *E.g.*, Superseding Indictment ¶¶ 30(f), 30(g)(iii).  That theory fails as a matter of law.  To be sure, a corporation may be liable for the criminal acts of its employee-agents as a matter of *vicarious* liability:  "the act of the agent, while exercising the

---

[2] *See* Tr. 2785 (GE) ("Q: These interest payments, they're not the result of any continued activity by the GIC traders, correct?  A: No.  Q: To your knowledge, Mr. Grimm and Mr. Goldberg and Mr. Carollo, they were never involved in calculating the interest or making any of these payments, correct?  A:  Correct.  They have no access to the payment system.  Q:  The brokers who originally bid out the GICs, they aren't involved in these payments at all, correct?  A:  No, they are not."); Tr. 2746 (FSA) (same).

[3] *E.g.*, Tr. 2784 ("Q: You and others in operations oversee that process, but the actual calculations and issuance of the payments, that is done automatically through [the computer system] Principia?  A:  Yes, Principia calculates all of the interest payments on a monthly, semiannually, quarterly basis, and my team … will send out wire transfers for the expected interest payments to be sent to the municipality on the given interest date.").

authority delegated to him ... may be controlled, in the interest of public policy, by imputing his act to his employer and imposing penalties upon the corporation for which he is acting." *N.Y. Cent. & H.R.R. Co. v. United States*, 212 U.S. 481, 494 (1909).  But calling a corporation a co-conspirator, as the government has done here, does not remotely mean that acts done by innocent corporate employees can be treated as acts in furtherance of a conspiracy.  To the precise contrary, a corporation cannot be treated as a conspirator distinct from the actions of its employees because "[a] corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952); *see also Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (same); *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (same); *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 74 (2d Cir. 1976) (Oakes, J., dissenting) ("It is, to be sure, basic conspiracy law that a corporation cannot conspire with its agents or employees acting within the scope of their employment.").  It is the nature of the corporation's employees' acts, therefore, that define whether those acts can be deemed in furtherance of the conspiracy; if those actions are innocent, the mere fact that the government has labeled the corporation a co-conspirator cannot transform them into conspiratorial acts.

Indeed, treating a corporation as a separate conspirator, distinct from its agents, would undermine the entire premise of conspiratorial liability.  Co-conspirators may be held responsible for each others' conduct because "conspirators are each other's agents; and a principal is bound by the acts of his agents within the scope of the agency." *United States v. Manzella*, 791 F.2d 1263, 1267 (7th Cir. 1986) (Posner, J.).  Yet there is no plausible legal or factual basis for the highly counterintuitive position that a corporation may be treated as the agent of its employees.  On the contrary, there is no dispute that defendants were the agents of GE and/or FSA.  And

-6-

theories of vicarious liability in which co-conspirator liability is grounded "hold[] principals liable for the acts of their agents, *not agents liable for the acts of their principals*."  *In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 176 (D. Mass. 2003) (emphasis added); s*ee also Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 534 (5th Cir. 1997) (rejecting a theory of "*respondeat inferior*" as "both unprecedented and erroneous")*; Brownlee v. Lear Siegler Mgmt. Servs. Corp.*, 15 F.3d 976, 978 (10th Cir. 1994) (same).

3.  Regardless of the merits of the government's corporate-entity-as-separate-conspirator theory, Counts Five and Six (against Steven Goldberg) must be dismissed because the relevant interest payments were *not* made by a corporate entity having anything to do with the conspiracy. The corporate entities responsible for writing the GICs were FSA Capital Management Services and FSA Capital Markets Services.  Tr. 2741-43.  The interest payments, however, were made by a separate corporate entity, FSA Asset Management, which had "nothing to do with negotiating the terms and conditions of the GIC," or "bidding [on] the GIC."  Tr. 2741; *see* Tr. 2741-43. There was no proof at all that FSA Asset Management was involved in the conspiracy.

The actions of FSA Asset Management (the entity responsible for the interest payments) cannot be attributed to the two separate FSA entities that wrote the GICs.  The Second Circuit has long recognized "the presumption of corporate independence and limited shareholder liability," which may be overcome only with proof (here, beyond a reasonable doubt) that one corporate entity "dominated" the other, such that the latter "was really the agent" of the former. *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991); *see also Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 27 (2d Cir. 1993) (presumption of corporate separateness overcome when relevant conduct of corporate subsidiary was shown to be "the result of domination and control" by its parent).  The

government has introduced no such evidence here.

**B.     The Interest Payments Were Not In Furtherance Of The Conspiracy Because The Conspiracy Had Terminated By The Time The Payments Were Made.**

Even if the interest payments made by defendants' employers can be deemed acts by a co-conspirator, this prosecution is still time-barred because the conspiracy—as pleaded and proven—had already terminated by the time those payments were made; the payments thus cannot be acts in furtherance of an ongoing conspiracy.

1. There is a fundamental distinction in conspiracy law between acts in furtherance of an ongoing conspiracy, on the one hand, and events that merely constitute the "result" of a completed conspiracy, on the other. *See Fiswick v. United States*, 329 U.S. 211, 216 (1946). Only the former count as criminal conduct, and only the former extend the running of the statute of limitations. *Id.*; *United States v. Lewis*, 161 F.2d 683, 684 (2d Cir. 1947) (L. Hand, J.). The distinction turns on whether the act in question was part of an ongoing criminal enterprise— whether there was "continuous co-operation of the conspirators to keep … up … [the] partnership in crime," *Fiswick*, 329 U.S. at 216 (quotation omitted)—or whether the conspiracy had ended by the time the act was done.

In "determin[ing] when [a] conspiracy ended," the "central inquiry should be '*the scope of the conspiratorial agreement*, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy.'" *United States v. Roshko*, 969 F.2d 1, 7 (2d Cir. 1992) (quoting *United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir. 1982), in turn quoting *Grunewald*, 353 U.S. at 397). "Once [the court] ascertain[s] the scope of the conspiracy, [it] must then determine when it terminated, keeping in mind that a conspiracy continues until its aim has been achieved, it has been abandoned, or otherwise terminated." *Id.* (quotation omitted).

