## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    - v. -

DOMINICK P. CAROLLO,
STEVEN E. GOLDBERG, and
PETER S. GRIMM,

         *Defendants*.

S1 10-CR-654 (H.B.)

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'
## JOINT MOTION FOR JUDGMENT OF ACQUITTAL

Howard E. Heiss
Mark A. Racanelli
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
*Attorneys for Defendant Peter S. Grimm*

John S. Siffert
Daniel M. Gitner
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 921-8339
*Attorneys for Defendant Steven E. Goldberg*

Walter F. Timpone
MCELROY, DEUTSCH, MULVANEY &
CARPENTER LLP
1300 Mt. Kemble Ave.
Morristown, NJ 07962
Telephone: (973) 993-8100
*Attorneys for Defendant Dominick P. Carollo*

# TABLE OF CONTENTS

**Page**

ARGUMENT ..................................................................................................................... 1

I.     The Interest Payments Do Not Extend The Limitations Period ....................... 1

    A.     The Interest Payments Were Not Made By Co-Conspirators ................................ 1

    B.     The Interest Payments Are The Result Of A Completed Conspiracy ................... 4

II.    The Evidence Demonstrates That The Government Proved One Overarching
Conspiracy, Not Five Separate Ones, And The Counts Of Conviction Are Thus
Multiplicitous In Violation Of The Fifth Amendment ....................................... 9

III.   The Government Failed To Present Sufficient Evidence To Establish Defendants'
Intent to Defraud ...................................................................................................... 13

CONCLUSION ................................................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Fiswick v. U.S.*,
329 U.S. 211 (1946)..................................................................4, 6

*Grunewald v. U.S.*,
353 U.S. 391 (1957)..................................................................5, 7

*Kaplan v. U.S.*,
7 F.2d 594 (2d Cir. 1925) ...........................................................12

*U.S. v. A-A-A Electric Co.*,
788 F.2d 242 (4th Cir. 1986) .......................................................9

*U.S. v. Anderson*,
326 F.3d 1319 (11th Cir. 2003) ....................................................9

*U.S. v. Ben Zvi*,
242 F.3d 89 (2d Cir. 2001)......................................................2, 3, 4

*U.S. v. Celaj*,
649 F.3d 162 (2d Cir. 2011)........................................................14

*U.S. v. Doherty*,
867 F.2d 47 (1st Cir. 1989)........................................................7, 9

*U.S. v. Evans & Assoc. Construction Co.*,
839 F.2d 656 (10th Cir. 1988) .....................................................9

*U.S. v. Girard*,
744 F.2d 1170 (5th Cir. 1984) .....................................................9

*U.S. v. Gleason*,
616 F.2d 2 (2d Cir. 1979) ...........................................................11

*U.S. v. Glenn*,
312 F.3d 58 (2d Cir. 2002).................................................13, 14, 16

*U.S. v. Hamilton*,
689 F.2d 1262 (6th Cir. 1982) .....................................................12

*U.S. v. Josephberg*,
459 F.3d 350 (2d Cir. 2006) (per curiam)........................................9

*U.S. v. Korfant*,
771 F.2d 660 (2d Cir. 1985) (per curiam)........................................9

*U.S. v. Muyet*,
994 F. Supp. 501 (S.D.N.Y. 1998).................................................12

*U.S. v. Salmonese*,
352 F.3d 608 (2d Cir. 2003)................................................. passim

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*U.S. v. Walker*,
   653 F.2d 1343 (9th Cir. 1981) ...................................................................................9

## ARGUMENT

### I.    The Interest Payments Do Not Extend The Limitations Period.

Even though all concerted conspiratorial conduct—the steps defendants and their co-conspirators took to rig bids on GICs—occurred outside the limitations period, the government continues to assert that each routine, automatic interest payment made by defendants' former employers to the issuers was an overt act continuing the conspiracy.  Not so: the interest payments were not made by co-conspirators, and were in any event the result of a completed conspiracy, not acts supporting a continuing one.  Defs.' Joint Br. ("DB") 2-16.

