UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                    :

                    V.                      :         10-CR-654 (H.B.)

DOMINICK P. CAROLLO,                        :
STEVEN E. GOLDBERG, and
PETER S. GRIMM,                             :

                    Defendants.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**GOVERNMENT'S SENTENCING MEMORANDUM**


DEIRDRE A. McEVOY                    ANTONIA R. HILL
Chief, New York Field Office         STEVEN TUGANDER
Antitrust Division                   WENDY H. WASZMER
U.S. Department of Justice           Attorneys, Antitrust Division
                                     U.S. Department of Justice
                                     26 Federal Plaza, Room 3630
                                     New York, New York 10278
                                     (212) 335-8000

## TABLE OF CONTENTS

INTRODUCTION.................................................................................1

FACTUAL BACKGROUND.......................................................... 1

I.    The Offense Conduct ..................................................... 1

      A.    Carollo's Offense Conduct................................... 3

      B.    Goldberg's Offense Conduct................................ 4

      C.    Grimm's Offense Conduct................................... 5

II.    Government's Sentencing Recommendations....................... 6

      A.    Loss Calculations............................................ 7

      B.    Sentencing Recommendations............................. 9

            1. Dominick Carollo......................................10

            2. Steven Goldberg.......................................10

            3. Peter Grimm........................................... 11

      C.    Restitution Order for Defendants......................... 12

ARGUMENT....................................................................12

DEFENDANTS' OBJECTIONS TO THE PRESENTENCE REPORTS SHOULD BE
REJECTED....................................................................12

I.    Defendants' "Due Process" Claims Should Be Rejected Because They Received
    Sufficient Notice Concerning Loss
    Calculations..........................................................12

II.    Defendants Provide No Basis to Limit Loss to the Transactions Proved at
    Trial..................................................................15

III.    The Government Properly Identified Three Categories of Loss to Victim
    Issuers...............................................................16

      A.    Broker Fees Are Properly Considered a Loss to Victim Issuers...................16

      B.    Lowered Bids Rates Are Properly Considered a Loss to Victim Issuers.........19

C.      Swap Kickback Fees Are Properly Considered a Loss to Victim Issuers......... 25

D.      Losses Occurring After Defendants Left Their Employers Are Properly
        Attributable to Them.................................................................30

IV.     Defendants' Conduct Warrants Enhancements.................................................31

A.      A Sophisticated Means Enhancement is Appropriate................................31

B.      A Role in the Office Enhancement is Appropriate...................................32

V.      The Government Has Properly Calculated the Number of Victims........................ 34

VI.     Section 3553(a) Factors Mitigate Against Leniency......................................... 35

A.      Nature and Circumstances of Defendants' Felony Offenses........................35

B.      The Need to Afford Adequate Deterrence..............................................37

**CONCLUSION**...............................................................................39

## **TABLE OF AUTHORITIES**

CASES

*United States v. Berger*, 224 F.3d 107, 118-20 (2d Cir. 2000)……………..…………………... 30

*United States v. Birkin*, 366 F.3d 95, 101 (2d Cir. 2004)……………………………………… 32

*United States v. Blount*, 291 F.3d 201, 207 (2d Cir. 2002)……………………………..……… 32

*United States v. Burgos*, 324 F.3d 88, 92 (2d Cir. 2003)………………………………………. 32

*United States v. Canova*, 412 F.3d 331 (2d Cir. 2005)……………………………… 16, 17, 34

*United States v. Carter*, 489 F.3d 528, 540 (2d Cir. 2007)……………………..…………… 15

*United States v. Jasper*, 291 F. Supp. 2d 248, 252-53 (S.D.N.Y. 2003)………...…………… 15

*United States v. Leslie*, 658 F.3d 140, 143-45 (2d Cir. 2011)………………………………… 31

*United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005)………………….…..………… 24

*United States v. Nolan*, 136 F. 3d 265, 273 (2d Cir. 1998)…………………………………… 25

*United States v. Reddick*, 22 F.3d 1504, 1513 (10th Cir. 1994)………………………..…… 18

*United States v. Rosado*, 728 F.2d 89, 96 (2d Cir. 1984)…………………..……………..… 14

*United States v. Torres*, 140 F.3d 392 (2d Cir. 1998)…………………………………......… 14

*United States v. Vaughn*, 430 F.3d 518, 526-27 (2d Cir. 2005)………………………..…… 15

*United States v. White*, 492 F.3d 380, 415-16 (6th Cir. 2007)……………………..………… 15


STATUTES

18 U.S.C. § 3553(a)……………………………………………………………… 35, 37, 39

18 U.S.C. § 3553(a)(2)(B)……………………………………………………………… 37

18 U.S.C. § 3661……………………………………………………………………… 24

18 U.S.C. § 3664(d)(5)…………………………………………………………………… 11

18 U.S.C. § 3664(j)(2)…………………………………………………………………… 12

**OTHER AUTHORITIES**

U.S.S.G. §§ 1B1.3(a) and (b)……………………………………..…………….……….... 16

U.S.S.G. § 2B1.1(a)(2)……………………………………………………………….... 9, 10

U.S.S.G. §2B1.1(b)……………………………………………………………….……….. 30

U.S.S.G. § 2B1.1(b)(1)(J)………………………………………………………………..... 9

U.S.S.G. § 2B1.1(b)(1)(K)……………………………………………………………….... 10

U.S.S.G. § 2B1.1(b)(2)(B)…………………………………………………………….... 9, 10

U.S.S.G. § 2B1.1(b)(10)………………………………………………………………... 9, 10

U.S.S.G. § 2B1.1(b)(10)(C)………………………………………………………..…….... 31

U.S.S.G. §2B1.1 cmt. 3(B)……………………………………………………….……….. 30

U.S.S.G. § 2B1.1 cmt. n. 3(D)(i)…………………………………………………………. 25

U.S.S.G. §§ 2R1.1(d)(1) & cmt. n. 3………...……………………..............…………….. 20

U.S.S.G. § 3B1.1(b)……………………………………………………..…………... 9, 10, 32, 33

U.S.S.G. §§ 3E1.1(a) or (b)………………..……………………………….…………. 9, 10, 11

# INTRODUCTION

The Government respectfully submits this Memorandum for the Court's consideration in connection with the sentencing of Dominick Carollo ("Carollo"), Steven Goldberg ("Goldberg") and Peter Grimm ("Grimm") scheduled for October 18, 2012, at 10:30 a.m., and in response to Defendants' objections to the Presentence Report ("PSR") and sentencing memoranda dated October 10, 2012. As set forth below, the trial evidence demonstrated Defendants' fraud in connection with the bidding for numerous multi-million dollar public investment contracts over the period of time from 1999 to 2006. Time after time, Defendants and their co-conspirators secretly corrupted the bidding process to steer deals to Defendants, reduce the interest rates Defendants were otherwise prepared to bid to the municipalities, and to share the spoils of their criminal conduct by giving kickbacks to the corrupt brokers. Defendants' objections to the factual recitation and loss calculations set forth in the PSRs, which largely ignore or mischaracterize the evidence, are without merit. Finally, Defendants' motions for downward departures should be denied.

## FACTUAL BACKGROUND

### I.      The Offense Conduct

Defendants were charged with and convicted of five separate conspiracies to defraud dozens of municipalities, as well as the Internal Revenue Service ("IRS"), in connection with the bidding of municipal bond investment contracts. Counts One and Two charged all three Defendants with conspiring with brokers CDR and IMAGE, respectively, on behalf of their former employer GE Capital ("GE"). Count Four charged Defendant Grimm with conspiring on behalf of GE with a U.S. subsidiary of the United Bank of Switzerland ("UBS"). Counts Five and Six charged Defendant Goldberg with conspiring with brokers CDR and IMAGE,

respectively, on behalf of his former employer, Financial Security Assurance ("FSA").[1]  Trial

commenced on April 12, 2012, and the jury found Defendants guilty on all remaining counts on

May 11, 2012.

Evidence at trial demonstrated that Defendants obtained improper, confidential

information from co-conspirator brokers that allowed them to win bids for investment

agreements at artificially determined and suppressed interest rates.  In exchange, Defendants paid

kickbacks to these brokers, in the form of undisclosed, unearned fees and provided intentionally

losing "courtesy" bids at their request.  Following the award of bids, Defendants and the co-

conspiring brokers submitted written misrepresentations, falsely certifying that the bidding had

been conducted in a *bona fide* manner, in accordance with procedures outlined by the Treasury

Regulations.

In each charged conspiracy, Defendants defrauded the municipalities (also referred to as

"issuers") that entered into investment agreements with Defendants' employers (GE and FSA) in

several ways:  (1) the municipal issuers were defrauded of the broker fees they paid for the

bidding process, which they expected to be both competitive and to comport with the safe harbor

provisions of the Tax regulations; (2) due to the corruption of the bidding process, issuers

received lower interest rates and thus, less money than they would have received in a truly

competitive environment; (3) on certain occasions, the corrupted rates included swap kickback

payments Defendants paid to the brokers, money that otherwise should have gone to the issuer;

and (4) the municipalities were deceived by Defendants' false certifications, which certified that

the bidding had complied with the safe harbor provisions.

---

[1]  Count Three, which charged all three Defendants with conspiring with broker Tradition and
Adrian Scott-Jones, was dismissed during trial.  Count Seven, which was dismissed prior to trial,
charged defendants with wire fraud in connection with a specific Guaranteed Investment
Contract ("GIC") transaction.

