UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                    :

            V.                    :                    10-CR-654 (H.B.)

DOMINICK P. CAROLLO,                    :
STEVEN E. GOLDBERG, and
PETER S. GRIMM,                    :

               Defendants.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S RESTITUTION MEMORANDUM

DEIRDRE A. McEVOY
Chief, New York Field Office
Antitrust Division
U.S. Department of Justice

ANTONIA R. HILL
STEVEN TUGANDER
Attorneys, Antitrust Division
U.S. Department of Justice
26 Federal Plaza, Room 3630
New York, New York 10278
(212) 335-8000

## Preliminary Statement

Defendants Dominick Carollo, Steven Goldberg and Peter Grimm were sentenced on October 18, 2012. At that time, the Court granted the Government's request for a sixty-day adjournment to allow the Government time to finalize its request for a restitution order pursuant to 18 U.S.C. § 3664(d)(5). (Transcript of October 18, 2012 Sentencing (hereinafter "S. Tr.") at 70:10-12). The Court also granted Defendants twenty days to provide the Court with a response to the Government's submission. *Id.* The losses are described in more detail below and are made up of four components: broker fees, swap fees, losses incurred by the victims as a result of fraudulently lowered bid prices, and attorney and other fees.

The Government hereby requests that the Court enter a restitution order in the amount of of $12,827,142.83 to the identified victims, and to further order each Defendant to pay restitution (after offsets) in the following amounts: Defendant Dominick Carollo, $2,603,372.38, jointly and severally with Defendants Steven Goldberg and Peter Grimm; Defendant Peter Grimm, $2,603,372.38, jointly and severally with Defendants Dominick Carollo and Steven Goldberg; and Defendant Steven Goldberg, $6,906,226.94: $2,603,372.38 of which should be paid jointly and severally with Defendants Dominick Carollo and Peter Grimm, and $4,302,854.56 of which should be his sole liability. These loss and offset amounts are set out in the attached spreadsheets and explained herein. A proposed Order is attached, along with a Restitution Ordered spreadsheet (Attachment A-2) identifying restitution amounts to be paid to each victim

of the conspiracies with which Defendants have been convicted.[1]  The Government has adhered
to the following principles in fashioning its proposed restitution Order:

1) Each defendant should be held jointly and severally liable for restitution amounts
identified for transactions related to Counts One and Two, of which each Defendant has been
convicted;

2) Defendant Grimm should be held solely liable to pay restitution amounts identified for
transactions related to Count Four, the Count of which he alone was convicted; and

3) Defendant Goldberg should be held solely liable to pay restitution amounts identified
for transactions related to Counts Five and Six, the Counts of which he alone was convicted.

## A. BACKGROUND

The Government has taken several steps to properly and completely identify victims.
With its submissions to the Probation Office, the Government provided a list of potential victims,
including contact information.  The Government also sent letters to known addresses of potential
victims, advising them of the verdict in this case and their rights as victims.  *See* 18 U.S.C. §
3664(d).  In addition, the Government created a website notice of this matter for all potential
victims.  The Government requested that the entities supply the Government with a detailing of
any expenses for which they seek restitution.

## B. APPLICABLE LAW

In fashioning a sentence in a fraud case such as this one, the Court must consider the need
to provide restitution to the victim.  18 U.S.C. §§ 3663A(c)(1)(A)(ii); 3663A(c)(1)(B).  The

---

[1] As shown in the Restitution Calculation spreadsheet (Attachment A-1), the Government has
reduced restitution amounts due to victims by amounts already paid to victims in connection with
the five SEC judgments, *i.e.*, "offsets."  *See* 18 U.S.C. § 3664(j)(2).

3

Court *shall* enter a restitution order for the full amount of the victim's losses.  U.S.S.G. § 5E1.1 (a)(1) (emphasis added).  Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victims in any Federal civil proceeding, and in any State civil proceeding to the extent provided by the law of the State.  18 U.S.C. § 3664(j)(2).