-8-

Here, the indictment demonstrates that the "scope of the conspiratorial agreement," as charged, was for defendants and others *to win GICs*.[4]  The indictment alleges that defendants and others unfairly obtained those GICs by engaging in fraudulent conduct that allowed them to win GICs on favorable terms.  Superseding Indictment ¶¶ 19-20.  Thus, for example, the indictment alleges that a key object of the wire fraud conspiracies was to deprive municipal issuers of money by "causing them to *award investment agreements and other municipal finance contracts*" on improper terms.  *E.g.*, *id.* ¶ 19 (emphasis added).  The indictment also specifies the "manner and means" by which the alleged conspiracy was carried out, which further specify that the central objective of the conspiracy was to obtain GICs.  The indictment alleges that the conspirators sought to control "*the bidding for*" GICs, *e.g.*, *id.* ¶ 21(a); agreed on who "should and should not be solicited to *submit bids* for particular" GICs, *e.g.*, *id.* ¶ 21(b); "discussed pricing, pricing levels, conditions, or other information related *to competing providers' bids*," determined what those bids would be, and submitted "*intentionally losing bids*," *e.g.*, *id.* ¶ 21(c), (d), (e); paid kickbacks to brokers "in exchange for [the brokers'] assistance in *controlling and manipulating the competitive bidding process*," *e.g.*, *id.* ¶ 21(f); made allegedly false statements and certifications that the "*bidding process*" complied with Treasury regulations, *e.g.*, *id.* ¶ 21(g), (h); and caused issuers "to award" GICs they would not have awarded if they 'had true and accurate information *regarding the bidding process*," *e.g.*, *id.* ¶ 21(i) (emphases added).

The government's evidence at trial similarly makes clear that the agreement's scope extended only to bidding for and winning GICs.  For example, the government's cooperating witnesses—all alleged co-conspirators—consistently testified that they conspired with

---

[4] Several conspiracies, each represented by a separate count, were charged in the indictment, but each is identical for purposes of this argument, and is treated as one.

defendants to fraudulently win bids for GICs.[5]  The government presented just that theory to the

jury.  At the beginning of its summation, for example, the government explained:

> This case boils down to a simple proposition.  State agencies, counties, cities and towns which bid out billions and billions of public money said what they wanted, *they wanted a fair bid, they wanted a competitive bid and they wanted an arm's length bid*.
>
> What did these defendants do?  They cheated them out of the very thing that they wanted.  *They were supposed to compete fairly for it, but instead the defendants schemed with the brokers to manipulate the rates and to lie to the state agencies, counties and towns*.  They chose to cheat.

Tr. 2976 (emphasis added).  And the government went on to explain that defendants "were on

the lookout to cheat these people out of money in two ways:  First, *to pull down the rates they*

*were otherwise prepared to bid*; and [s]econd, to share the spoils with the corrupt brokers in the

forms of kickbacks."  Tr. 2976-77 (emphasis added).  The scope of the conspiratorial agreement,

according to the government itself, was to win GICs by manipulating the bidding process.

Even assuming an object of the alleged conspiracy was to win GICs that paid lower

interest rates,[6] that object was accomplished when the GICs were awarded and signed, when all

---

[5] *E.g.*, Tr. 339 (Doug Goldberg) ("Generally we helped set up bids for specific providers, bidders to win either giving them information about other bidders' bids or giving them a last look or actually letting them reduce their bids."); Tr. 646 (Naeh) (describing involvement in "three felonies relating to my involvement in bidding of investment agreements while at CDR"); Tr. 899 (Rothman) ("I participated in a conspiracy to defraud municipal issuers and the IRS, and, as part of that conspiracy, I gave the last looks to providers of municipal investment agreements.  I solicited courtesy bids and I signed false certifications that the bidding process was competitive when in fact it was not."); Tr. 1059 (Zarefsky) ("I manipulated the bid process, which consisted of providing last looks to providers, as well as soliciting courtesy bids."); Tr. 1304-05 (Wolmark) ("We were involved in a practice where we were able—in bidding the transactions on behalf of the issuers, where we gave one of the providers last looks so he had an opportunity to know where everybody else's bid was … Number two, we also were given fees on the back end, swap fees, in payment for giving him a last look on the transaction."); Tr. 2261 (Zaino) ("I engaged in setting up bids for providers to win, gave people last looks, provided courtesy bids.").

[6] Although the indictment alleged that an object of the conspiracy was to win GICs that paid lower interest rates, the government did not prove it.  Indeed, much of the evidence at trial was inconsistent with that purported object; as part of the same charged conspiracies, the

their terms were fixed; that was the point at which the schedule and amount of all future interest payments were determined.[7] That interest payments were later, automatically made according to those terms was merely a necessary "result" of the completed conspiracy, and occurred as a matter of course, not because of "continu[ed] co-operation of the conspirators." *Fiswick*, 329 U.S. at 216.  Indeed, the government made that point to the jury in its summation: "And *as a result* [of fraud in the bidding process], the issuers received less on their investments every single time an interest payment was made or will be made." Tr. 3010 (emphasis added).  As explained, however, "[t]hough the result of a conspiracy may be continuing, the conspiracy does not thereby become a continuing one." *Fiswick*, 329 U.S. at 216.  No reasonable juror could have concluded that the interest payments were overt acts in furtherance of an ongoing conspiracy.

2.  The only court of appeals to have considered an analogous situation has agreed.  In *United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989), several defendants were successfully prosecuted "for conspiring to steal advance copies of civil service examinations and sell them to policemen so they could cheat and obtain promotions."  *Id.* at 51.  As relevant here, "the evidence [was] sufficient to show (1) that each of them, though promoted in 1979, received increased salary payments due to the promotions after the relevant date of July 29, 1981 (five years before indictment), and (2) that obtaining this increase in salary was an object of the conspiracy."  *Id.* at 61.  "The legal question [was] simply whether each defendant's receipt of salary payments after July 1981 can count as an 'overt act' for statute of limitations purposes."

---

government featured deals that included not just last looks down—the most plausible evidence that would support such an object—but also last looks up.  And last looks up are inconsistent with an intent to depress interest rates paid on GICs. *Cf. United States v. United States Gypsum Co.*, 438 U.S. 422, 464 (1978) (withdrawal occurs when a conspirator performs acts "inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators").

[7] Tr. 2780 ("Q:  The interest rate under which you make those payments, that is set at the time the GIC is awarded, is that right?  A:  That's correct.").