Accepting the government's theory would work an unprecedented expansion in conspiracy law, eliminating the fundamental distinction between acts that further the concerted conduct of an ongoing conspiracy and events that are the result of a completed one.  It may sometimes be difficult to mark the precise point where a conspiracy ends and its results begin.  But it is not difficult here—all the conspirators agreed to do was done once the GICs were won, and all concerted conduct ended thereafter.  The interest payments are simply the automatic result of a conspiracy, and do not depend at all on the continued concerted action of the co-conspirators.  Indeed, as the trial testimony made clear, the interest payments continue even now, and will not end for two more decades.  The government does not dispute that under its theory, the conspiracy continued through trial to this day, and that it would continue if all the conspirators were incarcerated or dead, presumably because its results would continue to be felt.  In other words, the government's view of when a conspiracy ends does not depend at all on whether there is any ongoing conspiratorial conduct, or even whether the conspirators themselves remain in existence.  Nonsense.

### A.    The Interest Payments Were Not Made By Co-Conspirators.

The government does not dispute the "requirement that an overt act must be knowingly

committed by at least one member of a conspiracy." *U.S. v. Salmonese*, 352 F.3d 608, 617 n.3 (2d Cir. 2003).   Yet it is undisputed that neither defendants nor any other conspirators themselves made the interest payments.   Nor does the government even attempt to defend the untenable theory that GE and FSA were themselves co-conspirators separate from defendants. And for good reason: while a corporation may be held *vicariously* liable for the criminal acts of its agents, that does not mean that the corporation can be deemed a separate member of the conspiracy, distinct from its agents, such that an act done by corporate employees having nothing to do with the conspiracy can nevertheless count as an overt act.   DB 4-8.

Instead, the government's theory appears to be that each interest payment is an overt act because defendants knowingly caused the interest payments to be made.   Gov't Br. ("GB") 31. That theory is meritless.   No one disputes that these payments occurred automatically, without the involvement of any co-conspirator.   Tr. 2746, 2784-85.   Contrary to the government's argument, while defendants knew *at the time they entered into the GICs* that future interest payments would result (GB 30), that does not render the payments themselves *defendants'* acts.

Indeed, the Second Circuit rejected that precise theory in *U.S. v. Ben Zvi*, 242 F.3d 89 (2d Cir. 2001).   As here, the defendant there was charged with a § 371 conspiracy.   The government argued that its first indictment had been timely because "it charged Ben Zvi with 'caus[ing]' an electronic funds transfer to be made [within the limitations period] from Lloyd's of London to its attorney in New York."   *Id.* at 97 (first alteration in original).   The Second Circuit rejected that argument "because the wiring of the funds was not an overt act by Ben Zvi or her co-conspirators."   *Id.*   "The wiring of funds by Lloyd's to its New York counsel …, *though precipitated by earlier fraudulent acts and omissions of defendant and her coconspirators*, did not involve or otherwise turn on any identifiable act or omission of the conspirators *as of the*

*time of the wire transfer*." *Id*. (emphasis added).  The government was only able to salvage the

prosecution in a later, superseding indictment by alleging that Ben Zvi's *own* knowing receipt of

conspiracy-related payments fell within the limitations period. *Id.* at 98.

     *Ben Zvi* is directly on point.  The automatic interest payments made by GE's and FSA's

back office, "though precipitated by earlier fraudulent acts and omissions of defendant[s] and

[their] coconspirators, did not involve or otherwise turn on any identifiable act or omission of the

conspirators as of the time of the [interest payments]." *Id.* at 97.  The indictment is untimely.

     The government relies on *Salmonese*, but that case in fact precludes the government's

position.  There, the government charged as an overt act a conspirator's "receipt of criminal

proceeds … through a wire transfer into an account under his control." 352 F.3d at 618.  As the

government notes, the Second Circuit held it irrelevant whether the defendant physically took

possession of the proceeds himself, or did so (for example) "through a clerical employee," so

long as his receipt was "knowing and intentional." *Id.*; *see* GB 29-30.  But the overt act in

*Salmonese* was the *conspirator's own act—his receipt of proceeds*—whereas no co-conspirator

in this case had any involvement in making any interest payments.