Defendants' conduct also defrauded the United States Treasury and the IRS because the IRS relied on the accuracy of Defendants' bidding certifications, thus impeding and obstructing its ability to accurately determine and collect revenue for the United States Treasury. Because the corrupted bidding process reduced interest rates paid by GE and FSA, the United States Treasury may have received less money than it was entitled to receive.

### A.    Carollo's Offense Conduct

Carollo was employed by GE from approximately 1993 to November 2002. Carollo was employed as a Business Leader at GE and was responsible for managing and supervising the day-to-day activities and personnel of GE's businesses involved in the sales of investment agreements and other municipal finance contracts, including Goldberg and Grimm. *See, e.g.*, Tr. Tr. 332-33; 341; 387 (D. Goldberg testimony that Carollo ran desk and was Goldberg's boss); Tr. 659 (Naeh testimony that Carollo was Grimm's supervisor); Tr. 2259 (Zaino testimony that Carollo was Goldberg's boss at GE); 1312-15 (Wolmark).

During the period of Carollo's supervision of the GE desk, Carollo, Goldberg, and Grimm received last looks from CDR, a broker which corrupted and undermined the competitive bidding process for municipal investment contracts. GE received last looks from CDR starting in the mid 1990s and continued doing so until August 1999, when GE hired Goldberg. *See, e.g.*, Tr. 1312-15; 1318-20 (Wolmark). After Goldberg was hired, Carollo was informed of and approved CDR's providing last looks to Goldberg. Upon Goldberg's departure to FSA in May 2001, Carollo approved of Grimm's illegal conduct with CDR. *See, e.g.*, Tr. 1312-15; 1393-94 (Wolmark); GX 573977. Carollo also supervised and approved of Goldberg and Grimm receiving last looks from, and paying kickbacks to, IMAGE. *See, e.g.* GX 587897 (Carollo directed Goldberg to separate kickback payments from time of award of contract to avoid

detection).  As the trial evidence relating to Counts One and Two demonstrated, during Carollo's

supervision, numerous multi-million dollar transactions were corrupted by Defendants' fraud.[2]

The Bill of Particulars[3] identifies additional fraudulent transactions corrupted by Carollo and his

codefendants that were not featured at trial.

**B.    Goldberg's Offense Conduct**

Goldberg was employed as Liability Manager at GE and worked on its municipal

derivatives desk from August 1999 until approximately May 2001.  From May 2001 until at least

2006, Goldberg was a Vice President or Director at FSA and worked at its offices in New York,

New York, where he ran its municipal trading desk.  Goldberg had authority to and did submit

bids for investment agreements or other municipal finance contracts for both GE and FSA.  *See,*

*e.g.*, Tr. 342 (D. Goldberg).

CDR steered multiple contracts to Goldberg while he was employed at GE, by providing

him with last looks during the course of the bidding.  *See, e.g.,* Tr. 637-38 (Naeh).  In exchange,

Goldberg paid kickbacks to CDR in the form of undisclosed swap brokerage fees for which CDR

did little to no work, and submitted intentionally losing bids upon CDR's request.  *See, e.g.*, Tr.

415-17 (D. Goldberg).  While employed at FSA, Goldberg and CDR likewise engaged in

fraudulent conduct corrupting the bidding process for investment agreements through last looks,

Goldberg's submission of intentionally losing bids, and payment of kickbacks disguised as swap

---

[2]  Count One:  Florida Housing Finance Corporation (8/30/1999), North Central Texas Health
Facilities (12/11/2000), Onondaga Industrial Development Agency (12/14/2000), Port Authority
of Allegheny County (3/12/2001), St. Louis College of Pharmacy (6/19/2001), Utah Housing
Corporation (1/17/2002), Utah Housing Corporation (8/7/2001), Michigan State Housing
Development Authority (4/25/2002), and Maine State Housing (5/20/2004).

Count Two:  Puerto Rico Highway and Transportation Authority (5/25/2000), KEDFA
(9/20/2000), Idaho Housing and Finance Association (1/10/2002), and Idaho Housing and
Finance Association (8/2/2002).

[3]  *See* Exhibit A to the Government's October 10, 2012 letter to the Court.

payments to CDR. *See, e.g.*, Tr. 342 (D. Goldberg); Tr. 663-64 (Naeh).  Goldberg also engaged

in the fraudulent corruption of the bidding process with the broker IMAGE while at GE and

FSA.  Goldberg engaged in obtaining last looks from IMAGE and, in exchange, submitted

intentionally losing bids and paid kickbacks to IMAGE in the form of swap payments. *See, e.g.*,

Tr. 2522-38; Tr. 2572-72 (Hilgeman).  As the trial evidence relating to Counts One, Two, Four,

and Five demonstrated, during Goldberg's time at GE and FSA, numerous multi-million dollar

transactions were corrupted by Defendants' fraud.[4]  The Bill of Particulars identifies additional

transactions corrupted by Goldberg and his codefendants that were not featured at trial.

## C.    Grimm's Offense Conduct

Grimm was employed by GE as a Liability Manager and a Vice President during the

period February 2000 until approximately 2007.  Grimm had authority to and did submit bids for

investment agreements on behalf of GE and, after Carollo and Goldberg left GE, Grimm had

primary responsibility for operating its municipal trading desk.

The Government proved that Grimm engaged in the fraudulent manipulation of bidding

for municipal investment agreements with three brokers, CDR, IMAGE and UBS.  CDR

provided Grimm with last looks during the course of the bidding and, in exchange, Grimm

submitted intentionally losing bids upon request and paid kickbacks to CDR in the form of

---

[4] *See supra* note 2 regarding transactions relating to Counts One and Two.  The transactions relating to Counts Five and Six are as follows:

Count Five:  New Jersey Healthcare – Meridian (10/29/2001), McAlester Public Works (6/27/2002), McAlester Public Works (6/28/2002), Health and Educational Facilities of Missouri (8/16/2002) ("MoHEFA 2002"), Board of Port Commissioners of the Port of Oakland (9/26/2002), West Virginia Development Economic Authority (3/13/2003), Board of Governors of Fairmont State College (3/20/2003), MoHEFA (8/26/2003), West Virginia Water Development Authority (10/23/2003).

Count Six:  University of Nebraska (3/18/2002), Kentucky Interlocal School Transportation Association ("KISTA") (6/19/2002), and William Paterson University, New Jersey (1/20/2004).

undisclosed swap brokerage fees. *See, e.g.*, 1069-70 (Zarefsky); Tr. 666-667 (Naeh); GX

605568.  Grimm also participated in GE getting last looks from, and paid kickbacks in the form

of undisclosed swap brokerage fees to IMAGE. *See, e.g.*, GX 596159; GX 589539.  UBS

structured bid lists to favor Grimm and provided him with last looks. *See, e.g.*, Tr. 2270; 2320;

2336; 2347 (Zaino).  In exchange, Grimm paid kickbacks to UBS in the form of additional

revenues UBS would not otherwise have earned in the form of backend swaps that Grimm and

UBS agreed would be the payback for steering the deals to him. *See, e.g.*, Tr. 2268-69; 2317-18

(Zaino).  As the trial evidence relating to Counts One, Two, and Four demonstrated, numerous

multi-million dollar transactions were corrupted by Defendants' fraud.[5]  The Bill of Particulars

identifies additional transactions corrupted by Grimm and his codefendants that were not

featured at trial.

## II.     The Government's Sentencing Recommendations

For the reasons stated herein, the Government respectfully recommends that the Court

impose a sentence within the United States Sentencing Guidelines ("Guidelines") range

calculated by the Probation Office for each defendant:  for Carollo, an offense level of 33, the

maximum sentence permitted of 120 months' imprisonment, although the Guidelines range is

135 to 168 months' imprisonment, and the fine range of $17,500 to $175,000; for Goldberg, an

offense level 35, 168 to 210 months' imprisonment, and a fine range of $20,000 to $200,000; and

for Grimm, an offense level 32, 121 to 151 months' imprisonment, and a fine range of $17,500

---

[5]  *See supra* notes 2 and 4 regarding transactions relating to Counts One and Two.  The
transactions relating to Count Four are as follows:

Count Four:  Commonwealth of Puerto Rico Public Improvement Bonds (10/10/2001), Colorado
Health – Catholic Health Initiatives (1/28/2002), Rhode Island Housing and Mortgage
(3/5/2002), Massachusetts Educational Finance Agency ("MEFA") (3/5/2002), and New Mexico
Educational Assistance Foundation (12/5/2002).

to $175,000.  For reasons explained below, the Government requests that the Court adjourn imposition of any order of restitution for a period of up to 90 days.

### A.    Loss Calculations

The Government submits that the sentencing recommendations contained in the PSRs and this memorandum are based on a conservative view of the total losses suffered by the victim issuers in this case.  The Government submitted to the Probation Office only three bases of loss in this case, listed on the Bill of Particulars:  broker fees, lowered bid prices, and swap kickback payments.  The Government did not include in its loss calculation:  (1) losses associated with transactions on the Bill of Particulars for which Defendants raised their bid prices following a last look, even though such bids were not competitive, because estimating such losses requires more complex calculation and are not as reasonably ascertainable;[6] (2) losses associated with transactions beyond the Bill of Particulars that were corrupted by Defendants with brokers other than Chambers, Dunhill & Rubin ("CDR"), UBS, and IMAGE; and (3) losses associated with transactions identified in the Bill of Particulars for Count Three, which was dismissed at trial.  Accordingly, the Government submits that the total estimated losses for each Defendant are *at minimum* the amounts set forth in the PSRs.

As set forth in the evidence submitted to Probation with the Government's pretrial submissions[7] and to the Court on October 10, 2012,[8] the total loss amounts in this case are as follows:

---

[6]  The Government did include in its loss calculations broker fees and swap kickback payments associated with these transactions.