In ordering restitution, the Court shall determine the amount of restitution by a preponderance of evidence.  18 U.S.C. § 3664(e).  The "burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."  *Id.*

### C.  PROOF OF RESTITUTION AMOUNTS

While the Government is mindful of the Court's decision not to use the Government's loss calculations for purposes of determining Defendants' sentences under the Sentencing Guidelines, it respectfully submits that the evidence adduced at trial and the evidence produced by the Government in connection with the Defendants' sentencing proceedings supports the proposed Order of restitution.  The Court explained that its rejection of the Government's loss calculation did not mean "I find there to be zero loss, because I don't.  It means only that I feel the more appropriate method for taking into consideration the loss at this stage is by reliance on general considerations prescribed by 3554(a)."  (S. Tr. at 49:23–50:2 (emphasis added).  The Government is obligated by the Mandatory Victims Rights Act  to advocate for restitution in this case.  *See* 18 U.S.C. § 3663A.  The Government respectfully submits this memorandum to provide the Court with a more comprehensive explanation of the losses of the victims, the proof supporting the losses, and a chart of payments made in civil matters to date that should be applied to offset any restitution amounts ordered by the Court.

To aid the Court in assessing loss for the purposes of determining restitution to be paid to identifiable victims, the Government has prepared and submits with this Memorandum four attached spreadsheets. Attachment A-1, a Restitution Calculation spreadsheet, identifies each category of loss and the payments made in connection with the SEC judgments for offset purposes, discussed more fully in Section D1, *infra*. Attachment A-2 is the Restitution Ordered spreadsheet that is to be attached to the Government's proposed restitution Order, and contains the amount of restitution to be paid by each defendant to each victim. Attachment A-3, the Restitution Calculation Proof spreadsheet, identifies the proof the Government has submitted in connection with each element of loss.[2] Attachment B, the Lowered Bids spreadsheet, contains a detailed explanation of the steps the Government took to calculate the loss in transactions where Defendants were allowed to lower their bids and still be awarded the contract.[3] As set forth below, the Court should order restitution for the following four categories of loss: broker fees, swap fees, losses incurred by the victims as a result of fraudulently lowered bid prices, and attorney and other fees.

1.    **Restitution Should be Ordered to Victims for Four Types of Losses**

The losses set out in the attachments and the proposed Order are made up of four components: broker fees, swap fees, losses incurred by the victims as a result of fraudulently

---

[2]  This spreadsheet identifies some additional evidence not previously identified to the Court in the Government's sentencing submissions, primarily which were audio exhibits at trial. The Government provides with this Memorandum a copy of all audio cited for the Court's and Defendants' convenience. The additional documentary evidence is also provided herewith.

[3]  The Government provided this spreadsheet to the Probation Office and Defendants prior to setencing, but the information contained therein was not contained in the final PSR.

lowered bid prices, and attorney and other fees.  This Memorandum contains a more comprehensive explanation of the Government's proof regarding each category of loss.

    a.    **Broker Fees**

    The Government's position that the entire broker fee represents an actual loss to the victim for which restitution should be ordered is based on the testimony of the victims and analogous case law.  The evidence at trial demonstrated that the primary service that issuers hired brokers to provide was to conduct bids in conformance with applicable Treasury regulations.  The Second Circuit's decision in *United States v. Canova*, 412 F.3d 331 (2d Cir. 2005), which involved determining loss for sentencing purposes regarding an analogous fraud, supports the conclusion that the entire broker fee is the appropriate measure of this component of restitution in this case.  In *Canova*, the Court held that where a party fraudulently procures payments for goods or services by falsely representing that they were provided according to certain specifications, the victim has been induced to pay for something it wanted and was promised but did not receive, thereby incurring some measure of pecuniary harm.  *Id.* at 352. Accordingly, and as explained below, the reasoning of *Canova*, prohibits Defendants from claiming that the losses they caused should be offset by their partial compliance with fraudulently awarded investment contracts .  *See Id.*