*Id.*

The government argued "that a conspiracy stays in existence until its object is achieved," and since "the object in part was to obtain salary," "each act of receiving salary is a new 'overt act.'" *Id.* The court, in an opinion by then-Judge Breyer, rejected that contention. The court acknowledged that it would be "reasonable to say that the act of receiving a conspiratorial objective is part of the conspiracy, where the receiving consists of one action, or a handful of actions, taking place over a limited period of time, or where some evidence exists that the special dangers attendant to conspiracies, the dangers of 'concerted' activity and 'group association' for criminal purposes, remain present until the payoff is received." *Id.* "But," the court continued, "where receiving the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions, such as receiving salary payments, *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place, we do not see how one can reasonably say that the conspiracy continues." *Id.* In those circumstances, "one would ordinarily view the receipt of payments merely as the 'result' of the conspiracy." *Id.* (citing *Fiswick*, 329 U.S. at 216).

*Doherty* is squarely on point. Just as with the salary payments at issue there, the interest payments here—automatically calculated and issued by a computer system—"merely consist[] of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions." *Id.* Nor can scores of interest payments made over not just years, but decades, be reasonably characterized as "a handful of actions, taking place over a limited period of time." *Id.* Moreover, "there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place." *Id.* As explained earlier, the trial evidence was undisputed that the interest payments were "not the result of any continued activity" by any co-conspirator after the GICs

were won.   Tr. 2785.   Accordingly, the interest payments are "a 'result' of, not an act in furtherance of, the conspiracy."   *Doherty*, 867 F.2d at 62.

3. a.   The government has relied on *United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003), but that reliance is misplaced.   *Salmonese* involved a conspiracy to engage in a "pump and dump" securities fraud scheme, in which the defendants conspired to inflate the value of certain securities, and later sell them at the artificially inflated value.   *Id.* at 612-13.   The only overt acts alleged in the indictment that fell within the limitations period were sales of the security caused by an unindicted co-conspirator (and the receipt of proceeds from such sales). *Id.* at 613.   The defendant had argued, among other things, that his conviction was invalid under *Doherty.   Id.* at 616.   The Second Circuit rejected that argument not because it disagreed with *Doherty*, but because it found *Doherty* to be inapplicable on its facts.   The Court noted that under *Doherty*, "'payoffs' could reasonably be viewed as part of a conspiracy where their receipt 'consists of one action, or a handful of actions, taking place over a limited period of time, or where some evidence exists that the special dangers attendant to conspiracies ... remain present until the payoff is received.'"   *Id.* (quoting *Doherty*, 867 F.2d at 61).   And the Court found that the case before it fell squarely into that category: "Although the conspirators' sales of [the securities] numbered more than a handful, they were hardly 'indefinite' in number or 'lengthy' in duration"; all the charged sales occurred within four weeks of the date on which the defendant argued the conspiracy terminated.   *Id.*   Moreover, it was "[i]mplicit in the conspiratorial scheme … that the receipt of benefits depended on selling the [securities] before their inflated market price collapsed."   *Id.*   In other words, the "special dangers" of concerted action "remain[ed] present until the payoff [wa]s received."   *Doherty*, 867 F.2d at 61.

Unlike in *Salmonese*, the interest payments in this case fall squarely within the category

*Doherty* held *cannot* constitute overt acts in furtherance of the conspiracy: "a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions," without any "evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place." *Doherty*, 867 F.2d at 61. In contrast to *Salmonese*, where the sales of securities were themselves part of the scheme—a "pump and dump" scheme cannot succeed without the "dump"—the interest payments in this case were a foregone conclusion once the GICs were won and their terms set, after which point no further action by the conspirators was required.

b. Reading *Salmonese* as the government does would put Second Circuit precedent in flat conflict with that of the Supreme Court. The government believes each interest payment, by itself, continues the conspiracy. If that is so, then the conspiracy *still* must be ongoing and will continue for many years—because the interest payments are still being made (*e.g.,* Tr. 2606), and one GIC is scheduled to pay interest until 2032 (GX 32-1)—even though the grand jury has indicted it and the conspirators have either pleaded guilty or have been so found by a jury. Indeed, since the interest payments alone suffice (on the government's theory) to keep the conspiracy alive, the government's reading of *Salmonese* would mean that the conspiracy will continue even if the conspirators were incarcerated—or even if they all die. That reading of Second Circuit precedent would undermine the fundamental distinction between acts in furtherance of a conspiracy and its "result," and the Supreme Court's admonition that a conspiracy lasts only as long as the "continu[ed] co-operation of the conspirators to keep … up … [the] partnership in crime." *Fiswick*, 329 U.S. at 216.

Indeed, the government's reading of precedent would untether the statute of limitations from the conspiratorial agreement and the concerted conduct that defines the conspiracy. *See id.* On the government's view, a conspiracy prosecution's timeliness turns not on the timing or

nature of the concerted conspiratorial conduct but rather on the terms of the particular investment agreement obtained through the fraud.  Thus, if conspirators cooperate to fraudulently obtain a one-year debt instrument, then the last overt act (on the government's theory) would be receipt of the final interest payment—12 months after the conclusion of concerted action among the co-conspirators to obtain the note.  In contrast, "if one successfully conspires to obtain a lifetime annuity through fraud, each monthly payment until the conspirator's death would constitute an overt act," *Doherty*, 867 F.2d at 61, even if the "continu[ed] co-operation of the conspirators" (*Fiswick*, 329 U.S. at 216) was the same in both cases.  No precedent supports that counterintuitive (and random) result.

Adopting the government's theory would also eviscerate the statute of limitations in conspiracy cases—a fear borne out by the facts of this case.  Because at least one of the GICs at issue is scheduled to pay interest at least until 2032, the government could have waited to prosecute defendants until 2038.  Indeed, it will *still* be able to prosecute any of the unindicted co-conspirators—including any corporation criminally liable for the conduct of its agents—any time within the next 26 years.  That theory "would for all practical purposes wipe out the statute of limitations in [these kinds of] conspiracy cases," a consequence the Supreme Court has rejected.  *Grunewald*, 353 U.S. at 402.  And it would turn on its head that Court's admonition that "limitations statutes are to be liberally interpreted in favor of repose."  *United States v. Habig*, 390 U.S. 222, 227 (1968) (quotation omitted).  Finally, as explained earlier, "courts must be alert to subtle 'attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions,"' *Rosenblatt*, 554 F.2d at 40 (quoting *Grunewald*, 353 U.S. at 404), and it is difficult to imagine a less "subtle" attempt at expanding the scope of the conspiracy-to-defraud statute than effectively gutting its statute of limitations.