     *Salmonese* itself establishes this crucial distinction in its examination of *Ben Zvi*.  In

explaining the "important difference" between the conduct in *Ben Zvi* that counted as an overt

act and the conduct that did not, *Salmonese* noted that both "involved a financial transfer by an

innocent third party precipitated by the defendants," but in the act that counted, "the defendants

themselves received the check," while the act that did not (like the interest payments here) was

caused by a conspirator's prior conduct, involving no conduct of any conspirator at the time of

the alleged overt act. 352 F.3d at 617.  Indeed, the government in *Salmonese* argued (as it

appears to argue here) that "it is of no legal significance that the overt act that occurred within

3

the limitations period was not actually performed by … [a] member of the charged conspiracy." *Id.* at 617 n.3 (quotation omitted). *Salmonese* explicitly rejected that argument, reiterating "the requirement that an overt act must be knowingly committed by at least one member of a conspiracy." *Id.* "Indeed, it was precisely because the *Ben Zvi* conspirators' knowing receipt of proceeds was *their* act … that the court held that the overt act requirement was satisfied." *Id.*

Here, while the interest payments resulted from defendants' conduct, that conduct occurred outside the limitations period. The payments themselves were not "*their* act[s]" (*id.*), but rather the acts of non-conspirators, and thus cannot constitute overt acts in furtherance of the conspiracy. A judgment of acquittal is required.[1]

## B.     The Interest Payments Are The Result Of A Completed Conspiracy.

1. No one disputes that: (i) there is a critical distinction between acts in furtherance of an ongoing conspiracy and events that merely constitute the "result" of a completed conspiracy, and only the former count as overt acts, *Fiswick v. U.S.*, 329 U.S. 211, 216 (1946); (ii) this distinction turns on whether the act in question was part of an ongoing criminal enterprise— whether there was "continuous co-operation of the conspirators to keep … up … [the] partnership in crime," *id.* (quotation omitted)—or whether the conspiracy had ended by the time the act was done; and (iii) "the crucial question in determining whether the statute of limitations

---

[1] Defendants argued in their joint opening brief (at 7-8) that even if a corporation could count as a distinct conspirator, Counts 5 and 6 (against Goldberg) must be dismissed because the interest payments supporting those counts were made not by Goldberg's corporate employer, but by a separate corporate entity. As noted, the government appears to have abandoned its corporation-as-distinct-conspirator argument. In any event, the government's response that the conduct of various FSA entities is all in furtherance of the conspiracy because they "shared a parent ([cite]), an office ([cite]), and a unity of purpose [no cite]" is puzzling. GB 31. The government does not appear to argue that the presumption of corporate separateness (DB 6-7) is overcome. Rather, it suggests that each FSA entity—including those responsible for interest payments but having nothing to do with bidding on GICs—was part of the conspiracy. Yet the government has no cite for its critical proposition—that each entity shared "a unity of purpose"—because no such evidence exists. Acquittal is required at least as to Counts 5 and 6.

has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Grunewald v. U.S.*, 353 U.S. 391, 397 (1957).

Accepting all those propositions can lead to only one conclusion: the interest payments are not overt acts in furtherance of an ongoing conspiracy. As explained in defendants' opening brief (at 9-11), "the scope of the conspiratorial agreement," as indicted and proven, was to win GICs. The government responds that the conspiratorial agreement was not only to win GICs, but to win GICs that pay below-market interest rates. GB 27-28. Even if that were so—and it is not[2]—it would not help the government. An agreement to win GICs that pay below-market rates is still an agreement *to win GICs*, and is concluded once the GICs are won. It is *not* an agreement to win GICs, and then to make below-market payments until the GICs expire—the government neither alleged nor introduced an iota of proof that the conspirators' agreement contemplated the making of each interest payment. And that is because the trial proof established that no agreement to make interest payments was necessary—once a GIC was won, all of its terms (including the schedule of future interest payments) were fixed, and the resulting interest payments were automatically made according to those terms. Tr. 2780; DB 10-11. In

---

[2] The government believes that testimony showing that GE and FSA were in the GIC business to make money—hardly a startling revelation—demonstrates that one of the objectives of the conspiracy was to artificially deflate interest rates on GICs. GB 27-28. The conclusion does not follow from the premise—GE and FSA were in the GIC business because it was profitable at market rates, not only at artificially low rates. The government asserts that "[o]f course, the most lucrative way for co-conspirators GE and FSA to profit from deals was to obtain and keep the municipal victims' money for the contractual period at a fraudulently rigged and suppressed interest rate." GB 27. The government cites no evidence to support that proposition, and none exists. As the government notes, GE and FSA make money in the GIC business, so winning more GICs means making more money. Indeed, the government fails to confront the large number of deals in which defendants *increased* their "last-look" bids, conduct that is fully consistent with an agreement to win GICs, but facially inconsistent with an agreement to win GICs at depressed rates. DB 10 n.6.

the government's own words, the interest payments were made "*as a result*" of the bid-rigging conspiracy (Tr. 3010 (emphasis added) (government summation)), not in furtherance of it.