[7]  The Government provided revised spreadsheets and calculations to Probation with its comments to the PSR on September 21, 2012.  The Government provided copies of these materials to Defendants at that time.  The amounts listed in the chart on page 8 *infra* include adjustments made by the Government since September 21, 2012, to eliminate any potential double counting in the allocation of broker fees and swap kickback payments in four

| Defendant | Broker Fees | Swap Fees | Lowered Bids[9] | Total Losses |
|---|---|---|---|---|
| Dominick Carollo | $2,811,904.59 | $473,591.00 | $1,665,675.66 | $4,951,171.25 |
| Steven Goldberg | $5,773,564.59 | $1,276,871.00 | $3,013,658.53 | $10,064,094.12 |
| Peter Grimm | $3,459,100.59 | $1,823,591.00 | $2,038,685.97 | $7,321,377.56 |

The Government relies on the evidence admitted at trial, as well as its post-trial

submissions to the Court in its sentencing recommendation.  During trial, the Government

offered testimonial, documentary and audio recordings for 31 transactions, which demonstrate

the loss amounts calculated by Probation and included in the amounts set forth in the chart

above.  *See* Government's Opposition to Defendants' Motions for Acquittal 1-7 (overview of

trial evidence by count).  The Government's post-trial submissions to Probation and the Court

included audio and documentary evidence concerning these same categories of actual or intended

losses for both the 31 trial transactions, as well as 198 additional transactions contained in the

Bill of Particulars.[10]  Specifically, the Government submitted five binders containing the

documentary evidence supporting its loss calculations for each count and a disk containing

copies of audio recordings that proved the criminal conduct for each transaction, and

---

transactions:  5/20/2004 Maine State Housing (Count One); 12/14/2001 City of Atlanta (Count Six); and 10/10/2001 Commonwealth of Puerto Rico (Counts One and Four); and 10/23/03 West Virginia Water.  The revised loss calculation sums are reflected in Attachment A.

[8]  *See* Government's October 10, 2012 letter to the Court and attached documentary and audio evidence relating to Bill of Particulars transactions.

[9]  Lowered bids were also referred to as bids that "did not leave money on the table," or "DLMOT."

[10]   In nine instances, losses were suffered in connection with more than one type of investment agreement bid out as part of a single transaction.  These losses are counted separately.  Other transactions, which are relevant to two counts, are counted only once.  The Government seeks losses for a total of 238 investment agreements bid out in 229 unique transactions.

spreadsheets submitted as a summary aid to help Probation and the Court navigate the loss evidence.[11]

## B.   Sentencing Recommendations

### 1. Dominick Carollo

The Government recommends the following sentence for Carollo based on a total offense level of 33: the maximum sentence permitted of 120 months' imprisonment, although the Guidelines range is 135 to 168 months' imprisonment, and the fine range of $17,500 to $175,000. The PSR includes this same Guidelines calculation of 33, but recommends a non-Guidelines sentence.

1.   Pursuant to U.S.S.G. § 2B1.1(a)(2), the base offense level for the charged conspiracy is 6;

2.   Pursuant to U.S.S.G. § 2B1.1(b)(1)(J), an additional eighteen-level (18) increase is appropriate because the loss to the victims for which Carollo is accountable is more than $2,500,000 but less than $7,000,000;

3.   Pursuant to U.S.S.G. § 2B1.1(b)(2)(B), an additional four-level (4) increase is appropriate because Carollo's conduct involved 125 victims;

4.   Pursuant to U.S.S.G. § 3B1.1(b), an additional three-level (3) increase is appropriate because Carollo was a manager and supervisor in a criminal activity. At the time of the offense, Carollo was the business leader of GE's municipal trading desk, and managed, supervised and approved of the day-to-day activities of the desk, including the bidding activities of Goldberg and Grimm;

5.   Pursuant to U.S.S.G. § 2B1.1(b)(10), an additional two-level (2) increase is appropriate because under Carollo's direction, Defendants agreed with coconspirator brokers to separate kickback payments from the award of the contract by time, use different investment amounts than those in the contract, and take other steps to avoid detection; and

6.   Pursuant to U.S.S.G. §§ 3E1.1(a) or (b) no adjustment for acceptance of responsibility is warranted.

---

[11]  In the few instances in which the Government has not submitted documentary proof of loss, such as broker fees, the spreadsheet reflects *no* loss for that category.

### 2.   Steven Goldberg

The Government recommends the following sentence for Goldberg based on a total offense level of 35: within the Guidelines range of 168 to 210 months imprisonment, and the fine range of $20,000 to $200,000. The PSR includes this same Guidelines calculation of 35, but recommends a non-Guidelines sentence.

1. Pursuant to U.S.S.G. § 2B1.1(a)(2), the base offense level for the charged conspiracy is 6;

2. Pursuant to U.S.S.G. § 2B1.1(b)(1)(K), an additional twenty-level (20) increase is appropriate because the loss to the victims for which Goldberg is accountable is more than $7,000,000 but less than $20,000,000;

3. Pursuant to U.S.S.G. § 2B1.1(b)(2)(B), an additional four-level (4) increase is appropriate because Goldberg's conduct involved 219 victims;

4. Pursuant to U.S.S.G. § 3B1.1(b), an additional three-level (3) increase is appropriate because Goldberg was a manager and supervisor in a criminal activity. At the time of the offense, Goldberg started and managed the municipal trading desk at FSA;

5. Pursuant to U.S.S.G. § 2B1.1(b)(10), an additional two-level (2) increase is appropriate because Goldberg agreed with coconspirator brokers to separate kickback payments from the award of the contract by time, use different investment amounts than those in the contract, and take other steps to avoid detection, including using the swap counterparty to make kickback payments; and

6. Pursuant to U.S.S.G. §§ 3E1.1(a) or (b) no adjustment for acceptance of responsibility is warranted.

### 3.   Peter Grimm

The Government recommends the following sentence for Grimm based on a total offense level of 32: within the Guidelines range of 121 to 151 months imprisonment, and a fine range of $17,500 to $175,000. The PSR includes this same Guidelines calculation of 32, but recommends a non-Guidelines sentence.

1. Pursuant to U.S.S.G. §2B1.1(a)(2), the base offense level for the charged conspiracy is 6;

2.  Pursuant to U.S.S.G. §2B1.1(b)(1)(K), an additional twenty-level (20) increase is appropriate because the loss to the victims for which Grimm is accountable is more than $7,000,000 but less than $20,000,000;

3.  Pursuant to U.S.S.G. §2B1.1(b)(2)(B), an additional four-level (4) increase is appropriate because Grimm's conduct involved 134 victims;

4.  Pursuant to U.S.S.G. §2B1.1(b)(10), an additional two-level (2) increase is appropriate because under Carollo's direction, defendants agreed with coconspirator brokers to separate kickback payments from the award of the contract by time, use different investment amounts than those in the contract, and take other steps to avoid detection; and

5.  Pursuant to U.S.S.G. §§3E1.1(a) or (b) no adjustment for acceptance of responsibility is warranted.

## C.    Restitution Order for Defendants

Pursuant to Title 18, United States Code, Section 3664(d)(5), the Government respectfully requests that the Court delay imposition of restitution for up to 90 days to allow the Government to obtain additional information concerning distribution of settlement payments in civil proceedings, which may result in appropriate set-off of any restitution ordered in this case. The Government is prepared to update the Court within 60 days regarding the status of settlement payments.  Should victims remain unpaid, the Government will recommend that the Court issue a restitution order for the unpaid amount, and hold Defendants jointly and severally liable.

As stated in the PSRs, and reflected in the Restitution spreadsheet submitted by the Government to Probation and the Court, certain of the victims have received compensation as the result of settlements reached between the SEC and five provider companies, including GE. There are currently ongoing settlement proceedings involving certain victims and the State Attorneys General, which may result in additional payments to victims.  At this point, because settlement payments have not been completed, and in light of FSA's failure to reach settlements

11

with any party to date, it is not certain that every victim will be appropriately compensated for its

loss.  In that circumstance, the Government would seek an order of restitution from this Court

within the time frame provided by Section 3664(j)(2).

## ARGUMENT

## DEFENDANTS' OBJECTIONS TO THE PRESENTENCE REPORTS SHOULD BE REJECTED

### I.      Defendants' "Due Process" Claim Should Be Rejected Because They Received Sufficient Notice Concerning Loss Calculations

Defendants' "due process" claim should be rejected summarily because the Government

has provided Defendants with the evidence underlying the calculations of loss.  Contrary to

Defendants' contention, *see* Goldberg Br. 26, the Government did not "hide the ball" and there

has been no unfair surprise regarding its loss calculations.  The Government limited its loss

calculation to transactions on the Bill of Particulars related to the Superseding Indictment –

transactions about which Defendants have had notice for over two years.  Moreover, as noted

above, the Government, in limiting its loss calculation to transactions on the Bill of Particulars,

has taken a less expansive approach than it could have, because it did not include other

transactions that Defendants corrupted with brokers other than CDR, UBS, and IMAGE.

Accordingly, Defendants' purported due process claim is entirely without merit.

In September 2010, the Government provided Defendants with a voluntary Bill of

Particulars, which encompassed all transactions relating to the charges in the original Indictment

and Bill of Particulars.  The Government provided Defendants with discovery of all relevant

audio and documents in connection with these transactions during the course of pretrial

discovery.  In October 2011, following the return of the Superseding Indictment, the

Government made another production to Defendants of a superseding Bill of Particulars, which

was a subset of the original Bill of Particulars.  During pretrial discovery, Defendants also were

provided with the Government's evidence, compiled by transactions (referred to as the

transaction "buckets"), which contained Government work product sorting relevant audio and

documents by transaction.