    Moreover, a loss determination that focuses on the award of an investment agreement fundamentally misses the essential nature of what the victims here bargained for and did not get, even in part.  Here, Defendants and their co-conspirator brokers were well aware that a bidding process that resulted in a safe harbor presumption was essential to the transaction for which the issuer was paying.  It not only was spelled out in bid specifications, it also was falsely and repeatedly attested to in the dozens of bid forms and certifications signed by Defendants and

6

their co-conspirators.  In every transaction in this case, the fraudulent manipulation of the

bidding process by Defendants and their co-conspirators deprived the issuers of the essential part

of the bidding process that they paid for in order to qualify for the safe harbor presumption.

In addition, Travis Gibbs, bond counsel for the victim Port Authority of the Port of

Oakland, testified that if he ever learned that the bidding process for an investment agreement

had been corrupted, *i.e.*, did not comport with the competitive requirements of applicable

Treasury regulations, he would have advised the issuer/client to cancel the agreement and rebid

the GIC transaction.  *See* Trial Transcript ("Tr.") at 2632-33).  In such a situation, the issuer

would be required to hire and pay another broker to conduct the bidding, thereby losing the cost

of the initial broker fee.  Thus, regardless of whether it obtained an investment agreement

providing for interest payments pursuant to the fraudulent bidding, the issuer would have

cancelled the agreement had it known the true circumstances of the bidding process.  In

connection with broker fees, the Government provided the Court, Probation and Defendants with

documentary proof of the amount sought in each instance.  These documents are identified by

bates number in the Restitution Calculation Proof spreadsheet, (*see* Attachment A-3), and are

contained in the evidence binders provided to the Court on October 10, 2012, which are

organized by transaction.  At sentencing, the Court declined to adopt the Government's argument

that the entirety of the broker fee was a loss to the issuer, and concluded that "[t]he GICs are not

worthless; they are simply undervalued." (S. Tr. at 49:18-21).  But that is not what the

issuer/victims bargained for – they bargained for contracts that were awarded in the manner that

provided safe harbor protection as Defendants certified – and Defendants' false certifications in

this case were completely unable to satisfy the safe harbor provisions of the Tax regulations.

7

Accordingly, the Government respectfully submits that it has proven that broker fees must be included in restitution ordered in this case. These broker fees are set forth in the Restitution Calculation spreadsheet (Attachment A-1).

### b.    Swap Fees

The Government submits that the testimony adduced at trial, and the documentary proof of the amounts of kickbacks Defendants paid co-conspirator brokers in the form of swap brokerage fees, provide sufficient proof for the Court to order restitution based on such fees. These invoices are in the evidence binders provided to the Court on October 10, 2012, prior to sentencing, and are organized by transaction.

As explained in detail in its Sentencing Memorandum at 25-30, the Government introduced testimony from a number of its witnesses that such kickback/swap fees were ultimately paid by the victim-issuers. Multiple co-conspirator brokers, including Dani Naeh, Stewart Wolmark (former executives of CDR), and Mark Zaino (formerly of CDR and UBS), testified about how kickbacks paid to brokers directly harmed the municipal victims.

Naeh testified that when he and others at CDR discussed steering deals to Defendant Goldberg, they also discussed the swap kickback fee that Goldberg would pay in exchange for CDR steering the deal to him. (Tr. at 664, Naeh). The interest rate they agreed that Defendant Goldberg would submit as the winning bid, would factor in the amount of the swap kickback to be paid to CDR. *Id.* Naeh explained that the swap kickback fee paid to CDR would be "paid out of the municipality's pocket." (Tr. at 664:24).