-15-

It would be one thing if Congress (or Second Circuit precedent) clearly mandated that the limitations period be extended according to the government's theory.  Here, however, there is no such congressional or judicial mandate.  On the contrary, there is a readily available alternative consistent with the charging document, the proof at trial, precedent, and common sense—*viz.*, the interest payments are not acts in furtherance of the conspiracy, but merely the result of a completed conspiracy.  For this reason, too, a judgment of acquittal on all counts is required.

## II.     The Evidence Demonstrates That The Government Proved One Overarching Conspiracy, Not Five Separate Ones, And The Counts Of Conviction Are Thus Multiplicitous In Violation Of The Fifth Amendment.

"An indictment is multiplicitous if it charges the same crime in two counts."  *United States v. Ansaldi*, 372 F.3d 118, 124 (2d Cir. 2004).  In that circumstance, the defendant is subject to multiple punishments for the same crime, resulting in a violation of the Double Jeopardy Clause of the Fifth Amendment.  *See United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999).  When, as here, "the same statutory violation is charged twice, the question is whether the facts underlying each count were intended by Congress to constitute separate 'units' of prosecution."  *Ansaldi*, 372 F.3d at 124 (citing *Bell v. United States,* 349 U.S. 81, 83-84 (1955)).  In a Section 371 conspiracy, the "unit of prosecution" is a single agreement to violate the law.  *Id*.  The question, then, is whether the evidence was sufficient to prove that the agreements alleged in each count were separate and distinct.[8]

Here, the indictment charged a total of six separate conspiracies (one per count), five of which were submitted to the jury.  Each count charged a separate conspiratorial agreement based on the identity of the broker and provider, alleging a new agreement was formed each time a

---

[8] *See, e.g.*, *United States v. Jones*, 482 F.3d 60, 73 (2d Cir. 2006) (considering sufficiency of the evidence to support defendant's convictions on two separate conspiracy counts); *United States v. Josephberg*, 459 F.3d 350, 356 (2d Cir. 2006) (per curiam) (explaining that the district court may address multiplicitous convictions after a jury verdict).

defendant worked with a different broker or on behalf of a different provider.  For example, Count One charged that all three defendants conspired with CDR brokers while employed by GE, while Count Six charged that Goldberg conspired with IMAGE brokers while employed by FSA.[9]  The government's theory is that these broker-provider relationships constitute separate "bilateral" conspiracies and, thus, separate "units of prosecution."[10]  In other words, the indictment alleges that the identity of the broker and provider distinguish the conspiracies from each other.

It is well established, however, that a mere change in membership does not itself create a new conspiracy; rather, the change must somehow alter the conspiratorial agreement itself.  *See Kaplan v. United States*, 7 F.2d 594, 596 (2d Cir. 1925) ("[T]he conspiracy is determined by the design of the parties who originate it, and when a new person joins, if the purposes remain the same, it continues to be the single venture which it was before."); *United States v. Muyet*, 994 F. Supp. 501, 512 (S.D.N.Y. 1998) (Leisure, J.) ("[A] single conspiracy is not transformed into multiple conspiracies by virtue of the fact that it may involve two or more phases.... Nor is a single conspiracy transposed into a multiple conspiracy simply by [] change of membership[.]" (internal citations and quotations omitted)).  And the evidence—including testimony of government witnesses—as well as the government's own summation demonstrates that, at most, defendants were involved in a "single venture," not five separate ones.  Defendants were thus convicted repeatedly for the same crime.

1.  While the indictment purports to allege that defendants' relationships with each broker and provider constituted separate agreements, the trial evidence shows no change in the overall

---

[9] The counts of conviction were segregated as follows: Count One (all defendants (GE) / CDR); Count Two (all defendants (GE) / IMAGE); Count Four (Grimm (GE) / UBS); Count Five (Goldberg (FSA) / CDR); Count 6 (Goldberg (FSA) / IMAGE).

[10] Letter from Antonia R. Hill to the Honorable Harold Baer, Jr. (Apr. 13, 2011).

agreement itself based on the identity of the broker or the provider who joined it.  For example, cooperating witness Mark Zaino testified that the supposedly distinct "bilateral" arrangements were parts of a single, overarching agreement.  Zaino testified that he caused UBS to pay swap fees to CDR, IMAGE, and other brokers, at the behest of multiple providers including GE, FSA, and CDC, and that he did so pursuant to a single scheme to steer GICs to particular providers.  Tr. 2363-65.  Take Count Four (Grimm/UBS) as an example.  At least two deals featured in that count involved payments to CDR (the broker in Count One) facilitated by UBS.  Tr. 2340, 2346-47, 2360-63.  Indeed, when asked to explain a post-bid swap payment involved in Count Four, Zaino testified that, along with getting UBS paid, he was trying "to get CDR paid."  Tr. 2340.

CDR witnesses also established a larger single agreement among providers and brokers.  They testified that they helped *many* "favored" providers win GICs—not only GE and FSA, but also JPMorgan, Societe Generale, Lehman Brothers, and others.  Tr. 341, 661-662, 899, 905.  CDR cooperator Dani Naeh, for example, testified that he solicited courtesy bids from all those providers:  "if I was working on a transaction where I had preselected a provider to win the deal, I would then go to people that I was friendly with in the industry and say, you know, this deal is earmarked for someone to win, can you put in, can you put in a bid."  Tr. 661.  He further testified that other providers submitted courtesy bids "because they knew that sometime down the line it could be a day later, could be a week later, could be a month later, that I would be working on their behalf to get an investment contract steered to them, and under those circumstances, I'd be asking the other providers to submit intentionally losing bids so that they could win."  Tr. 662.

Indeed, the government's own proof demonstrates that a common arrangement among multiple providers was often integral to the success of the charged scheme.  For example, in the

-18-

University of Nebraska transaction, Grimm at GE told Goldberg, then at FSA, that he had agreed with IMAGE to lower his bid to allow FSA to win the transaction.  Segregating the counts—in this case, Counts Two and Six—is artificial, and inconsistent with the proof at trial.