Indeed, the proof demonstrates that the interest payments do not depend *in any way* on the continued existence of the conspiracy.  They continue to this day, even though the conspiracy has been exposed and a large number of conspirators stand convicted.  They will continue until the GICs expire, even if all the conspirators were to be incarcerated, and even if they all were to die.  The government does not deny that the necessary consequence of its theory is that the conspiracy continues despite all of this, but dismisses the point as an "irrelevant and counterfactual hypothetical."   GB 30 n.16.   That response is incoherent—"counterfactual hypotheticals" are the ordinary method through which the validity of legal theories is tested. And the government's theory flunks: if the interest payments proceed in the same manner whether or not the conspirators have openly renounced the conspiracy, or whether they remain free or alive, those interest payments cannot possibly be the product of "continuous co-operation of the conspirators to keep … up … [the] partnership in crime." *Fiswick*, 329 U.S. at 216 (quotation omitted).   They can only be the *result* of the conspiracy, occurring wholly independent of the conduct of the co-conspirators, and thus cannot count as overt acts in the conspiracy's furtherance. *Id.*

2.   The government's appeal to precedent is equally unavailing.   Certainly, *Salmonese* does not support its position.   That case involved a "pump and dump" securities fraud scheme. 352 F.3d at 612-13.   The Second Circuit held that sales of the security caused by an unindicted co-conspirator (and the receipt of proceeds from such sales)—*i.e.*, the "dump" portion of the "pump and dump" scheme—were acts in furtherance of the conspiracy.   *Id.* at 613, 616.   That holding is unexceptional—the sale of securities and receipt of the proceeds in *Salmonese* were

themselves a necessary part of the conspiratorial agreement, since a "pump and dump" scheme is obviously not complete without the "dump."  *Salmonese* does not remotely imply that when, as here, interest payments are a continuous and automatic result of a prior, completed scheme—and when each interest payment is made independent of any concerted activity—each interest payment nevertheless is an overt act in furtherance of the conspiracy.

The government relies on *Salmonese*'s statement that "where a conspiracy's purpose is economic enrichment, the jointly undertaken scheme continues through the conspirators' receipt of their anticipated economic benefit."  GB 27 (quoting *Salmonese*, 352 F.3d at 615) (internal quotation omitted).   That statement is true as far as it goes, but must of course be read in light of Supreme Court precedent.  In particular, the Supreme Court held in *Grunewald* that a conspiracy extends no further than "the scope of the conspiratorial agreement."  353 U.S. at 397.   And *Fiswick* requires "continuous co-operation of the conspirators."  329 U.S. at 216.   In *Salmonese*, as in most cases, the scope of an illegal agreement to gain economic advantage will include receipt of profit, which by necessity requires continued conspiratorial conduct.  But *Salmonese* does not purport to extend that principle to cases where those two conditions are absent.  On the contrary, *Salmonese* recognized the principle—announced by then-Judge Breyer in *U.S. v. Doherty*, 867 F.2d 47 (1st Cir. 1989), and itself based on *Grunewald* and *Fiswick*, *id.* at 61-62— that "payoffs" "could reasonably be viewed as part of a conspiracy where their receipt 'consists of one action, or a handful of actions, taking place over a limited period of time, or where some evidence exists that the special dangers attendant to conspiracies ... remain present until the payoff is received,'" but that "no such conclusion was warranted 'where receiving the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions, such as receiving salary payments, and there is no evidence that any concerted activity

7

posing the special societal dangers of conspiracy is still taking place.'" *Salmonese*, 352 F.3d at 616 (quoting *Doherty*, 867 F.2d at 61).  The Second Circuit properly found that the facts in *Salmonese* fell within the first category.  *Id.*; DB 13.  The facts here fall squarely within the second—the interest payments are a continuous, routine, and automatic set of events independent of any continued concerted activity.  DB 11-14.