Following their convictions, the Government advised Defendants on numerous occasions

that it would seek sentences based on all transactions in Counts One, Two, Four, Five, and Six of

the superseding Bill of Particulars.  Moreover, the Government repeatedly explained to

Defendants the three categories that would be included in its loss calculation.  Defendants also

were advised that the proof for each transaction and basis of loss could be found in the evidence

produced during pre-trial discovery, and were expressly directed to the transaction buckets.  The

Government's initial submission to the Probation Office, including the evidence in the binders of

the documents and audio identified in spreadsheets, was produced and identified to Defendants

long ago in the buckets for each transaction.[12]  These spreadsheets contained information relating

to transactions on the final Bill of Particulars:  the transaction date, name, program name, related

audio (to both transaction and swap kickback, if appropriate), bates numbers of documents

reflecting broker fees and swap fees, and a chart showing how the loss was calculated for

transactions involving fraudulently lowered interest rates.[13]

---

[12]  For each transaction on the Bill of Particulars, the Government has identified audio and
documentary evidence sufficient to establish loss amounts by a preponderance standard.
For example: for the 11/5/1999 Mississippi Home Corporation transaction in Count One, the
documentary evidence of the broker fee (MUB-CDR-0055-00365) cited in the loss calculation
spreadsheet is found in the "Cleared Docs" portion of the transaction bucket under the same
bates number (MUB-CDR-0055-00365).  Similarly, the relevant audio cited in the loss
calculation spreadsheet (IDs: 147273 and 147293) are found in the "Audio/DocuGenie" section
of the transaction bucket under those same audio IDs (147273 and 147293).

[13]  As noted above, in instances where multiple funds were corrupted, there are multiple entries
for a transaction.

On September 21, 2012, almost one month prior to sentencing, the Government provided

Probation with copies of the loss and restitution spreadsheets on which some revisions had been

made. At that time, the Government also provided Defendants with copies of the revised

spreadsheets it had provided to the Probation Office. Moreover, on October 10, 2012, when it

provided the Court the binders of related documents for each Count and audio it had previously

provided to Probation, as well as related spreadsheets summarizing the evidence, the

Government also provided copies to the Defendants. Defendants have been able to review the

evidence and challenge the Government's recommendations, and they have done so in their

sentencing memoranda.

Defendants' reliance on *United States v. Torres*, 140 F.3d 392 (2d Cir. 1998), to support

their "due process" arguments is unavailing. *See* Grimm Br. 14-15. Their citation to the case is

plainly inapposite. *Torres* involved the claim by a *pro se* defendant that she was unaware of the

sentencing procedure to be utilized by the court. *See* 140 F.3d at 403. In rejecting that

defendant's claims, the Second Circuit noted:

> Due process requires (1) that a defendant not be sentenced based on materially
> false information; (2) that a defendant be given notice and an opportunity to
> contest the facts upon which the sentencing authority relies in imposing the
> sentence; and (3) that a defendant not be sentenced based on a material
> misapprehension of fact.

*Id.* at 404 (citations omitted). Defendants cannot assert any of these circumstances. Indeed, in

this case, the parties made submissions prior to the issuance of the draft PSR. *See United States*

*v. Rosado*, 728 F.2d 89, 96 (2d Cir. 1984) ("It will normally be preferable, however, for both

sides to confine their *ex parte* presentations of sentencing information to the Probation

Department"). Moreover, the Government first disclosed the evidence underlying its loss

calculations (*i.e.*, the deal buckets) two years ago and updated it on several occasions, and

disclosed to Defendants its work product summarizing the loss calculations on September 21,
2012.

Under the circumstances of this case, Defendants have had sufficient notice to prepare for
sentencing and the cases on which they rely require nothing more.

## II.    Defendants Provide No Basis to Limit Loss to the Transactions Proved at Trial

Nor do Defendants present any other basis for the Court to limit the loss calculation only
to the 31 featured transactions proven at trial. *See* Grimm Br. 14; Goldberg Br. 21. Defendants
argue that the Government cannot demonstrate any loss stemming from additional transactions,
but their briefs fail to cite any case law supporting the rejection of the Government's evidence
regarding loss. Several of the cases cited by all three Defendants involve instances in which the
court found the Government had met the preponderance standard, *see e.g., United States v.
Vaughn*, 430 F.3d 518, 526-27 (2d Cir. 2005), or where the Government relied only on trial
evidence to establish loss, *see, e.g., United States v. Jasper*, 291 F. Supp. 2d 248, 252-53
(S.D.N.Y. 2003), which is not the case here. Furthermore, in the few cases cited by Defendants
in which the courts found errors in sentencing, *see United States v. Carter*, 489 F.3d 528, 540 (2d
Cir. 2007), *United States v. White*, 492 F.3d 380, 415-16 (6th Cir. 2007), the basis for remand
was the district court's failure to explain its reasoning, rather than the Government's failure to
meet its burden. The Government's trial evidence and post-trial submissions meet the
preponderance standard here, and all of these cases are therefore distinguishable.

Indeed, the limitation urged by Defendants would unfairly prejudice the Government,
given its readiness to present evidence beyond the 31 deals featured at trial. Defendants, having
repeatedly sought to limit the Government's proof at trial, cannot now escape responsibility for
losses stemming from other Bill of Particulars transactions. Although the Court, on the basis of

its discretion and judicial economy, determined that the Government's proof at trial would be limited to certain transactions to be identified by the Government, the Court did not issue any ruling with regard to the scope of relevant conduct for sentencing purposes. *See* U.S.S.G. §§ 1B1.3(a) and (b) (defining relevant conduct for determining Guidelines range). Moreover, the Court also ruled that it would allow general testimony about the parameters of the conspiracies charged, and the Government proved, via the testimony of multiple witnesses, the broad nature of Defendants' agreements with the coconspirator brokers.

**III.    The Government Properly Identified Three Categories of Losses to Victim Issuers**

**A.    Broker Fees are Properly Considered a Loss to the Victim Issuers**

The Government proved at trial that victim issuers paid broker fees to CDR, UBS, and IMAGE, which conspired with Defendants to defraud the issuers in the course of bidding. *See, e.g.,* Tr. 359 (D. Goldberg). The testimony at trial proved that in every transaction the cost of the broker fee was incurred by the issuer. It was industry practice for the bidding provider to pay the broker fee on behalf of the issuer, and thus providers calculated the cost of the broker fee into the interest rates they bid for the transactions. The broker fees paid by Defendants were identified in the provider certifications regarding each transaction, and those certifications, *see, e.g.,* GX 12-5 (provider certification for Catholic Health Initiatives transaction), as well as payment invoices, *e.g.,* GX 70-58, form the basis of the Government's proof of this category of loss. *See also* GX 251(summary of broker fee invoices).

The Second Circuit's decision in *United States v. Canova*, 412 F.3d 331 (2d Cir. 2005), supports the Government's inclusion of broker fees as an element of loss in this case. In *Canova*, the Court held that where a party fraudulently procures payments for goods or services by falsely representing that they were produced or provided according to certain specifications,

the victim has been induced to pay for something that it wanted and was promised but did not receive, thereby incurring some measure of pecuniary loss. *Id.* at 352. The Court further noted that the doctrine of substantial performance, which is essentially what Defendants in this case argue, is not available to one whose transgression is willful. *Id.*

Defendants' conspiracies with the brokers, to deprive the issuers of a competitive bidding process, constituted willful transgressions. When paying the broker fee, the victim issuers not only bargained for an investment agreement that was to be performed by the winning provider pursuant to its terms, but bargained for and paid for an investment agreement that was awarded pursuant to a bidding process that comported with the safe harbor rules of the federal Tax regulations. *See* Tr. 2628; Tr. 2669-71 (Gibbs); Tr. 2598; Tr. 2605 (Farber); Tr. 2192-94 (Whitaker). Despite completed or continuing performance of the investment agreements at issue, it remains that these agreements were procured by the intentionally false certifications of the Defendants and their co-conspirator brokers attesting that the bidding process was carried out in compliance with the safe harbor provisions of the Tax regulations. *See, e.g.,* Tr. 2297–2300; GX 31-5; GX 31-6 (Massachusetts Education and Finance Authority ("MEFA"); GX 31-5 (Puerto Rico Highway and Transportation); GX 11-5; GX 11-6 (Commonwealth of Puerto Rico)). Time after time, on hundreds of occasions, Defendants lied to the municipalities as part of their fraudulent scheme, defrauding the unknowing issuers who relied on such lies, to award contracts that did not comport with the safe harbor provisions. Thus, the issuers did not get the services they paid for in reliance on Defendants' intentional lies and Defendants' performance of the contracts is irrelevant to the loss of the broker fees. *Canova*, 412 F.3d at 352.

Moreover, the Court should reject Defendants' assertion that the issuers received valuable services when GE and FSA carried out the contracts, and any estimated loss must consider the

value of such services.  The only case cited by Defendants, *United States v. Reddick*, 22 F.3d

1504, 1513 (10th Cir. 1994), is distinguishable from this case.  In *Reddick*, the Tenth Circuit, in

evaluating losses to students of a fraudulent unaccredited university, found that the district court

erred in failing to assess whether any value students placed on their degrees reduced the total

claimed loss amount, which was estimated from the deposits of tuition money. *Id.* at 1513-14.