Wolmark corroborated Naeh's testimony. (Tr. at 1378-79). In his testimony about a $475,000 swap kickback fee that Defendant Goldberg arranged to pay CDR through co-conspirator UBS on the 2002 MOHEFA transaction, Wolmark was asked:

8

Q.      At the end of the day, whose pocket did that $475,000 come out of?

A.      It would come out of the [municipality]'s pocket.

        . . .

THE COURT.  . . . I assume you're talking from your experience in this field for a long, long, long time?

A.      Yes, I am, your Honor.

(Tr. 1379:4-1379:13).

        Similarly, when asked about the effect that the swap kickback fee had on the rate paid by the issuer on the investment agreement, Zaino likewise confirmed that swap kickback payments adversely impacted the interest rate paid to the municipal victim: "It lowered the rate on the [transaction]." (Tr. at 2318: 12.)

        Defendant Grimm himself admitted in an audio recording that swap kickback fees came out of the issuer's pocket.  Specifically, he told Mike Welty of UBS that he had to "back up" (or lower) his bid price by seven basis points so that he could pay a swap fee to UBS in exchange for Welty's steering the deal to him. (*See* GX 47139; Tr. at 2351 (Zaino).  Moreover, in another recorded call, all three defendants discussed that the only point of paying a broker a kickback through a swap fee was that the broker would <u>save</u> them money through lowered bids. *See* GX 587571.  During the same recorded conversation, Defendant Goldberg explained "the idea was . . . to see if he could save us money and then we'd pay him." *Id.*

        The Government respectfully submits that this testimony is sufficient to establish that swap kickback fees must be included in the calculation of restitution ordered in this case.  These fees are set out in the Restitution Calculation and Restitution Proof spreadsheets, and total $2,480,680.00.

9

c.    **Lowered Bids**

This loss component includes $3,263,865.65 for losses incurred on occasions when Defendants fraudulently lowered their bids and still won the transactions. In its submissions to the Court on October 10, 2012, and October 15, 2012, and to the Probation Office in its PSR submissions, the Government provided a spreadsheet that contained references to substantive proof (*i.e.*, citations to audio recordings, as well copies of the cited audio) showing Defendants being allowed to lower their bids by their co-conspirator brokers and still be awarded the contracts. In addition, on October 10, 2012, the Government produced to Probation and Defendants another spreadsheet that set out each step in the process the Government took in calculating the loss due to reduced bids. The Government attaches an updated copy of its Lowered Bids spreadsheet as Attachment B.[4] The Government took the following steps to calculate this category of actual loss for restitution purposes in the spreadsheet below.[5]

Step One: The Government reviewed audio recordings associated with each fund to establish both the "Original Bid" (Column M on Attachment B) and the "Reduced Bid" (Column N).

Step Two: The Government subtracted the "Reduced Bid" from the "Original Bid" to determine the "Basis Point Reduction" (Column O).

_____

[4] The Government has re-reviewed the amounts in the columns of the Lowered Bid spreadsheet. It has made minor corrections to its calculations in a small number of instances, primarily those in which bids were connected to an index, such as BMA or LIBOR, or in which the bid document reflects a different bid amount. Such corrections would not have impacted the overall loss calculation for sentencing purposes, and all but one such correction resulted in a reduction of the amount of restitution the Government seeks.

[5] The Government has eliminated certain steps from the original Lowered Bid spreadsheet it submitted in connection with sentencing because it does not seek restitution for future interest payments.

10

Step Three:  The Government divided the "Original Bid" by the "Reduced Bid" to compute the "Relative Rate Differential" (Column P).

Step Four:  The Government multiplied the "Actual Interest Paid" by GE or FSA on each fund (Column Q) by the "Relative Rate Differential" to compute the "Interest at Original Bid Rate" (Column R).  This demonstrates what GE or FSA would have paid at the Original Bid Rate but for the Defendants' fraud.

Step Five:  The Government subtracted the "Actual Interest Paid" from the "Interest at Original Bid Rate" to determine what GE or FSA should have paid the municipalities, "Current Interest Impact" (Column S).