2.  The government itself presented its theory of the case as one overarching conspiracy. For example, the government argued that Goldberg and Grimm participated in the same agreement to win GICs even while at different employers:  "As part of the scheme between IMAGE and Goldberg and FSA, Goldberg will help IMAGE's conspiracy with GE.  Why not? *This is how they all made money at the expense of the issuer.*"  Tr. 3021 (government summation) (emphasis added).  The government also contended that Goldberg and Grimm were "willing to take turns helping each other out with respect to bids," when they worked for different employers, and that each was "prepared to pay kickbacks to IMAGE" so that "Goldberg [could] make some money here, and Grimm [could] make some money later."  Tr. 3020-21 (government summation).  And the government specifically argued in its rebuttal summation that the University of Nebraska deal mentioned above was evidence of Grimm (at GE) assisting Goldberg (at FSA).  Tr. 3189-90.

The government similarly argued that the identity of Goldberg's employer did not change the scheme, because when he left GE to join FSA, it was "a new company, the *same scheme*." Tr. 2982 (government summation) (emphasis added).  The government later explained, to similar effect:  "You've heard from the same five CDR witnesses who said they kept on conspiring with Goldberg once he arrived at FSA. ... Business as usual!"  Tr. 2983 (government summation). The government made the same point about Counts Two and Six, claiming "it is no surprise when Goldberg arrived at FSA, he picked up right where he left off, with IMAGE as well. Again, a new company, the same Goldberg."  Tr. 2983 (government summation).   In other

words, according to the government's own theory, employees of FSA and GE were in one agreement to win bids and pay fees.

The government also argued that the scheme remained the same when the broker changed.  As to the CDR and IMAGE conspiracies in Counts One and Two, for example, the government stated: "This [Count Two conspiracy] existed at approximately the same time as the Count 1 conspiracy, the *same scheme*, just with a different broker."  Tr. 2981-82 (emphasis added).

The government's own arguments thus confirm what the evidence itself makes clear: there was one overarching agreement—"the same scheme"—involving multiple providers and brokers, i.e., "a collective venture directed toward a common goal."  *United States v. Sureff*, 15 F.3d 225, 229 (2d Cir. 1994) (quotation omitted); *see also United States v. Ness*, 2003 WL 21804973, at *7 (S.D.N.Y. Aug. 6, 2003), *aff'd*, 466 F.3d 79 (2d Cir. 2006), *vacated on other grounds*, 553 U.S. 1091 (2008) (finding only one conspiracy where evidence showed that defendant was aware of the entire scope of conspiracy and played a central role in its execution).

3.   The government introduced no evidence at all to the contrary.  With respect to the CDR counts, for example, not one of the five cooperating CDR witnesses gave specific testimony about how the inception, formation, membership, or objective of the CDR-GE agreement alleged in Count One was distinguished from the inception, formation, membership, or objective of the CDR-FSA agreement alleged in Count Five.  Nor was there any testimony explaining any distinction between the GE-IMAGE conspiracy charged in Count Two and the FSA-IMAGE conspiracy charged in Count Six.  The government simply introduced no evidence, beyond pure conjecture, that would have allowed the jury to find multiple conspiracies.

4.  Because the evidence presented at trial demonstrates the existence of one agreement,

not multiple ones, enforcing the jury's verdict would subject defendants to multiple punishments for the same crime, a result prohibited by the Fifth Amendment. *See Ansaldi*, 372 F.3d at 124. It does not matter, of course, that the indictment charged multiple conspiracies. "The Second Circuit has long recognized the ease with which prosecutors can draft indictments that allege what appear to be separate conspiracies but may actually be parts of an overall conspiracy." *United States v. Hernandez*, 2009 WL 3169226, at *9 (S.D.N.Y. Oct. 1, 1999) (Baer, J.) (quotation omitted).

"Ordinarily, when a defendant is convicted of multiplicitous counts, the district court should vacate … the [multiplicitous] convictions," *Ansaldi*, 372 F.3d at 125, and defendants are entitled to at least that remedy. Here, however, more is required because the jury was instructed that if it concludes "that there existed a single conspiracy, and that the government did not prove beyond a reasonable doubt that separate conspiracies existed, you cannot find the defendant guilty of those separate conspiracies as charged in the indictment." Tr. 3221. Given the evidence—which, as explained, proved at most "that there existed a single conspiracy"—the jury was not entitled to "find the defendant[s] guilty of [the] separate conspiracies charged." Accordingly, the only proper conclusion for a reasonable jury, consistent with the evidence and the Court's instruction, was acquittal.[11]

## III.   The Government Failed To Introduce Sufficient Evidence Of Defendants' Fraudulent Intent.

Fraudulent intent is an essential element to sustain each object of the conspiracy. *E.g.*, *United States v. Montour*, 944 F.2d 1019, 1024 (2d Cir. 1991); *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). The government's evidence was sufficient to sustain neither.

---

[11] As set forth in the memorandum in support of Mr. Carollo's Rule 29 motion, Mr. Carollo joins in this request for relief in the alternative, in the event the Court denies his motion.

#### A.    The Provider Certificates Fail To Prove Defendants' Fraudulent Intent.

Presumably due to a lack of other evidence of fraudulent intent, *see infra* Part III.B, the government attempted to demonstrate such intent principally by relying on (according to the government, false) provider certificates signed by defendants when they won GICs, in which they represented that they had complied with various Treasury Department regulations applicable to the bidding process.  These certificates are insufficient to support an inference of defendants' intent to defraud, because the government failed to prove that defendants believed their certifications to be false.

1.   To plausibly support an inference that defendants intended to defraud either the issuers or the IRS by providing false certificates, the government would have to demonstrate that defendants believed the certificates to be false.  The evidence, however, supports precisely the opposite conclusion:  that defendants did not knowingly submit false provider certificates.