In its denial of defendants' motion to dismiss, this Court found that on the face of the indictment, this case was more like *Salmonese* than *Doherty* because the "interest payments here are not nearly as attenuated as the salary increases in *Doherty* that followed the conspiracy to distribute police officer promotional exams."  ECF No. 53, at 5.  The evidence at trial, however, established that the making of the interest payments fell outside the scope of the conspiratorial agreement, and that those payments are in fact independent of any conspiratorial conduct.  Indeed, the government's own witnesses testified that GE and FSA continued to make interest payments at the time of trial (*e.g.*, Tr. 2606), while the defendants were sitting in the courtroom charged with federal crimes, watching their co-conspirators testify against them.  The evidence thus demonstrates that the interest payments do not rely on any conspiratorial conduct at all.  Unlike in *Salmonese*, for example, where receipt of proceeds by a conspirator from the sale of the fraudulently inflated securities would obviously not have happened if the conspirators had abandoned the scheme beforehand, the interest payments here have been made, and will continue to be made, automatically and as a matter of course.  Counting such payments as overt acts that continue a conspiracy rather than the results of a finished one would render that distinction meaningless.  A judgment of acquittal is required on this ground as well.[3]

---

[3]  The government relies on several out-of-circuit precedents, but none supports its position.  Several of these cases are prosecutions solely under the Sherman Act, and rest on a proposition of substantive antitrust law, inapplicable here, that "a Sherman Act violation [is]

## II.     The Evidence Demonstrates That The Government Proved One Overarching Conspiracy, Not Five Separate Ones, And The Counts Of Conviction Are Thus Multiplicitous In Violation Of The Fifth Amendment.

The government argues that the charged conspiracies stand on their own, and are not part of the same overarching conspiracy, because a new conspiracy was created each time a different broker or provider took part in the conduct.  But the facts adduced at trial, as well as the government's arguments on summation, show that the conspiracy had one common goal, regardless of which broker or provider was involved:  for the providers to kick back "swap fees" to the brokers in exchange for the brokers' agreement to steer winning bids to those providers.[4]

The government's evidence, at most, showed a single conspiracy under all eight of the factors outlined in *U.S. v. Korfant*, 771 F.2d 660, 662-63 (2d Cir. 1985) (per curiam):  (i) the counts charge the same § 371 conspiracy; (ii) the participants overlapped, as illustrated by the chart on page 38 of the government's brief; (iii) the conduct occurred during overlapping periods of time from 1999 to 2006; (iv) the government concedes that the defendants used similar means

---

'accomplished both by the submission of noncompetitive bids *and* by the request for and receipt of payments at anti-competitive levels.'"  *U.S. v. Evans & Assoc. Construction Co.*, 839 F.2d 656, 661 (10th Cir. 1988) (quoting *U.S. v. Northern Improvement Co.*, 814 F.2d 540, 543 n.2 (8th Cir. 1987)).  Other cases plainly fall within the category of conduct *Doherty* recognizes as actionable overt acts: "one action, or a handful of actions, taking place over a limited period of time," or ongoing concerted activity, 867 F.2d at 61.  *See U.S. v. Girard*, 744 F.2d 1170, 1173 (5th Cir. 1984) (payoff less than three months after, and in exchange for, payoffs to co-conspirators); *U.S. v. A-A-A Electric Co.*, 788 F.2d 242, 244 (4th Cir. 1986) (concerted conduct continued through limitations period, including payoffs from some conspirators to others); *U.S. v. Walker*, 653 F.2d 1343, 1347 (9th Cir. 1981) ("Without the continuing cooperation of … co-conspirators, … the scheme would have fallen apart.").  And in *U.S. v. Anderson*, 326 F.3d 1319 (11th Cir. 2003), much like in *Salmonese*, it was clear that the conspirators' receipt of payments was an integral part of the conspiratorial agreement.  *Id.* at 1328.