In this case, contrary to Defendants' claims, the full amount of the broker fee should be

counted as loss because a contract that was bid in a manner that did not comport with the safe

harbor provisions was worthless to the issuer.[14]  Indeed, Travis Gibbs testified that if he learned

the bidding process had been corrupted, he would have advised the issuer to cancel and rebid the

GIC transaction. Tr. 2632–33 (Gibbs).  The jury heard evidence of the numerous ways

Defendants and brokers conspired to undermine and, in fact, did undermine the interests of

issuers in the bidding process.  Thus, the Court can appropriately conclude that issuers suffered

losses commensurate with the payment of broker fees.

Finally, the evidence Defendants introduced at trial sharply contradicts their argument

that the issuers received a bidding process that resulted in an award of a GIC at fair market value.

First, a competitive bid is what the issuers testified they expected. *See, e.g.,* Tr. 2596–98; Tr.

2605; Tr. 2611 (Farber); Tr. 2192 (Whitaker).  The bidding process was the way in which the

issuers sought to comply with the safe harbor regulations. *See* Tr. 2360–61 (Gibbs).  Defendants

---

[14]   Brokers steered deals to Defendants by "predetermining" or "preselecting" a winning bidder,
(*e.g.,* Tr. 739–40, 752-53 (Naeh)), providing Defendants a "last look," *i.e.,* information about
other bidders and bid levels (*e.g.,* Tr. 362-65 (D. Goldberg), Tr. 1069 (Zarefsky)), limiting the
list of competing bidders to favor Defendants, (*e.g.,* GX 11906; Tr. 2280–81 (Zaino)), and other
means.  On many occasions, the brokers allowed Defendants to lower their rates, defrauding the
municipalities that mistakenly believed their brokers were doing what they were paid to do:
seeking the highest rate from providers. (*See, e.g.,* Tr. 387–89 (Onondaga); Tr. 408-10 (Port of
Allegheny); Tr. 1074–95 (August 2001 and January 2002 Utah Housing); Tr. 2553–57 (January
2002 Idaho Housing)).

did not submit competitive bids, and then they lied repeatedly about their actions.[15]  Second,

even in instances where Defendants raised their bids after receiving last looks, there is no way of

knowing what Defendants would have bid if not for the conspiracies (thus resulting in a true

determination of fair market value), because they submitted their bids only after getting last

looks from the coconspirator brokers.  Indeed, testimony at trial showed that Defendants often

submitted low initial bids, expecting to raise them after receiving a last look.  *See, e.g.*, Tr. 339–

41; Tr. 362–63 (D. Goldberg).

      Defendants, by their lies and fraudulent conduct, intended to deprive the issuers of the

ability to prove their bonds were tax exempt.  The broker fees paid for such fraudulent bidding is

thus an appropriate measure of the issuers' loss.

### B.    Lowered Bids Rates Are Properly Considered a Loss to the Issuer

      The PSRs correctly identify lowered bid rates (also referred to as "last looks down") as a

third category of quantifiable loss that should be included in determining Defendants' Guideline

offense level.  During the course of the trial, the Government proved that on numerous

occasions, Defendants submitted winning bids to brokers at interest rates that were lower than

the rates Defendants were willing to bid in a competitive market.  *See, e.g.,* Tr. 1074-78, 1115

(Zarefsky).  As the evidence showed at trial, Defendants were able to win bids at these reduced

rates only because of their long term corrupt relationships with brokers, and their submission of

voluminous, intentionally false certifications.  Rather than bidding a competitive interest rate, as

the bidding process contemplated and Defendants had promised, Defendants reduced their bid

---

[15]  It is for this reason that the Court should reject Defendant Grimm's argument that there is no
loss associated with an intentionally losing bid.  *See* Grimm Br. 17.  When Defendants submitted
intentionally non-competitive bids at the request of their coconspirator brokers, they were
involved in a corrupted bid process that they falsely claimed was competitive, thus depriving the
issuer of the broker fee it paid.

rates after receiving improper information from brokers whom Defendants had bribed. *See, e.g.,* Tr. 387–89 (Onondaga); Tr. 408-10 (Port of Allegheny); Tr. 1074–95 (August 2001 and January 2002 Utah Housing); Tr. 2553–57 (January 2002 Idaho Housing).  As a result of this "last look down" conduct, Defendants' employers, GE and FSA, received higher profits and more money than they should have received.  These higher profits were obtained at the expense of not only numerous municipalities located throughout the United States, but also the United States Treasury.  It is uncontroverted that both the municipal issuers and the Treasury received substantially less money than they would have received had the bidding process been conducted in a competitive and honest fashion. *See* Tr. 664, 735 (Naeh).  This improper, fraudulent result was precisely what Defendants had hoped to achieve when they entered into their kickback conspiracies with numerous corrupt brokers.  Avoiding this harmful result was precisely the reason why municipalities and the Treasury expressly prohibited last looks and kickbacks in the bidding process, and the reason why they required certifications from providers and brokers.

It is difficult to imagine any clearer demonstration of concrete loss in a competitive bidding scenario than was proven by the Government at trial.  In some bid-rigging and price-fixing cases, quantifying loss can be a complex task because it requires a determination of the prices that would have been offered by the conspirators but/for the bid rigging or price fixing conduct.[16]  Here however, audio recordings and other evidence plainly show the interest rates that would have been offered, but/for Defendants' bid rigging conduct.  The loss suffered by the

---

[16] For this reason, the Guidelines presume loss in Sherman Act cases to be 20 percent of the affected volume of commerce. *See* U.S.S.G. § 2R1.1(d)(1) & Application Note 3.  Were the Court to make the same presumption here, the loss amount would be at least in the hundreds of millions of dollars, because the affected volume of commerce (the amount of interest and principal paid by GE and FSA on affected transactions entered into during the course of the conspiracy) was in the billions of dollars.  In any event, Defendants here were charged with fraud offenses, and therefore the relevant fraud guidelines should be applied in this case.

issuers from lowered bids therefore requires no speculation; the difference in the numbers

initially bid and the lowered bids that secured Defendants the contracts are on the recordings and

reflected in the bid forms. *See, e.g.,* GX 605315, 605317 (bid lowered by 17 basis points on

Utah Housing transaction); GX 7-2 (Grimm's bid form reflecting lowered bid).

      To argue that such last looks down did not cause any loss is to ignore common sense, and

by doing so Defendants fail to accept responsibility for their conduct.  This failure to accept

responsibility is exacerbated by Defendants' bold and audacious assertion that the victims of

their conspiratorial conduct (the United States Treasury and numerous municipal issuers) not

only were not harmed, but rather, *benefitted* from the five wire fraud conspiracies of which

Defendants were convicted.[17]  Victim testimony at trial was plainly to the contrary. *See, e.g.,* Tr.

2596-98; Tr. 2605; Tr. 2611 (Farber); Tr.2192 (Whitaker).  Defendants try to buttress this

argument by stating the obvious: when they won bids that were pre-arranged for them to win by

corrupt brokers who had been bribed, their bids were the highest. *See* Goldberg Br. 33.  Of

course Defendants ignore the fact that the sole objective of the conspiracy was for them to win

transactions they desired at inflated profit levels, an objective they achieved.  And Defendants

also ignore the uncontroverted evidence at trial that showed that they and their co-conspirator

brokers further reduced competition to favor Defendants via the submission of courtesy bids, and

the intentional omission of competitive providers from bid lists. *See, e.g.,* Tr. 2562-2571

(Hilgeman).

      Moreover, Defendants attempt to misdirect the Court regarding the meaning of the term

FMV.  As the trial evidence showed, the bid process at issue in the conspiracy was designed by

the Treasury to establish FMV, precisely because each GIC is unique. *See, e.g.,* Tr. 347 (D.

---

[17]  It should be noted that Defendants made this same argument to the jury as a ground for
acquittal.

Goldberg).  Therefore, unlike the stock market, for example, there are no market indices that can

be used as benchmarks for FMV; instead it is the competitive bidding process that establishes

FMV for GICs.  Most importantly, the Treasury Regulations, upon which Defendants placed

heavy reliance at trial, provide that GICs procured outside the Treasury's prescribed competitive

bidding process are not presumed to have been procured at FMV.  Accordingly, there is no merit

to Defendants' arguments that despite their bid rigging, the victims of their crimes received

FMV, because the Treasury Regulations presume just the opposite.  Defendants simply cannot

avoid the fact that the victims did not receive what they were rightly entitled to expect to receive:

the highest rate that a competitive, fair bidding process would yield.

Nor is there any merit to Defendants' assertions that so-called "raised bids" should be

used to offset the damage done by last looks down.  As became evident during the course of the

trial, Defendants knew, through their longstanding corrupt relationships with brokers, that they

would receive improper "last looks" before their final bids were submitted.  This last look

information was so valuable to Defendants that they were willing to pay brokers to obtain it.  The

information was valuable, of course, because it allowed Defendants to win bids by paying

slightly more than the next highest bid.  By obtaining last looks, Defendants avoided the prospect

of "leaving money on the table" to their benefit and to the detriment of the municipalities and the

Treasury.  Because they had the ability to receive last looks, Defendants had no incentive to bid

competitively.  *See, e.g.,* Tr. 2376:1–5 (Zaino testimony that when a last look will be given,

"there is no incentive or need to bid our best").  The fact that Defendants were able to "raise"

their initial bids demonstrates that the initial bids were not competitive bids.  Accordingly,

Defendants actions in "raising" their bids above their initial non-competitive levels should not be used to offset the harm caused by their bid reduction conduct.[18]

Defendants' argument that the PSRs unfairly double count when they include broker and swap fees as loss in reduced bids transactions is similarly without merit. *See* Goldberg Br. 33. First, with respect to broker fees, as described more fully above, *supra* Section II.A., the victims suffered two separate loss components:  reduced interest rates and the potential for their underlying bonds being declared taxable by IRS. Second, with respect to swap fees, the evidence showed that Defendants' purpose in paying the kickbacks (that were disguised as swap brokerage fees) was to win transactions at inflated profit levels. *See infra* Section II.C (citing testimony of Naeh and Wolmark, Tr. 664:24; *see* Tr. 735; Tr. 2373). Second, the evidence also showed that the costs of the kickbacks were passed on to the victims. It therefore follows that no double counting exists because the loss to the victim, in the form of reduced interest rates, included both the costs of the kickbacks and the Defendants' inflated profit levels that resulted from the payment of the kickbacks. Accordingly, Defendants' double counting objections are unfounded.[19]

---

[18]  Accordingly, it is the Government's position that "raised bids" resulting from last looks also caused pecuniary and non-pecuniary harm to municipalities and the Treasury. Due to the lengthy and complex market and transaction analysis required to estimate the amount of loss caused by this conduct, the Government has not included a "raised bid" amount in our loss calculation.