The Government respectfully submits that its Lowered Bids spreadsheet and supporting documentation – based on trial testimony and audio and documentary proof identified in the Restitution Calculation Proof spreadsheet (Attachment A-3) – demonstrates that it properly determined losses resulting from lowered bids for purposes of calculating restitution.

### d.    Attorney and Other Fees

A restitution order shall include "other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." *See* 18 U.S.C. § 3663(b)(4); *accord* 18 U.S.C. § 3663A(b)(4); *United States v. Bahel*, 662 F.3d 610, 647 (2d Cir. 2011) ("Attorneys' fees are 'other expenses' that are properly included within a restitution award.").  The restitution statutes "give[] the district courts broad authority to determine which of the victim's expenses may be appropriately included in a restitution order," and the Second Circuit has affirmed that "other expenses" incurred during the victim's participation in the investigation or prosecution of the offense may include attorney fees and accounting/auditing costs. *United States v. Battista*, 575 F.3d 226, 233-34 (2d Cir. 2009) (citing

11

*United States v. Amato*, 540 F.3d 153, 159-63 (2d Cir. 2008) (affirming that attorney fees and accounting/auditing costs were a direct and foreseeable result of defendant's offenses)).

As set forth above, the Government has taken a number of steps to notify victims and obtain loss information from them, such as attorney fees and other fees they expended in connection with the Government's investigation and the resulting trial. The Government has received approximately twenty-five responses for restitution in this regard providing legal fee expense amounts and, in some instances, supportive documentation such as invoices.[6] The Government provided copies of the responses to the Court, Defendants and Probation prior to sentencing in the evidence binders, organized by transaction. Such amounts are identified in the Restitution Calculation and Restitution Calculation proof spreadsheets, along with the other three loss categories that the Government identified concerning each fraudulent transaction, and total $661,845.59.

In instances where issuers incurred losses on more than one fraudulent transaction affected by the Defendants' conspiracies, we allocated those losses as follows: where the issuer allocated specific fees to specific transactions, we followed its allocation; where the issuer told us to allocate the fees equally among its transactions, we did so; and where the issuer did not allocate the fees to specific transactions, we allocated them equally among its transactions on the Restitution Calculation spreadsheet.[7] In each case, however, the legal and other fees were incurred by the issuer. Accordingly, where the issuer and victim-payee are the same, any payment that had been made as compensation in parallel civil investigations by other agencies

---

[6] These expenses may include an issuer's costs for collecting and providing documents related to various transactions during the Government's investigation, including transactions involved in this case.

[7] In many, if not all of the latter instances, we advised the issuer of the allocation.

12

was offset against the amount of legal and other fees.  To the extent the issuer and victim/payee
are different, payments made to the victim do not offset legal and other fees incurred by the
issuer.

The Government respectfully submits that the submissions of the issuers concerning
attorney and other fees they incurred as result Defendants' fraud amply supports an order of
restitution with respect to this category of loss.

**2.    All Victims on the Bill of Particulars Are Entitled to Restitution**

Defendants are liable for the losses caused to each entity that was a victim of the conduct
underlying the respective Counts for which the Defendants were convicted.  Section 3663(a)(2)
of Title 18 defines "victim" as a person "directly and proximately harmed as the result of the
commission of an offense."  In cases of conspiracies, such as those charged in this case, a victim
includes any person directly harmed by a defendant's criminal conduct in the course of the
conspiracy.  *Id.*; *see also* 18 U.S.C. § 3663A(a)(2).