Evidence offered by the government itself demonstrated that defendants believed the regulations were intended to prevent lowering bids *only* for the purpose of avoiding "arbitrage." When a municipality issues bonds, those bonds are typically tax-exempt, and the municipality is prohibited from reinvesting the bonds at higher interest rates and thereby turning a profit.  If a municipality fails to comply with this rule, it is required to pay arbitrage—that is, to refund the excess—to the IRS.  The only "training" on the certificates—or, indeed, on GIC bidding at all— that the government proved defendants received at GE was an investment agreement bidding checklist which said that the regulations only prohibit lowering bids to avoid arbitrage:  any "[b]id must be a market rate (not adjusted due to issuer's arbitrage rebate considerations)—see attached 'Provider Certificate' for tax reps we must make with respect to investment of proceeds of all tax exempt transactions.  We must be in compliance with these reps."  DOJ-GE-00000176. One of the government's witnesses (bond counsel Travis Gibbs) confirmed this understanding,

explaining that the regulations were aimed at preventing "yield-burning" (i.e., lowering bids to avoid arbitrage).  Tr. 2655 (Gibbs Cross).

The government never even suggested that defendants lowered bids to avoid arbitrage. Thus, if defendants shared Gibbs's (and GE's) understanding that the regulations prohibit only adjustments made for arbitrage-avoidance purposes, they would have believed that the certificates were accurate.  No witness testified that he had given defendants different information about the meaning of the regulations that would have led them to believe that they covered anything other than arbitrage avoidance.

In addition, several of the government's cooperating witnesses admitted that they were unaware of how the regulations defined and treated such allegedly wrongful practices—central to the government's case against defendants—as supplying courtesy bids and providing last looks. *E.g.*, Tr. 662-63 (Naeh Direct); Tr. 952, 958 (Rothman Cross); Tr. 2613-14 (Farber Cross).  Even assuming the government is correct about the scope of the regulations themselves, the government never explained why defendants must have known that the regulations precluded that conduct when its own witnesses (who also worked in the GIC industry) did not.

Nor could the jury reasonably have concluded, beyond a reasonable doubt, that defendants' certifications were false merely by consulting the regulations and concluding that defendants violated them (and thus falsely attested to compliance).  Those regulations were confusing on their face, *see* Tr. 3033, 3035, and are at the very least ambiguous.  Indeed, as explained, the jury saw GE's checklist and heard Gibbs's testimony, both of which supported the conclusion that defendants did not violate the regulations.  DOJ-GE-00000176; Tr. 2637, 2655. The prosecution and the defense advanced competing interpretations of the regulations, and the jury was left with little help to ascertain which was correct.  There was simply no basis—other

than conjecture—for the jury to conclude that defendants' certifications were false.  Accordingly, the certificates do not support an inference of fraudulent intent.

2.   Nor is there any basis for extrapolating any conclusion about defendants' understanding of the regulations or the provider certificates from the cooperators' testimony that they believed the certifications were false.  While the government's witnesses did not directly opine about defendants' state of mind, the government relied on their testimony to try to establish intent.  That technique suffers from a similar problem to that which arises with more direct commentary about mental state from lay witnesses:  the nexus between the witness's opinion and the defendant is insufficiently close to allow the jury to draw reasonable conclusions about the defendant's state of mind, because the testimony is not grounded in any first-hand observation linking the witness's understanding to the defendant's.  *Cf.* Fed. R. Evid. 701(a) (lay opinion must be "rationally based on the witness's perception").

**B.      The Evidence Was Insufficient To Demonstrate Fraudulent Intent.**

With or without the certificates, the evidence was insufficient to support a finding of fraudulent intent beyond a reasonable doubt, as to either object of the charged conspiracy.

1.      *IRS Object*

a.  As explained, the government must prove defendants' specific intent to defraud the IRS beyond a reasonable doubt.  *E.g.*, *Montour*, 944 F.2d at 1024.  The government's principal theory of defendants' intent to defraud the IRS was based on the certificates.  By representing that they had complied with the terms of the regulations, the theory went, defendants aimed to mislead the IRS about the dynamics of the bidding process, which in turn could affect the tax-exempt status of the bonds issued by the municipalities, thus depriving the IRS of rebates it was entitled to collect from the issuers.  According to the government, defendants' alleged bid manipulation and subsequent false certifications put the issuers and their bonds at risk, and made

it so that no one, including the IRS, could determine whether there had been a bona fide bid.

As already explained, however, there is no evidence at all—and certainly not enough to convince a reasonable jury beyond a reasonable doubt—that the certificates were knowingly false. Thus, the government's theory of specific intent to defraud the IRS is baseless.

b.   In any event, the government's theory fails even on its own terms. There was no evidence to connect the supposed misrepresentations in the certificates to any IRS function. The government's desired inference—that defendants submitted the certificates to the municipalities with the fraudulent intent to mislead the IRS and thereby to impede its functions—was unsupported. In fact, the government did not prove that the IRS ever saw or was told about any statement made in the provider certificates. Likewise, there was no evidence that the IRS was deprived of money that it was owed as a result of defendants' conduct, and the government did not call any witness affiliated with the IRS to explain that there was a problem with the rates on the winning bids or with the related provider certificates. The government offered no explanation as to why defendants would have wanted to defraud the IRS, given that the issuer, not the providers, would have had to pay any rebate owed. And no one could have predicted, at the time the bids were made, whether the issuer would owe the IRS arbitrage, because arbitrage calculations are done well after the bidding is complete. *E.g.*, Tr. 2617 (Farber Cross).

Nor was there any evidence that defendants intended to interfere with any IRS monitoring function. The government opted not to call an IRS witness to tell the jury what monitoring there would have been, which, had they done so, might have allowed the jury to draw reasonable conclusions about how likely the certificates were to factor in that process. As it was, the prosecution presented no evidence that the IRS performs audits or asks to see provider certificates in connection with those audits. Indeed, there was no evidence that there even *was*

-25-

an IRS monitoring function that defendants could have conspired to impede, let alone evidence

to show that defendants intended to impede it.  No reasonable jury could have found, beyond a

reasonable doubt, that defendants specifically intended to defraud or harm the IRS.

2.    *Wire Fraud*

a.  The prosecution offered no direct proof of defendants' intent to defraud the issuers.

Rather, beyond the fraudulent intent the government (unsuccessfully) sought to prove through

the certificates, the government sought to show defendants' fraudulent intent to deceive the

issuers by playing for the jury defendants' recorded phone conversations.[12]  That effort fails to

sustain the government's burden because "[w]hile it is true that a conviction may be based solely

on reasonable inferences from circumstantial evidence, a conviction cannot rest on mere

speculation or conjecture."  *United States v. Pinckney*, 85 F.3d 4, 7 (2d Cir. 1996) (internal

citation omitted).