[4] Contrary to the government's assertion (GB 36), the Court did not "reject[]" pretrial the notion that the evidence only supported one conspiracy.  Rather, the Court ruled pretrial that it "may very well possibly be true" that the Indictment was multiplicitous but that the issue was a factual one "appropriate for the jury."  ECF No. 53, at 5.  Now, after the jury has heard the evidence, the issue of whether the evidence was sufficient to support the convictions is one for the Court.  *U.S. v. Josephberg*, 459 F.3d 350, 356 (2d Cir. 2006) (per curiam).

and operations, *see* GB 37; Tr. 3005 (gov't summation) ("Goldberg continued the corrupt relationship with CDR once he arrived at FSA, and they used the very same methods to carry out their scheme."); (v) the conspiracies shared common overt acts, such as making misrepresentations; (vi) the geographic scope of the conspiracy was centered in New York City; (vii) the co-conspirators shared common goals and objectives; and (viii) the alleged distinct conspiracies were in fact interdependent, as the government explained  repeatedly in its summation, DB 18-20.

The government alleged that the conspiring brokers and providers shared the common goal of causing the providers to win bids by paying kickbacks to the brokers.  Indeed, as defendants' opening brief explained, the government's own summation emphasized that there was a common scheme, common goal, and common methodology among all the providers and brokers.  DB 18-20.  The government offers no response.  Defendants' opening brief also demonstrates that the government's evidence proved one conspiracy.  DB 17-19.  Again, no response.  Indeed, the government's own witnesses time and again testified that while there may have been different providers and brokers, there was one conspiracy.  For example: Evan Zarefsky testified that in exchange for last looks Grimm at GE would provide courtesy bids when CDR needed them.  When asked what Steve Goldberg, who worked at GE and FSA, did in exchange for last looks, Zarefsky said, "For me personally, same answer I just provided with Peter."  Tr. 1070-71.  Indeed, CDR broker Naeh elaborated how Goldberg's conspiratorial behavior at FSA was only the continuation of the pre-existing conspiracy from his time at GE.  According to Naeh, CDR "discussed internally all the time of different ways CDR could extract additional fees from deals that we were working on, and with whom we could do that with.  Steve Goldberg was one of those type of people."  Tr. 694.  Another CDR broker, Douglas

Goldberg, described what happened when Steve Goldberg left GE for FSA in 2001.  Douglas Goldberg testified that Wolmark asked him to "take the letter we had drafted previously for [Steve Goldberg] at [GE]"—that described CDR's swap brokerage business—"and change the address to that Steve at FSA."  Tr. 468.  Even viewing the evidence in the light most favorable to the government, it is insufficient to show that defendants participated in separate conspiracies.

Given the evidence and the government's own summation, its argument boils down to the assertion that the different providers did not share a common goal, and the different brokers did not share a common goal, merely because on any given transaction the co-conspirators intended for only one provider to win and one broker to be paid.  But that does not reflect different agreements with different scopes—it simply reflects the nature of a GIC auction where only one broker bids out the deal and only one provider can win.  By its very nature any conspiracy involving GICs will involve different bilateral relationships depending on which broker and which provider was involved in a particular deal.  The government's characterization of these deal-specific pairings as separate bilateral conspiracies is a fiction, unproven at trial.  By the time a provider conspired with a broker to steer a given bid, the issuer already had hired that broker for the deal, and the method of operations for the conspiracy was exactly the same, regardless of which broker bid out the deal.  The fact that all co-conspirators did not participate in every deal does not mean that there were multiple conspiracies.  All conspirators need not participate in or even know about every act committed within the conspiracy to achieve the agreed-upon objective.  *See U.S. v. Gleason*, 616 F.2d 2, 16-17 (2d Cir. 1979).  Indeed, the government's entire theory appears to be based on the erroneous proposition that when an additional broker or provider entered the conspiracy, that was sufficient to create a new conspiracy.  But the law is clear—a "single conspiracy [is not] transposed into a multiple conspiracy simply by ... change of

11

membership." *U.S. v. Muyet*, 994 F. Supp. 501, 512 (S.D.N.Y. 1998); *see also Kaplan v. U.S.*, 7 F.2d 594, 596 (2d Cir. 1925) ("[T]he conspiracy is determined by the design of the parties who originate it, and when a new person joins, if the purposes remain the same, it continues to be the single venture which it was before.").