[19]  Grimm's other arguments of inaccuracies and double-counting are likewise insufficient for the Court to disregard the Government's loss calculations. For example, Grimm argues that the the Government's revised loss calculations resulted in a reduction in his loss figure by over $1.1 million. Grimm Br. 14. This loss calculation was not the result of error, but rather the Government's taking a conservative approach to allocating loss to deals that related to more than one count. For example, the Government allocated the reduced bid rate for the 12/14/2001 City of Atlanta transaction to Count Six rather than Count Two, which lowered the loss attributed to Grimm in Count Two. Similarly, Grimm's complaint about the allocation of an extra $200,000 for the Puerto Rico deal to Count Four, Grimm Br. 20-21 and n.70, also results from the transaction involving multiple counts. If Grimm were convicted only of Count Four, $1,335,000

Defendant Grimm's focus on the Maine State Housing transaction is similarly misplaced. Grimm Br. 26–27. The recorded calls and testimony regarding the transaction reveal that Grimm was in fact prepared to bid a rate of 85 basis points above the BMA index. *See* Tr. 941–45; GX 119135. That rate was reduced by Defendant Grimm after he received confidential, inside information from not one, but two separate employees of corrupt broker CDR, Matthew Rothman and David Rubin. While Grimm tries to place some misdirected significance on the "put" provision that is discussed in the calls, a thorough review of the evidence shows that co-conspirator Rubin convinced Defendant Grimm that the existence of the put provision did not necessitate a recalculation of his bid. GX 119135. More importantly, Rubin and Rothman assured Grimm that he could in fact reduce his bid by 4 basis points and still win. *Id.* As a result, Grimm reduced his bid by 4 basis points and caused harm to the United States Treasury.

Defendant Grimm's objection to the PSR's inclusion of "DV 01" information, which represents the dollar cost of changing an interest rate by one basis point, is also unavailing. Grimm Br. 26–27. Despite Defendants' objections, the law is clear that for the purposes of sentencing, the Court can consider evidence that was not introduced during the course of the trial. *United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005); 18 U.S.C. § 3661. The DV 01 information objected to by Defendants was provided by their former employers, which used this information in the regular course of their businesses. Because the DV 01 information is a relevant, useful tool to calculate harm in this case, it was properly considered in the PSR.[20]

---

would be the proper kickback amount allocated to Grimm, as he paid both a $200,000 kickback to CDR and $1,135,000 kickback to UBS. While the $200,000 was inadvertently attributed to both Counts One and Four, the total loss attributed to Grimm's Guidelines calculation is not affected by this allocation.

[20] Also relevant to the loss analysis, as Defendants indirectly refer to in the restitution sections of their briefs, is the fact that GE paid $70 million to victims to compensate them for the damages caused by Defendants' conduct.

Furthermore, Defendants spent enormous effort attempting to limit the Government's proof at trial, and the Government significantly pared down its proof to meet the ordered parameters prior to trial. It would not serve the interests of justice, however, if the Government's good faith in streamlining trial evidence is used against it to exclude relevant sentencing information now presented.

Finally, Defendant Carollo's analysis of Note 3(D)(i) of Section 2B1.1 of the Guidelines is strained and misplaced. No fair interpretation of this Note would exclude the substantial harm caused in this case, fraudulently obtained principal and reduced interest, from a Guidelines loss calculation. Significantly, in the only relevant case cited by Defendant, the court included the same type of harm as is present here in its loss calculation. In *United States v. Nolan*, 136 F. 3d 265, 273 (2d Cir. 1998), the Second Circuit held that the predecessor version of Note 3(D)(i) did not apply "where the money stolen included both principal and agreed upon interest."

### C.   Swap Kickback Fees Are Properly Considered a Loss to Victim Issuers

Swap kickback fees are also properly considered a loss to the issuer for purposes of calculating Defendants' offense level. The evidence at trial demonstrated two types of swap kickbacks in this case. First, for transactions brokered by CDR and IMAGE (Counts One, Two, Five, Six), brokers received kickbacks in exchange for corrupting the bidding and steering transactions when Defendants caused a swap counterparty (*e.g.,* UBS) to pay the brokers in the course of executing a swap transaction. In these instances, witnesses testified regarding the kickbacks and the Government introduced invoices relating to the swap. *See, e.g.,* Tr. 664 (Naeh); 1349; 1376–78 (Wolmark); GX 251 (summarizing swap invoices introduced at trial). Second, with Count Four transactions, where UBS acted both as the broker and the swap counterparty for the kickback swap, the internal profit made by UBS in connection with such

swaps is included in the Government's calculation as a loss.  In these instances, as UBS was both the broker and swap counterparty, there was no invoice for the payments.  Mark Zaino testified regarding the kickbacks on Count Four transactions and UBS spreadsheets identifying the profit were introduced as evidence.  *See* Tr. 2336–37; GX 11-9.

Multiple co-conspirator brokers testified about the kickbacks and the related harm to municipalities.  For example, Dani Naeh, a former executive at CDR, testified that when he and others at CDR were steering deals to Goldberg, part of the very same discussion with Goldberg was the swap kickback fee that Goldberg would pay in exchange for steering the deal to him.  Tr. 664 (Naeh).  The interest rate that they agreed Defendant Goldberg would submit as the winning bid would factor in the amount of the swap kickback fee he would pay CDR.  *Id.*  Naeh explained that CDR would not only be paid the regular broker fee disclosed to the municipality, but that CDR also would take a swap fee as a kickback, "ultimately both being paid out of the municipality's pocket."  Tr. 664:24; *see* Tr. 735; Tr. 2373 (Naeh and Wolmark testimony that swap kickback fees lowered the interest rates paid to the municipality).

Naeh's testimony is corroborated by the testimony of Stewart Wolmark of CDR.  Tr. 1278-79.  When asked about a $475,000 swap kickback fee that Goldberg arranged to pay CDR through co-conspirator broker UBS on the 2002 MoHEFA transaction, Wolmark was asked:

Q.    At the end of the day, whose pocket did that $475,000 come out of?

A.    It would come out of the [municipality]'s pocket.

* * *

THE COURT:  . . . I assume you're talking from your experience in this field for a long, long, long time?

A:    Yes, I am, your Honor.

Tr. 1379:4-1379:13 (Wolmark).

Mark Zaino, a former executive of UBS, also testified that a swap kickback fee adversely impacted the interest rate paid to the municipal victim:

> Q.    What effect, if any, did the money paid on the swap have on the rate received on the investment agreement?
>                          * * *
> A.    It lowered the rate on the [transaction].

Tr. 2318:8–2318:12 (Zaino). *See also* Tr. 2344–46 (Zaino testifying that for Grimm to pay the kickback wanted by UBS on Puerto Rico transaction he would need to lower his bid by that amount).

Significantly, Grimm himself admitted on tape that the swap kickback fees came from the issuer's pocket. In a recording relating to the Catholic Health Initiatives transaction, Grimm told Mike Welty of UBS that they had to "back up" Grimm's bid price by seven basis points so that Grimm could pay a swap fee to UBS for steering the deal to him. GX 47139. Zaino testified that "backing up" the price meant that that Grimm would lower his bid by the amount paid to UBS. Tr. 2351 (Zaino). That this reduction in bid price was for the kickback fee and not the regular brokerage fee was confirmed by Welty when he commented that "everybody's paying me [a broker fee] obviously." GX 47139. Moreover, as all three Defendants discussed in a 2002 call, the only point of paying a broker a kickback through a swap fee was that, pursuant to the goals of the conspiracy, the broker would save them money through lower bids. GX 587571. On that recording, Carollo told Grimm and Goldberg that he was "disgusted" with a broker who wanted to be paid a swap fee, but had put GE in competition with other providers. *See id.* (on the same recording, Goldberg explaining, "the idea was ... to see if he could save us money and then we'd pay him").