The victims are therefore determined by the scope of the underlying criminal conduct,
and are not merely those specifically referenced at trial.  *See* 18 U.S.C. § 3663A(a)(2) ("in the
case of an offense that involves as an element a scheme, conspiracy or pattern of criminal
activity," victims include "any person directly harmed by the defendant's criminal conduct in the
course of the scheme, conspiracy, or pattern"); *United States v. Dupre*, 04 Cr. 267, 2007 WL
1589451 at *5 (S.D.N.Y. June 4, 2007) (holding that restitution was allowed for all losses during
the course of ten-year conspiracy even though the counts of conviction only covered a two-year
period); *United States v. Rand*, 403 F.3d 489, 495-95 (7th Cir. 2005) (reasoning that "while the
conduct underlying a restitution order must be specifically articulated in the charge or plea
agreement, specific victims need not be, especially in a case involving as an element a scheme,

13

conspiracy, or pattern of criminal activity") (internal quotation marks omitted).  As such, the

spreadsheet identifies any person directly harmed by any of the Defendants' conduct, of which

the Government is aware, regardless of whether or not those details were mentioned at trial.

A defendant convicted of a conspiracy should also be ordered to pay restitution to all

victims of the entire scheme, even if he himself had directly participated in conduct that caused

only some of the losses.  *Chu v. United States*, 06 Civ. 13509, 2008 WL 254068, at *2,

(S.D.N.Y. June 24, 2008) ("[A] defendant charged with fraud must make restitution . . . for . . .

all losses caused in the course of a defendant's criminal conduct, whether the defendant is

convicted of each of those offenses or not." (internal quotation marks omitted)).  However, an

order for joint and several liability among defendants is permitted where more than one

defendant contributed to the loss of a victim.  *See* 18 U.S.C. § 3664(h).

As noted in the Restitution Calculation spreadsheet, in many instances there are different

payees for different transactions for bonds issued by a single municipal issuer.  (*compare*

Alabama Housing Finance Authority (South Bay, Ltd.) bid on 12/6/00 *with* Alabama Housing

Finance Authority (Balboa Investment Group III) bid on 3/27/01).  These are instances where the

public or quasi-public issuer issued bonds to help fund different projects.  For example, a state

health facilities authority may have issued bonds to fund multiple, separate hospital projects.  In

these instances, the borrower on the investment agreement is, in most cases, not the issuer itself,

but the hospital that was carrying out the project.  In such cases, the victim is the ultimate

borrower on the investment agreements, rather than the issuer itself, as it is the entity that lost

money as a result of Defendants' conduct.[8]  The Government has identified victims as payees in

---

[8]   Some of these different projects were the subject of testimony at trial.  For example,
MOHEFA issued bonds to help fund a variety of projects, including a project at the St. Louis

14

its Restitution Calculation and Restitution Ordered spreadsheets from the investment agreements or bid specifications for each transaction.  In some instances, the issuer and payee are the same.

The conspiracies charged in this case were multi-year conspiracies.  Following the return of the Superseding Indictment, the Government provided Defendants with a Bill of Particulars identifying over 220 transactions the Government alleged were affected by each conspiracy.  At trial, the Government elicited testimony concerning the inception, parameters and participants in each charged conspiracy, as well as evidence of a limited number of transactions (approximately 31 in total) related to each conspiracy.  However, as noted earlier, restitution should not be limited to the 31 issuers whose transactions were featured at trial as examples of the charged conspiracies, but should be available to all of the issuers listed on the Bill of Particulars who suffered a loss as the result of Defendants' criminal conduct.

Accordingly, the Government respectfully submits that all the victims identified in the Bill of Particulars suffered actual losses and are entitled to restitution in the amounts identified.

### D.  POTENTIAL OFFSETS

As noted above, any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victims in any Federal civil proceeding, and in any State civil proceeding to the extent provided by the law of the State.  18 U.S.C. § 3664(j)(2).  Separate from this criminal prosecution, there were parallel civil investigations by other agencies which resulted in settlements with several financial institutions.  The methodologies for calculating the settlements vary by each agency and the statutory or regulatory schemes each agency enforces, and thus are not identical to the

---

College of Pharmacy bid out by CDR.  *See, e.g.* Testimony of Wolmark about St. Louis, Tr. at 1393-94; Testimony of Naeh about 2002 MOHEFA transaction, Tr. at 726-51.