The prosecution tried to transform the fact that, in its words, defendants spoke in "hushed

tones," "us[ed] guarded terms," and suggested talking "offline" in some of the calls into proof of

their intent to defraud, because, the government theorized, this showed that defendants were

trying to hide their bidding practices.  Tr. 2984-87, 3008.  But the government did not secretly

record defendants' conversations; defendants repeatedly discussed the supposedly fraudulent

transactions on phone lines that they were well aware were recorded by GE.  These tapes

describe for the jury how defendants interacted with brokers and reflect the often favorable terms

they were able to secure on winning bids, but they do not demonstrate that defendants intended

to defraud the issuers, or to do anything but advance their legitimate business interests.

Indeed, the government's evidence was not inconsistent with the innocent explanation

---

[12] Indeed, the government failed even to call any witnesses concerning Count 2, relying only on these recorded conversations.

that defendants sought to submit competitive bids.  For example, where defendants agreed to submit bids on GICs they knew they were not going to win, the evidence offered no indication that they did so as part of a scheme to defraud issuers by somehow producing a lower winning bid than the issuer otherwise would have received.  The evidence does not refute the defense's argument that defendants agreed to submit these courtesy bids because they wanted to stay on the brokers' lists to increase the likelihood that they would be given the chance to bid on future deals that they *could* win.  Even with respect to transactions in which defendants were invited by brokers to lower their bids, there was evidence that legitimate business considerations motivated that bidding activity.  *E.g.*, Tr. 1009-10, 1180-81, 1182, 2392, 2409-11, 2413-14, 2417.

At most, the prosecution's evidence described defendants' bidding practices and their impact on the outcome of particular deals.  But proof of the effect of the supposedly improper bidding tactics challenged in the indictment does not substitute for proof of defendants' specific intent to defraud the issuers.   Securing a deal with advantageous terms and cultivating relationships with issuers and brokers were part of defendants' jobs, not inherently wrongful aims.  The government presented no evidence that defendants won any deal on which they did not submit the highest bid—their participation in deals they won provided the issuer with a better deal than it would have gotten had they not submitted a bid on that transaction, since the next highest bid (that is, one at a lower rate) would in all likelihood have been accepted.  *E.g.*, Tr. 2427 (Zaino Cross) (Grimm submitted highest bid on Puerto Rico deal); Tr. 2441 (Zaino Cross) (Grimm submitted highest bid for float fund on New Mexico deal).   In addition, the government's witnesses testified that, on some deals, brokers communicated with defendants to encourage them to *raise* their bids in order to beat another provider's offer.  *E.g.*, Tr. 1282 (Zarefsky Cross).  That conduct—which resulted in the issuer getting a better deal with a better

rate—is plainly inconsistent with an intent to defraud the supposed "victim" of the charged conspiracy.  The evidence thus strongly supports the defense's theory that defendants acted with innocent intent, and where there are at least equally persuasive competing inferences to be drawn from the evidence, no jury could reasonably conclude that the government proved its case beyond a reasonable doubt.  *See Glenn*, 312 F.3d at 70.

b.  Further, as with the IRS object, even if the government could properly rely on the purportedly false certificates—which it cannot—those certificates fail to establish defendants' intent to defraud the issuers.  Assuming the certificates include misrepresentations, that alone is not enough to prove intent because "the deceit must be coupled with a contemplated harm to the victim."  *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987).  Even evidence that someone was deceived by a misrepresentation does not necessarily suffice to show that the person making the statement anticipated and intended that effect.  *See United States v. Novak*, 443 F.3d 150, 156-57 (2d Cir. 2006).  Rather, "[o]nly a showing of intended harm will satisfy the element of fraudulent intent."  *United States v. Gabriel*, 125 F.3d 89, 97 (2d Cir. 1997) (quotation omitted).  And "[w]here the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent."  *D'Amato*, 39 F.3d at 1257; *see Guadagna*, 183 F.3d at 130.

Here, the government relied on two separate theories of fraud against the issuers: (i) a scheme to defraud the issuers out of money, and (ii) a scheme to defraud them out of their purported property right "to control their assets by causing them to make economic decisions based on allegedly false and misleading information."  Tr. 3224.  Neither theory is supported by the evidence, even if the certificates include misrepresentations.

i.  The government failed to prove that defendants intended to deprive issuers of money.

-28-

Indeed, the evidence showed that GICs were uniformly won by the highest among multiple bidders, that brokers sometimes encouraged defendants to increase their bids to win a deal, and that defendants discussed the supposed "fraud" in the open, on phone lines they knew were recorded.  Against this backdrop, the inference that defendants intended to harm issuers is weak and attenuated—the government has produced no evidence to show the "contemplated harm" needed to transform a misrepresentation into the basis for a finding of specific intent.

ii.  Nor is there any evidence to support the theory that defendants intended to deprive the issuers of the right to control their assets.  An alleged victim's right to control property is harmed only when that victim is deprived of "facts material to the bargain."  *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970).  "To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction."  *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994).  There must be "a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver."  *Novak*, 443 F.3d at 159 (quotation omitted).  The Second Circuit "ha[s] drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes."  *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007).  That standard is not met here.

*First*, the government failed to establish that the certifications defendants signed were an essential part of the bargain, as opposed to boilerplate formalities.  The government did not present any witnesses from the so-called victims—the issuers—in Counts Two, Five, or Six.  As

a result, there is no testimony for those counts about what the issuers considered to be material terms of the GIC bargains.  Indeed, Grant Whittaker, an issuer witness who testified about a deal in Count One involving Mr. Grimm, confirmed that the two "essential terms" of the GIC deal were: (1) the interest rate, and (2) the provider's obligation to make payments to the issuer.  Tr. 2245.  The government did not allege, nor did it prove, that defendants ever misrepresented either of those two terms in any certification on any deal in this case.