The government argues that the co-conspirators attempted to keep their allegedly distinct "bilateral"[5] conduct "separate from one another" (GB 39) by pointing to Goldberg's comment to an IMAGE broker that he did not want Gary Heinz at UBS "blabbing over to fucking Stewart Wolmark [at CDR]" about swap fees that GE paid IMAGE.  *See* GX 588035.  But the only inference is that Goldberg did not want to share his profits on *this particular deal* with CDR. The fact that Goldberg only wanted to work with IMAGE on one deal was insufficient to establish that Goldberg participated in multiple separate conspiracies.  Co-conspirators may treat each other differently or have different stakes in a conspiracy without transforming a single conspiracy into multiple separate ones.  *See U.S. v. Hamilton*, 689 F.2d 1262, 1270 (6th Cir. 1982) ("It is academic that to be a party one must have some stake in the conspiracy, but that each party need not have the same stake; merely acting for the venture's success is sufficient."). In fact, the quotation the government cites suggests, if anything, that Goldberg considered IMAGE, Heinz at UBS, and Wolmark at CDR to be "within this community" and part of the same group of co-conspirators.  *See* GX 588035.

In response to the defendants' invitation, the government did not cite any co-conspirator testimony describing how the charged conspiracies were actually separate agreements—distinct in inception, membership, means, or objective.  The government introduced no testimony at all to distinguish the alleged GE-IMAGE conspiracy in Count Two from the alleged FSA-IMAGE

---

[5] Letter from Antonia R. Hill to the Honorable Harold Baer, Jr. at 2 (Apr. 13, 2011).

conspiracy in Count Six.  The government now points to testimony from Douglas Goldberg and Stewart Wolmark in an effort to distinguish the alleged GE-CDR conspiracy in Count One from the alleged FSA-CDR conspiracy in Count Five.  GB 38.  But that testimony only confirms that CDR would steer the GIC to the favored provider.  Likewise, Wolmark's testimony about steering bids to GE and FSA in exchange for kickbacks was insufficient to establish that there were separate illegal agreements to defraud the issuers.  The government can point to nothing— neither law nor proven fact—that can transform one conspiracy into five of them.

The government agrees that if the counts of conviction are multiplicitous, the defendants are entitled to be sentenced on only one of the multiplicitous counts.  GB 40.  That remedy, at the least, is required here.  But the Court's instruction here did not allow the jury to convict on *any* counts it found multiplicitous.  DB 21.  The government argues that the proper remedy remains for the Court to enter judgment on only one of the multiplicitous counts.  But that remedy would violate the defendants' Sixth Amendment right to trial by jury by allowing the Court to direct a conviction even where the jury, as instructed, should have voted to acquit.  The Court should enter a judgment of acquittal on the multiplicitous counts of conviction, or, at the least sentence the defendants on only one of the multiplicitous counts.

## III.   The Government Failed To Present Sufficient Evidence To Establish Defendants' Intent to Defraud.

As the government concedes, its proof of defendants' intent in this case was circumstantial.  GB 8.  While the government may secure a conviction based on circumstantial evidence, the proof must be sufficient to establish each element of the charged offenses, including intent, beyond a reasonable doubt.  *E.g.*, *U.S. v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002).  "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury

must necessarily entertain a reasonable doubt." *Id.* at 70 (quotation omitted).  The evidence in this case, reviewed fairly and completely, provides at least equally strong support for the conclusion that defendants acted with innocent intent as it does for the competing inference that defendants intended to defraud issuers and/or the IRS.

In a sufficiency challenge, the court must "view the evidence as a whole." *U.S. v. Celaj*, 649 F.3d 162, 167 (2d Cir. 2011).  The government's survey of the evidence, however, skews the sufficiency analysis by entirely overlooking important evidence that is at odds with its preferred conclusion that defendants intended to defraud issuers or the IRS.  For example, the government highlights transactions in which brokers invited defendants to lower their bids as proof of defendants' intent to harm the issuers by paying them artificially reduced interest rates.  The government's articulation of this theory, however, completely ignores substantial evidence suggesting that legitimate business considerations motivated that bidding behavior.  *See, e.g.*, Tr. 1009-10, 1180-81, 1182, 2392, 2409-11, 2413-14, 2417.  Similarly, while the government argues that, where defendants were given opportunities to revise their bids upward, they deprived the issuer of "the right to control how its assets were spent" (GB 9), the government does not address the more obvious, direct result of these bid modifications:  the municipalities accepted a bid with *more favorable* terms than they otherwise would have, a result plainly inconsistent with defendants' supposed intent to harm them.  The government also claims that it has shown "that Defendants were conscious of the fraudulent nature of their conduct" through evidence of "the multiple lies they told and the steps they took to conceal their scheme."  *Id*.  But the government's only evidence of the supposed lies and concealment is pulled from taped conversations *which the defendants indisputably knew were being recorded*.