Nor does the fact that the kickback swap fees were paid on a date different from the bid date, or for amounts different from the corrupted investment agreements, prove that the swap

payments were legitimate. The trial record is replete with evidence of Defendants taking steps to hide the fact that they were making kickback payments disguised as swap fees. Testimony at trial proved that Defendants and their co-conspirators intentionally separated payment of the swap kickback fee by both time and amount in order to prevent suspicion. *See, e.g.*, Tr. 413-14 (D. Goldberg). They also created a phony letter by CDR for Goldberg's files to lend legitimacy to the payments, which falsely stated that CDR had extensive experience in brokering interdealer swaps. *See* Tr. 403-05 (D. Goldberg); GX 4-6. Indeed, Douglas Goldberg testified that this procedure was initiated while Defendant Goldberg was at GE, and continued when he went to work at FSA. In fact, after Defendant Goldberg went to FSA, he and CDR agreed to have the kickback swap payments made by co-conspirator UBS, the swap counterparty, to add a further layer of obfuscation. *See* Tr. 466 (D. Goldberg). In addition, during a recorded conversation played at trial, Defendant Goldberg was heard explaining how Carollo insisted on this process of disguising kickback payments in a discussion with David Eckhart of IMAGE. *See* GX-587897. When Eckhart called Goldberg asking for his kickback for steering the Puerto Rico deal to Goldberg, Goldberg stated that he had "talked to, uh, Dom on Friday. Uhm, we were just gonna get some time between the settlement and that, so you know, sometime." *Id.*

Defendants' argument that fees GE and FSA paid to hedge their risk on a transaction "are of no consequence to the issuer," but were a routine part of the GIC industry, Grimm Br. 21, likewise fails for two reasons. First, the kickbacks were hardly legitimate; Defendants intentionally cast their kickbacks as purportedly legitimate swap fees so as to disguise them, and as multiple witnesses testified at trial, the swap fees were fraudulent because the brokers did little to no work for the money. *See, e.g.*, Tr. 370–72, 414, 464-65 (D. Goldberg); 913–15 (Rothman). Second, the municipal issuers were harmed. In support of their argument that the swap fees were

of no consequence to the municipalities, Defendants point to questions posed on cross-examination to Travis Gibbs, bond counsel for Port of Oakland, in which Gibbs testified that post-transaction hedging by the winning provider wasn't relevant to the issuer. Grimm Br. 22; *see* Tr. 2646. On redirect examination, however, Travis Gibbs testified that if additional fees were paid to a broker and would affect the bid, he would want to know that as the representative of the issuer because "[t]he tax regulations have several provisions that directly implicate the question of whether fees are being paid to a broker by providers." (Tr. 2672:10-12). As discussed above, Naeh, Wolmark, and Zaino testified that the kickbacks were paid by the municipalities in the rate on the contracts.

Defendant Grimm further erroneously argues that "internal profit...is not a swap fee" or kickback, and therefore does not constitute a loss to the issuer victims. Grimm Br. 21. But Grimm's argument is squarely contradicted by the facts at trial. Mark Zaino of UBS, testified about payments Grimm arranged to be made to UBS for the two transactions Grimm challenges, $1,135,000 for Puerto Rico and $75,000 for Catholic Health Initiatives, bid out by UBS and awarded to GE because of Grimm's fraudulent conduct. Grimm Br. 21 and n.70; Tr. 2338; Tr. 2346 (Zaino). UBS was both the broker for the Puerto Rico and Catholic Health Initiatives transaction, and the swap counterparty for the backend swap Grimm agreed to enter into with UBS in exchange for UBS steering the deals to him. *Id.*; GX-47139. Zaino testified that UBS's swap desk booked $1,135,000 in the form of local profit as a result of this swap kickback transaction. Tr. 2338-39 (Zaino). Zaino testified that this was an extraordinary amount of profit for UBS, and estimated it to be five times the ordinary profit UBS would make on a similar transaction. *Id.* Likewise, Zaino testified that the normal fee UBS would charge for a transaction like the one Grimm paid $75,000 to UBS for steering the Catholic Health Initiatives

transaction would have been "maybe zero to $10,000 tops." Tr. 2360-61 (Zaino). Because UBS was the swap counterparty, there was no "swap fee" that could be attributed as a kickback. Accordingly, the Government attributed the profit amounts as the amount of the kickbacks, as UBS would not have earned this profit but for the fraudulent manipulation of the bids by entering into these swap transactions. *See, e.g.*, Tr. 2234 (Zaino testifying that UBS discussed internally trying to get Grimm to engage in a swap hedge with UBS in connection with the Puerto Rico transaction).

Finally, for the same reasons, Goldberg's argument that the kickback swap fees came from the providers' profits and not from the issuer is flawed. *See* Goldberg Br. 31. Gains obtained through the fraudulent manipulation of bids likewise may be construed as loss for purposes of determining offense characteristics under U.S.S.G. § 2B1.1(b). *See* U.S.S.G. §2B1.1, cmt. 3(B) (court can consider defendant's gains where losses sustained cannot be adequately determined). Here, where Defendants enjoyed profits large enough to pay kickbacks sometimes amounting to hundreds of thousands of dollars, it is evident that in certain instances the lowered bid price does not capture the entirety of an issuer's loss and the Court should look to the swap paid from profits Defendants obtained by virtue of their bid corruption.

**D.    Losses Occurring After Defendants Left Their Employers Are Properly Attributable to Them**

The Court should also reject Defendants' contention that they should not be held accountable for losses associated with transactions after they left GE. *See* Carollo Br. 23; Goldberg Br. 34. Their argument stands in direct contravention of both conspiracy law and the jury's verdict. Carollo cites nothing in the Sentencing Guidelines in support of this claim and, as the Court correctly instructed the jury, once a person joins a conspiracy, that person remains a member until he withdraws from it. *See* Tr. 3238; *United States v. Berger*, 224 F.3d 107, 118-20

(2d Cir. 2000). In their closing arguments, Defendants maintained that they withdrew from the conspiracies charged in Counts One and Two when they left GE and, by their verdict, the jury clearly rejected this argument. *See* Tr. 3229. As a member of the conspiracies charged in those counts, Carollo can be held liable for the losses incurred by their victims during the entire conspiratorial period. *See United States v. Leslie*, 658 F.3d 140, 143-45 (2d Cir. 2011) (citations omitted) (district court properly considered defendant's conduct during entire conspiracy for purposes of sentencing where defendant failed to prove withdrawal).

## IV.   Defendants' Conduct Warrants Enhancements

### A.   A Sophisticated Means Enhancement is Appropriate

Defendants' conduct constituted sophisticated means sufficient to warrant a two-level adjustment for each defendant under U.S.S.G. § 2B1.1(b)(10)(C). The sophisticated means enhancement applies when the totality of a scheme is sophisticated, even if each step in the scheme was simple. *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003); *United States v. Lewis*, 93 F.3d 1075, 1083 (2d Cir. 1996).

Defendants and their co-conspirators submitted hundreds of false certifications in both provider certificates and, in a number of instances on their bid forms, to the municipalities. These certifications were relied upon by the municipalities, their bond counsel and the IRS. *See, e.g.*, Tr. 2285-86 (Zaino); Tr. 2504-05 (Farber). They also took other actions designed to conceal their fraudulent conduct. First, under Carollo's direction, Defendants agreed with co-conspirators to separate the kickback payments from the award of the conduct by time, use different amounts, and take other steps to create the impression that they were not connected and to prevent suspicion and detection. *See, e.g.*, Tr. 413-14; GX 587897. Second, Defendants and their co-conspirators arranged for another layer of concealment of the kickbacks by having

31

the swap counterparty – rather than GE or FSA – make the actual kickback payments to the co-conspirator brokers. This additional step of having the swap counterparty make the kickback payment to the broker eliminated a paper trail of invoices from the broker to GE or FSA. *See, e.g.*, Tr. 462-465. In a recorded telephone call played at trial, Goldberg and Wolmark discussed how this enabled FSA to disclose only the payment of the broker fee to the municipality and conceal the kickback swap payment. GX 698185; Tr. 465-68. In another recorded call, Grimm revealed his knowledge that provider certificates required disclosure when he discussed swap fees with Dani Naeh, but said he wanted to discuss ideas about getting around it "off-line." GX 415993; Tr. 698-700.

**B.    A Role in the Offense Enhancement is Appropriate for Carollo and Goldberg**

The Guidelines provide a three-level enhancement if a defendant was a "manager or supervisor" and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3 B.1.1(b). It is not necessary that a defendant manage or supervise a large number of participants for the enhancement to apply. *United States v. Burgos*, 324 F.3d 88, 92 (2d Cir. 2003). The management or supervision of a single participant is sufficient. *Id.* The terms "manager" or "supervisor" are left undefined by the Guidelines. The Second Circuit, however, has determined "a defendant may be properly considered a manager or supervisor if he exercised some degree of control of others involved in the commission of the offense." *United States v. Birkin*, 366 F.3d 95, 101 (2d Cir. 2004) quoting *United States v. Blount*, 291 F.3d 201, 207 (2d Cir. 2002) (internal quotations omitted). Generally, then, a manager or supervisor is one whose role in the criminal enterprise "bespeaks control." *Burgos*, 324 F.3d at 92.

Pursuant to U.S.S.G. § 3B1.1(b), a three-level increase is warranted for Carollo. Carollo was the business leader of GE's municipal trading desk, and managed and supervised the day-to-

day activities of the desk, including the bidding activities of Goldberg and Grimm. *See, e.g.*, Tr. 341 (D. Goldberg testimony that Carollo in charge of GE's bidding desks); Tr. 387 (D. Goldberg testimony that Carollo was Goldberg's boss); Tr. 659 (Naeh testimony that Carollo was Grimm's supervisor); Tr. 2259 (Zaino testimony that Carollo was Goldberg's boss at GE); *see, e.g.*, Tr. 413-14; GX 587897 (Carollo directed Goldberg that kickback payments be separated from award of contract to avoid detection). The criminal activity involved five or more participants in both Counts One and Two: the three defendants from GE; the five current and former CDR employees who testified; and the four current and former employees from IMAGE.