Government's calculations in this criminal proceeding. In many respects, comparing the regulatory settlements and offsets and losses identified by the Government is akin to comparing apples to oranges. Nevertheless, the Government has attempted to determine compensatory damages paid to the victims of Defendants' offenses through these settlements that would require a reduction in the amount of payment of restitution the Court orders. It is important to note, however, that Defendant Steven Goldberg's former employer, FSA, has not settled with any regulatory agency or any state agency. The Government discusses each source of potential offsets of which it is aware below.

1.     **United States Securities and Exchange Commission Judgment Payments**

The Government has obtained settlement information pertaining to judgments entered in actions by the United States Securities and Exchange Commission (SEC) against the following entities: General Electric, UBS, Bank of America, Wachovia and JP Morgan. We are providing copies of the judgments with this submission as Attachments C1-C5. These judgments provide for payments exceeding $30 million and contain amounts that have been paid regarding approximately 110 of the transactions on the BOP (excluding Count Three).[9]

It is the Government's understanding that the amounts set out and paid pursuant to the SEC judgments were not based on loss, but, rather, were based on disgorgement of profits, interest and, in some cases, penalties. The Government understands that the amounts paid pursuant to the SEC judgments were proportionate to the the the size of the underlying bond issues

---

[9] The SEC judgments, in certain instances, reflect payments by providers who won a transaction and providers who submitted a courtesy bid on a transaction. The SEC judgment payments also were not limited to the transactions and victims identified in the Bill of Particulars in this case.

16

for identified victims.[10]  For this reason, and not surprisingly, the amounts paid in some instances

are more than the losses identified by the Government and, in some instances, less than the loss

amounts identified by the Government.  The Restitution Calculation spreadsheet (Attachment A-

1), reflects the payments made pursuant to the SEC judgments in the "Total SEC Settlement

Payments" column.  It also identifies as "overpayments" in the "Restitution Due (Overpayment)"

column the instances where the SEC payment exceeds the Government's loss calculation.

At sentencing, defense counsel raised the fact that the SEC payments were in some

instances larger than the Government's loss calculation and argued that the overpayments should

be redistributed to other victims.  (S. Tr. at 65-66).  It is the Government's position that one

victim should not be required to pay losses suffered by a different victim, even if both victims

obtained bond proceeds from the same issuer (in connection with different bond issues).  Each

loss was the result of a different bid, different conduct, and a different investment agreement

entered into with different victims.  For example, bids were submitted to Allegheny County

Hospital Development Authority for projects at the Villa St. Joseph of Baden, Inc. (bid date

6/22/00, Count One), and The Covenant at South Hills, Inc. (bid date 2/26/01, Count One).

Different losses were suffered by the Villa St. Joseph of Baden, Inc. and by The Covenant at

South Hills, Inc. as the result of each bid transaction, and each should not be required to

reimburse the other entity's separate losses with funds from any payment it might receive as

compensation in connection with any civil action.

In those instances where the victim and issuer are identical, however, the Government

has applied the amount of overpayment on that victim-issuer's transactions equally to the losses

---

[10]  The exception to this is Bank of America, which only was required to make disgorgement of its profits.  For this reason, its payments were not based on the size of the bond issue.

in its other transactions which were either not subject to the SEC judgments or were not fully compensated by the SEC judgments. If such reallocation does not fully compensate such victims, the Government has identified the unpaid loss in the last column of the Restitution Calculation spreadsheet (Attachment A-1) "Restitution Due after Distribution of Excess Offset: Restitution Ordered." One example of this is Utah Housing, which is a victim in ten transactions, in Counts One and Five. Utah Housing was overcompensated in connection with the SEC judgments in three transactions. The Government combined the overpayments and applied it equally in the remaining seven transactions, reducing the total loss in those transactions. Another example is Idaho Housing and Finance Association ("Idaho"). Idaho is a victim in thirteen transactions, all related to Count Two. Idaho was compensated in connection with the SEC judgments in connection with all transactions. There were overpayments in seven transactions and underpayments in six transactions. The Government has combined the overpayments and applied them equally across the six undercompensated transactions, resulting in no remaining loss or restitution due.