The jury heard testimony from an issuer witness involved in a transaction featured in Count Four that the provider certificate in that transaction was not signed and the issuer never noticed the omission.  Tr. 2606 (Farber).  This is entirely inconsistent with a finding that the certifications constituted essential terms of the deal.  Likewise, because there was no evidence that the hedge fees paid by defendants were relevant to the issuers, the government cannot point to the failure to disclose those fees as a material omission.  In fact, Travis Gibbs, who served as bond counsel to one issuer, testified that "how the provider hedges the GIC is not relevant to the issuer at all, not material to the issuer," and that as bond counsel he does not need to know about other fees paid to the broker that are not "in connection with the GIC."  Tr. 2646, 2672-73. Given this testimony from issuer victims, the jury could not have found that the certifications went to essential terms of the GIC bargains.

*Second*, the government failed to establish that the alleged misrepresentations affected the ultimate value of the transactions.  Instead, the proof more closely resembled *Regent Office Supply Co.*, where the Second Circuit reversed a mail fraud conviction because the government failed to establish that misrepresentations caused or were intended to cause any injury.  421 F.2d at 1182.  In that case, defendant salesmen made misrepresentations to potential customers about having been referred by friends.  The court reversed the convictions because "solicitation of a

purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain" does not constitute a scheme to defraud. *Id.* at 1179.  While the court criticized the business practice of making false statements about the referral to solicit a purchase, it found that those practices could not amount to fraud where the customer received precisely the product it purchased and there was no evidence of intent to harm—just intent to sell. *Id.* at 1180.

The evidence presented at trial leads to the same conclusion here.  There was no evidence that defendants intended to sell anything other than GICs with the terms that the issuers understood and accepted.  The testimony from the issuer witnesses is that they received the GICs that the providers offered.  Mr. Farber (Tr. 2606-07) and Mr. Whittaker (Tr. 2206-07) both testified that their respective issuers continue to receive interest payments on the GICs to this day, and neither testified that the providers failed to perform under the contracts.  There was no testimony or other evidence that any underlying tax-exempt bond was ever the subject of proceedings to declare the issuance taxable.  Mr. Whittaker testified that to his knowledge, no Utah Housing bond has ever lost its tax-exempt status (Tr. 2193), and Mr. Farber testified that the IRS has not challenged New Mexico's bonds at issue in this case (Tr. 2618-19).  In short, there was no evidence that the misrepresentations affected the economic substance of the deals. The government's assertion at trial that defendants' conduct risked such a result was based entirely on speculation. Tr. 2997-98, 3185.

*Finally*, the government's right-to-control-assets theory of liability is itself invalid. Although the Second Circuit has held that a right to control one's assets counts as "property" under the mail and wire fraud statutes, *see, e.g.*, *United States v. Carlo*, 507 F.3d 799, 801-02 (2d Cir. 2007), neither the statutory language nor Supreme Court precedent supports that

-31-

interpretation.  As the Third Circuit has recognized, a deprivation of control over how money is spent is "too amorphous to constitute a violation of the mail fraud statute as it is currently written."  *United States v. Zauber*, 857 F.2d 137, 146-47 (3d Cir. 1988); *see also United States v. Lewis*, 67 F.3d 225, 233 (9th Cir. 1995) ("[T]he right to make an informed business decision is not the kind of intangible right protected under the wire fraud statute").  Further, even if the right to control one's assets counts as property, a theory based on a scheme to *deprive* a victim of such "property"—as the government alleges happened here—is not sufficient to sustain a wire fraud conviction, because the wire fraud statute proscribes a scheme "for *obtaining* money or property." 18 U.S.C. § 1343.  While an intent to deprive suffices in the Second Circuit, *see, e.g.*, *Porcelli v. United States*, 404 F.3d 157, 161-63 (2d Cir. 2005), at least two other circuits have held that wire or mail fraud can be accomplished only if there is an intent to obtain money or property from the victim of the fraud.  *See, e.g.*, *Monterey Plaza Hotel Ltd. P'ship v. Local 408*, 215 F.3d 923, 926 (9th Cir. 2000); *United States v. Walters*, 997 F.2d 1219, 1224-27 (7th Cir. 1993).  Further, that reading of the wire fraud statute is squarely supported by the Supreme Court's decision in *Scheidler v. NOW, Inc.*, 537 U.S. 393 (2003), which held that that the Hobbes Act's statutory language requires that property must actually be obtained by extortion for a violation of the Act to have occurred.

Accordingly, because the government's evidence was insufficient to support the requisite finding of intent as to either object of the conspiracy, a judgment of acquittal is warranted.

## CONCLUSION

For the foregoing reasons, this Court should grant defendants' motion for a judgment of acquittal.

Dated: July 13, 2012
New York, New York

Respectfully submitted:

*Howard E. Heiss*

Howard E. Heiss
Mark A. Racanelli
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
*Attorneys for Defendant Peter S. Grimm*

*Walter F. Timpone (HEH)*

Walter F. Timpone
MCELROY, DEUTSCH, MULVANEY &
CARPENTER LLP
1300 Mt. Kemble Ave.
Morristown, NJ 07962
Telephone: (973) 993-8100
*Attorneys for Defendant Dominick P. Carollo*

*John S. Siffert (HEH)*

John S. Siffert
Daniel M. Gitner
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 921-8339
*Attorneys for Defendant Steven E. Goldberg*

## CERTIFICATE OF SERVICE

I, Anton Metlitsky, hereby certify that a true and correct copy of the foregoing was served on the following this 13th day of July, 2012, by the Court's ECF system and by email:

| | |
|---|---|
| Antonia Hill, Esq.<br>**U.S. DEPARTMENT OF JUSTICE,**<br>**ANTITRUST DIVISION**<br>26 Federal Plaza, Room 3630<br>New York, New York 10278 | Steven Tugander, Esq.<br>**U.S. DEPARTMENT OF JUSTICE,**<br>**ANTITRUST DIVISION**<br>26 Federal Plaza, Room 3630<br>New York, New York 10278 |
| Kevin B. Hart, Esq.<br>**U.S. DEPARTMENT OF JUSTICE,**<br>**ANTITRUST DIVISION**<br>26 Federal Plaza, Room 3630<br>New York, New York 10278 | Wendy Wei-Wenne Huang Waszmer<br>**U.S. ATTORNEY'S OFFICE,**<br>**SOUTHERN DISTRICT OF NEW YORK**<br>26 Federal Plaza, Room 3630<br>New York, New York 10278 |

Anton Metlitsky