In addition, the government persists in arguing that provider certificates signed by

14

defendants, in which they represented that they had complied with Treasury Department regulations applicable to the bidding process, contain misrepresentations that establish defendants' intent to defraud.  But the government points to no proof that defendants *knowingly* submitted false provider certificates.  Indeed, the only evidence the government cites to show defendants' understanding of the Treasury Regulations (and, by extension, their knowledge that they violated them) is a memorandum circulated by GE in 1999.  GB 17.  The government misconstrues that document, which, fairly read, actually suggests that defendants believed they *had* complied with the relevant regulations.  The memorandum told GE employees that the regulations prohibit lowering bids *for the purpose of avoiding arbitrage*, which the government has never argued that defendants did.  DB 22-23.  On that understanding, the defendants would have believed that statements attesting that they had complied with the regulations were accurate, and there would therefore have been no knowing misrepresentations in the certificates or bid forms.  The government has offered no evidence to contradict that understanding.

Moreover, the government's defense of its proof of defendants' intent to defraud the IRS does not seriously engage with the points raised in defendants' opening brief.  The government still points to no evidence that connects the bid forms or provider certificates to any IRS function, even though the representations made in those documents are the sole basis for the government's IRS-fraud theory.  GB 15-19.  At trial, the government did not prove that these certificates had any effect on any IRS process, or that the IRS was deprived of money that it was otherwise owed as a result of defendants' conduct.  DB 24-26.[6]

---

[6] The limited evidence (beyond the bid forms and provider certificates themselves) that the government points to as proof of defendants' intent to defraud the IRS does not cure the deficiencies in its theory.  For example, the government cites Matthew Rothman's testimony about the Maine State Housing deal as proof that defendants' allegedly false certifications "deprived the IRS of its ability to identify and collect arbitrage."  GB 18.  But the evidence

Where, as here, there are at least equally persuasive competing inferences to be drawn from the evidence, no jury could reasonably conclude that the government proved its case beyond a reasonable doubt. *See Glenn*, 312 F.3d at 70.

## CONCLUSION

Defendants' motion for a judgment of acquittal should be granted.

Dated: September 12, 2012
New York, New York

Respectfully submitted:

_____
Howard E. Heiss
Mark A. Racanelli
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
*Attorneys for Defendant Peter S. Grimm*

_____
Walter F. Timpone
MCELROY, DEUTSCH, MULVANEY &
CARPENTER LLP
1300 Mt. Kemble Ave.
Morristown, NJ 07962
Telephone: (973) 993-8100
*Attorneys for Defendant Dominick P. Carollo*

_____
John S. Siffert
Daniel M. Gitner
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 921-8339
*Attorneys for Defendant Steven E. Goldberg*

_____

showed that Grimm definitively did *not* lower his bid to avoid paying arbitrage. Tr. 984-991. Indeed, Maine State Housing Authority *paid* arbitrage on this deal. PG-DX 177.

16

**CERTIFICATE OF SERVICE**

      I, Mark A. Racanelli, hereby certify that a true and correct copy of the foregoing was served on all parties of record this 12th day of September by the Court's ECF system on the following:

| | |
|---|---|
| Antonia Hill, Esq.<br>**U.S. DEPARTMENT OF JUSTICE,**<br>**ANTITRUST DIVISION**<br>26 Federal Plaza, Room 3630<br>New York, New York 10278 | Steven Tugander, Esq.<br>**U.S. DEPARTMENT OF JUSTICE,**<br>**ANTITRUST DIVISION**<br>26 Federal Plaza, Room 3630<br>New York, New York 10278 |
| Kevin B. Hart, Esq.<br>**U.S. DEPARTMENT OF JUSTICE,**<br>**ANTITRUST DIVISION**<br>26 Federal Plaza, Room 3630<br>New York, New York 10278 | Wendy Wei-Wenne Huang Waszmer<br>**U.S. DEPARTMENT OF JUSTICE,**<br>**ANTITRUST DIVISION**<br>26 Federal Plaza, Room 3630<br>New York, New York 10278 |

                /s/ Mark A. Racanelli
                Mark A. Racanelli