Defendant Carollo's argument that he is entitled to a minor role adjustment is unpersuasive and should be rejected. ███████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████ Second, Carollo's insistence that brokers and his subordinates are to blame for his actions, further demonstrates his failure to accept responsibility for his conduct.

Likewise, a three-level increase is warranted for Goldberg pursuant to U.S.S.G. § 3B1.1(b) for his extensive fraudulent conduct at FSA. When Goldberg left GE, he went to FSA to start and manage its municipal trading desk. *See* Tr. 342 (D. Goldberg). All of the CDR witnesses testified about their extensive dealings with Goldberg at FSA, with Goldberg submitting fraudulently determined bids and paying kickbacks to CDR in the form of swap fees in exchange. Likewise, Goldberg had the major role in FSA's dealings with IMAGE. As manager of FSA's desk, Goldberg supervised the participation in the charged conspiracy of Walter Schemitsch, his subordinate on the desk. Under Goldberg's supervision and management, Schemitsch submitted fraudulent bids on contracts brokered by, among others,

33

CDR.   Like Counts One and Two, the criminal activity charged in Counts Five and Six involved five or more participants.   Moreover, Goldberg's contention that "all" of his supervisors knew and approved of his illegal conduct is unsupported by the evidence, and more importantly, further demonstrates his failure to accept responsibility for his conduct.

For the reasons discussed above, Goldberg's and Carollo's arguments that they should not receive a supervisory role adjustment are unpersuasive and should be rejected.

## V.   The Government Has Properly Calculated the Number of Victims

Defendant Carollo's contention regarding the four-level enhancement for the number of his victims because broker fees do not constitute loss should also be rejected.   As discussed in Section II.A, the Second Circuit held in *United States v. Canova* that "a party who contracts to have goods produced or services performed according to certain specifications, and who pays for those goods or services in reliance on a fraudulent representation…has sustained a measure of pecuniary loss for purposes of calculating the fraud guideline." 412 F.3d 331, 354 (2d Cir. 2005).   Contrary to *Canova*, Carollo essentially asks the Court to find that issuers who paid broker's fees or kickbacks disguised as swap fees suffered no loss.   *See* Carollo Br. 27-28.   To the contrary, the evidence at trial, as well as the voluminous evidence regarding deals that were not featured at trial, demonstrates that even where a bid was not lowered, issuers were harmed because they paid fees with the expectation that the bidding process was being conducted properly.   *See, e.g.,* Tr. 2632:22 – 2633:7 (testimony of Travis Gibbs regarding the need to re-bid investment contracts where safe harbor is not followed).   Each of the municipal issuers whose competitive process was corrupted by Defendants' conduct constitutes a victim for the purposes of the Guidelines.   *See Canova*, 412 F.3d at 353 ("in no case do the Guidelines contemplate a

court rewriting the parties' contract to excise specifications paid for but not received, and thereby, concluding that the victim sustained no loss.").

## VI.   Section 3553(a) Factors Mitigate Against Leniency

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations.[21]

### A.   Nature and Circumstances of Defendants' Felony Offenses

This is not a simple case of fraud, involving one or two isolated instances committed by Defendants during their otherwise exemplary careers. This case involves hundreds of public victims being defrauded by hundreds, if not thousands, of acts carried out by Defendants day after day while they conducted their business – acts all designed to cheat and deceive public entities, and enrich themselves, their employers and their coconspirators.

Defendants were convicted, after a lengthy trial, of multiple serious felony offenses – defrauding hundreds of cities, towns, and other public entities across the United States by corrupting the bidding for the reinvestment of tax exempt bond proceeds on hundreds of occasions over a period of many years. These cities and towns paid for and expected a transparent and competitive bid process, in which providers submitted arms-length bids for their

---

[21] 18 U.S.C. § 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines]; (5) any pertinent policy statement [issued by the Sentencing Commission]; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense. *Id.*

investment agreements. Yet, time after time, Defendants and their broker partners-in-crime cheated unknowing and trusting public entities – entities that were raising money to fund public projects to benefit first time home buyers, student loan recipients, clean water, nursing homes, hospitals and the like. They secretly corrupted the bidding process to steer deals to Defendants, to reduce rates Defendants were otherwise prepared to bid to the cities and towns, and to share the spoils of their criminal conduct by giving kickbacks to the brokers. As a result, Defendants corrupted hundreds of millions of dollars of contracts for billions of dollars in bond proceeds issued country-wide.

Defendants not only carried out this illicit conduct throughout their careers at GE and FSA, they took careful steps to further dupe their victims by submitting hundreds of lies – in their bids and in certifications – assuring the issuers that their conduct was honest, and causing the issuers and their bond counsel to unwittingly believe that the bond proceeds they were investing satisfied the safe harbor rules of the federal Tax regulations. The Government offered hundreds of these lies at trial and has submitted many more to the Court in connection with sentencing as evidence of Defendants' fraud.

Defendants also took extraordinary steps to avoid raising suspicion concerning their criminal relationship with the brokers by hiding the kickback payments, first by making the payments weeks after the transactions were completed on swaps that had different terms and amounts than the corrupted transactions. Defendants later added the additional step of diverting the kickback payments through the swap counterparty rather than paying the broker directly.

The Government respectfully submits that the nature and circumstances of Defendants' offenses – the extensive fraud and kickback scheme and hundreds of public victims – clearly warrant a sentence within the Guidelines range.

36

### B.    The Need to Afford Adequate Deterrence

One of the most important factors that this Court must consider in imposing a sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).  Fraud-based crimes, like the one perpetrated by Defendants, are typically quite difficult to detect and prosecute.  These crimes consist of secret agreements between individuals who are motivated to conceal their fraudulent activities through sophisticated means.  And the proof at trial showed the extent to which defendants acted to conceal their crimes from their victims and the Government.

Defendants made deliberate, repeated choices to violate the law.  Every time they obtained secret information about bidding, every time they reduced their bids to cheat the municipal issuer, every one of the hundreds of false statements they made to lull their victims into believing a legitimate bid had been conducted, every time they paid a kickback – each amounts to a choice to commit a crime.  These choices spanned a period of over five years in which there were many opportunities to cease this fraudulent conduct and corruption of the bidding process, yet Defendants failed to do so.  Defendants' sentencing memoranda are replete with evidence of the effects a sentence of incarceration would undoubtedly have on their families, yet each Defendant knew the law and violated it many times, fully aware of the risks and consequence to himself and to his family.

Defendants have failed to truly acknowledge the illegality of their conduct or the serious nature of their illegal conduct.  This is evident in their repeated claims that the issuers suffered no loss by their conduct.  Carollo Br. 20; Goldberg Br. 28; Grimm Br. 14.  In addition, not only does Carollo maintain he is unfairly charged, Carollo PSR, p.36, he placed the blame on Grimm and Goldberg, advising Probation that, although they were his subordinates, they were colluding

with the brokers, including CDR, to undermine the bidding process.  Carollo PSR, ¶ 78.
Goldberg tries to diminish the seriousness of his crimes by claiming that he always paid the
highest price to issuers when awarded a contract.  *See, e.g.*, Goldberg Br. 46.  That such prices
paid to the issuers were reduced by the kickbacks Goldberg paid the coconspirator brokers
evidences the disingenuousness of this argument.

Defendants' claims that they did not personally benefit from their fraudulent schemes
likewise rings hollow.  *See, e.g.*, Grimm Br. 1; Goldberg Br. 48; Carollo Br. 35.  Probation's
assessment of Goldberg was that he personally benefitted from a well-paying salary throughout
his offense, with no apparent regard for fair business practices, and the fact that his municipal
victims could be deleteriously impacted by his conduct.  Goldberg PSR, p.33.  Probation's
assessment of Grimm was that he engaged in this offense without regard for the effects his
crimes may have had on his victims and that he engaged in this scheme "because by generating
business for GE, he was able to maintain a well-paying position and lead a more-than-
comfortable lifestyle."  Grimm PSR, p.30.  Probation similarly did not credit this argument
regarding a purported lack of personal benefit in assessing Carollo's culpability.

The Government's extensive investigation uncovered industry-wide corruption.  There
is an obvious need for a strong warning to others in this industry and to maximize the general
deterrent effect of this prosecution.  The Government's investigation is ongoing and these
Defendants are the first individuals to be sentenced for this conduct.  Many others await
sentencing.  Moreover, Defendants are incorrect that the Government's investigation and
subsequent changes in industry practice mitigate the need for general deterrence.  A Guideline
sentence would send a strong message to all those working in the financial and other industries,
whose customers and clients depend on the honesty, truthfulness and fair dealings of people like

Defendants, that hidden schemes and secret kickbacks covered up by lies and designed to take money from the pockets from trusting customers will not be tolerated.

The Government respectfully submits that the need for both specific and general deterrence clearly warrants significant jail sentences within the Guidelines range.

## CONCLUSION

For all of the reasons stated, the Court should sentence Defendants Dominick Carollo, Steven Goldberg, and Peter Grimm to Guidelines sentences, which are sufficient but not greater than necessary to comply with 18 U.S.C. § 3553(a).  The Government also respectfully requests that the Court delay imposition of restitution for up to 90 days to allow the Government to obtain additional information concerning distribution of settlement payments in civil proceedings.

Respectfully submitted,

DEIRDRE A. McEVOY
Chief, New York Field Office
Antitrust Division
U.S. Department of Justice

Dated:    New York, New York
          October 15, 2012

ANTONIA R. HILL
STEVEN TUGANDER
WENDY H. WASZMER
Attorneys, Antitrust Division
U.S. Department of Justice
26 Federal Plaza, Room 3630
New York, New York 10278
(212) 335-8000

39