**2.    State Attorneys General Settlement Payments**

The Government also understands that various state Attorneys General ("AG") have obtained settlement agreements with various providers relating to certain transactions on the Bill of Particulars, which will ultimately compensate additional victims. The Government understands that the amounts in the AG settlements have been calculated on a transaction by transaction basis. Victims have been notified and there is an "opt-in" period. Only when the opt-in period ends are payments made by the provider to all victims who opt in.[11] With regard to

---

[11] In certain instances, including with regard to GE, the opt-in period has been extended.

at least one provider, settlements have been completed and payments to certain victims have
been made. The Government is attempting to obtain information about the payments that have
been made and believes it will receive it within the next several weeks. Other settlements are
expected to be finalized and payments made within the first quarter of 2013. If the Government
receives additional information about such future payments, it will provide that information
promptly to the Court, the Clerk of Court and Defendants. To the extent that such payments are
proper offsets against loss, the Government will advise the Court and recommend that a
satisfaction of judgment be ordered for such amounts.

**3.    Multi-district Civil Class Action Suit**

A class action suit alleging claims and damages for conduct like that for which
Defendants have been convicted has been filed in the Southern District of New York and is
assigned to Judge Victor Marrero. *See In re Municipal Derivatives Antitrust Litigation*, 08-Civ-
2516 (VM). Various providers, including Defendants' former employers, GE and FSA, are
alleged to be defendants and/or co-conspirators in this case. The Government understands that
any settlements or payments in this action will not take place in the near future. Should such
settlements take place and be approved by the Court, certain of the victims in this case may be
eligible to receive payments. Again, the Defendants may be entitled to have the Order of
restitution reduced by a satisfaction of judgment should the victims be made whole for some
losses through this action.

## E. CONCLUSION

The materials the Government has provided to the Court, Defendants and Probation, both prior to sentencing and attached to this Restitution Memorandum, provide a sufficient basis for the Court to order restitution in this case. The Government therefore respectfully requests that the Court issue amended Judgments for each Defendant ordering them to make payment of the restitution amounts sought by the Government to the identified payees, as set out in the accompanying proposed Order and Attachment A-2.

Respectfully submitted,

DEIRDRE A. McEVOY
Chief, New York Field Office
Antitrust Division

Dated: New York, New York
       December 17, 2012

ANTONIA R. HILL
STEVEN TUGANDER
Attorneys, Antitrust Division
U.S. Department of Justice
26 Federal Plaza, Room 3630
New York, New York 10278
(212) 335-8000

20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                         :

          v.                                            :        10-CR-654 (H.B.)

DOMINICK P. CAROLLO,                             :
STEVEN E. GOLDBERG, and
PETER S. GRIMM,                                  :

          Defendants.                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## CERTIFICATE OF SERVICE

I, *Steven Tugander*, hereby certify that a true and correct copy of the Government's
Restitution Memorandum was served on all parties of record by electronic mail, on the following
counsel, this *17th* day of December, 2012.

| | | |
|---|---|---|
| Howard E. Heiss<br>Mark A. Racanelli<br>O'MELVENY & MYERS LLP<br>7 Times Square<br>New York, New York 10036 | John S. Siffert<br>Daniel M. Gitner<br>LANKLER SIFFERT &<br>WOHL LLP<br>500 Fifth Avenue<br>New York, New York 10110 | Walter F. Timpone<br>MCELROY, DEUTSCH,<br>MULVANEY & CARPENTER<br>LLP<br>1300 Mt. Kemble Avenue<br>Morristown, New Jersey 07962 |

                                                                            
NAME